# EXHIBIT A

_____
               )
KSENIIA PETROVA,        )
               )   Case No. 2:25-cv-00240-CR
     Petitioner,     )
               )
               )
               )
               )   **[PROPOSED]**
v.               )
               )   **FIRST AMENDED PETITION FOR**
UNITED STATES DEPARTMENT OF   )   **WRIT OF HABEAS CORPUS**
HOMELAND SECURITY;     )            **AND**
               )   **COMPLAINT FOR DECLARATORY**
KRISTI NOEM, Secretary,    )   **AND INJUNCTIVE RELIEF**
U.S. Department of Homeland Security;  )
               )
PETE R. FLORES, Acting Commissioner,  )
U.S. Customs and Border Protection;   )
               )
JULIO CARAVIA, Director,    )
Boston Logan Airport Port of Entry,   )
U.S. Customs and Border Protection;   )
               )
PAMELA J. BONDI, U.S. Attorney General; )
               )
THERESA MESSIER, Superintendent,   )
Chittenden Regional Correctional Facility, )
South Burlington, VT       )
               )
PAUL CAMPBELL, Warden,    )
Ouachita Correctional Center, Monroe, LA )
               )
KEITH DEVILLE, Warden,    )
Richwood Correctional Center, Monroe, LA )
               )
     Respondents.    )
_____)

## SUMMARY OF THE CASE AND REQUESTED RELIEF

**1.** This is an amended petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief on behalf of Kseniia Petrova, a research scientist at Harvard University, whom the United States government has unlawfully detained for over three months. The detention stems from arbitrary, capricious, and unlawful actions by U.S. Customs and Border Protection (CBP) at Boston Logan Airport on February 16, 2025.

**2.** The original petition was filed on February 23, 2025, while Ms. Petrova was detained at the Chittenden Regional Correctional Facility in Vermont. It invoked habeas jurisdiction under 8 U.S.C. § 1252(e)(2), based on the government's assertion that Ms. Petrova had been ordered removed under the expedited removal statute, 8 U.S.C. § 1225(b)(1)(A)(i). The petition accordingly sought the limited relief authorized by § 1252(e)(4)(B).

**3.** The government has now conceded that no expedited order of removal was ever issued against Ms. Petrova. As such, she is not subject to the limitations set forth in § 1252(e)(4)(B) and now seeks immediate release under 28 U.S.C. § 2241.

**4.** Respondents have repeatedly confirmed that CBP's decision to deem Ms. Petrova inadmissible and to cancel her J-1 visa was based on her failure to declare research materials she was transporting from *Institut Curie* in France to her lab at Harvard University.

**5.** Ms. Petrova's subsequent detention by U.S. Immigration and Customs Enforcement (ICE) resulted directly from CBP's inadmissibility finding and visa cancellation. Because CBP lacked a lawful basis for either action, Ms. Petrova challenged the resulting ICE detention as blatantly unlawful.

**6.** On May 14, 2025—less than two hours after this Court set a bail hearing to consider Ms. Petrova's release—the U.S. Department of Justice initiated her arrest and transfer from ICE to

U.S. Marshals custody. Simultaneously, U.S. Department of Homeland Security (DHS) lodged an immigration "detainer" expressly designed to ensure Ms. Petrova's re-detention by ICE upon any release from criminal custody.

7.     Upon information and belief, Ms. Petrova is currently detained at the Ouachita Correctional Center in Monroe, Louisiana. On May 15, 2025, the United States District Court for the Western District of Louisiana issued an Order of Commitment to Another District, directing the U.S. Marshals to transport her to Boston, Massachusetts, to face a criminal charge of smuggling—based on the same alleged failure to declare the research samples Ms. Petrova had in her possession on February 16, 2025, at Logan Airport.

8.     This Court should exercise its authority to enjoin DHS from re-detaining Ms. Petrova upon her potential release on bail from criminal custody. Alternatively, this Court should prohibit her transfer outside New England—away from her immigration and criminal counsel, her colleagues at Harvard University, and potential witnesses relevant to her removal proceedings in immigration court—if she is re-detained by ICE.

## JURISDICTION

9.     This action arises under the Constitution of the United States, the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*., and the Tariff Act of 1930, 19 U.S.C. §§ 1202.

10.    This Court has habeas jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), and Article I, § 9, cl. 2 of the United States Constitution (Suspension Clause). The Court may grant habeas relief pursuant to 28 U.S.C. § 2241 *et seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the All Writs Act, 28 U.S.C. § 1651.

11.    This Court also has subject matter jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., and 28 U.S.C. § 1331 (federal question). The APA directs that courts "shall

hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 702(2)(A). The Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. §§ 702, 706; 28 U.S.C. §§ 2201–02; and 28 U.S.C. § 1651. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

12.     This Court has jurisdiction over the alleged FOIA violation under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, *et seq*., 28 U.S.C. § 1331 (federal question), and 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act). CBP's failure to make a determination on Petitioner's properly filed FOIA request within the statutory time period constitutes a constructive denial of her FOIA request. Thus, Petitioner is deemed to have exhausted her administrative remedy. 5 U.S.C. § 552(a)(6)(C)(i).

## **VENUE**

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because this civil action is brought against officers or employees of the United States, and Petitioner was detained at the Chittenden Regional Correctional Facility in South Burlington, Vermont—within the jurisdiction of this District—at the time of the initial filing. Although Petitioner was subsequently transferred outside this District, this Court retains jurisdiction under *Ex parte Endo*, 323 U.S. 283, 306 (1944); *see also Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004) ("Endo stands for the important but limited proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction.").

## REQUIREMENTS OF 28 U.S.C. § 2243

14.     With respect to Petitioner's habeas claim, the Court must grant the petition for writ of habeas corpus or issue an order to show cause (OSC) to Respondents "forthwith," unless Petitioner is not entitled to relief. 28 U.S.C. § 2243. If an OSC is issued, the Court must require Respondents to file a return "within *three days* unless for good cause additional time, not exceeding twenty days, is allowed." *Id.* (emphasis added).

15.     Courts have long recognized the significance of the habeas statute in protecting individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most important writ known to the constitutional law of England, affording as it does a *swift* and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

## PARTIES

16.     Petitioner Kseniia Petrova is native of Russia and a resident of Boston, Massachusetts. She has been conducting research at Harvard University since May 2023 pursuant to a valid J-1 exchange visitor visa. She is currently detained at the Ouachita Correctional Center in Monroe, Louisiana.

17.     Respondent U.S. Department of Homeland Security is the federal agency responsible for implementing and enforcing the Immigration and Nationality Act and the Tariff Act of 1930. DHS oversees its component agencies, including U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement. Relevant here, CBP is responsible for the inspection and admission of noncitizens arriving in the United States, and ICE is responsible for the detention and removal of noncitizens.

18.     Respondent Kristi Noem is sued in her official capacity as the Secretary of the U.S.

Department of Homeland Security (DHS). In this capacity, she is responsible for the implementation and enforcement of the Immigration and Nationality Act and Tariff Act of 1930. Secretary Noem is responsible for the oversight of CBP and ICE, and is a legal custodian of Ms. Petrova.

19.     Respondent Pete R. Flores is sued in his official capacity as Acting Commissioner of the U.S. Customs and Border Protection, a component agency of DHS. Mr. Flores has served as the Acting Commissioner of CBP since January 20, 2025, overseeing all CBP operations nationwide.

20.     Respondent Julio Caravia is sued in his official capacity as the Director of the Boston Logan Airport Port of Entry, U.S. Customs and Border Protection. As Port Director, Mr. Caravia is responsible for CBP operations at Boston Logan International Airport in Boston, Massachusetts.

21.     Respondent Theresa Messier is the Superintendent of the Chittenden Regional Correctional Facility.  When the initial complaint was filed, Superintendent Messier had physical custody of Ms. Petrova pursuant to the facility's contract with ICE to detain noncitizens.

22.     Respondent Paul Campbell is the Warden of the Ouachita Correctional Center in Monroe, Louisiana.  Because Petitioner is currently detained at that facility, Warden Campbell is her immediate custodian for purposes of this action.

23.     Respondent Keith Deville is the Warden of the Richwood Correctional Center, Monroe, Louisiana.  Upon information and belief, Petitioner was continuously detained at the Richwood Correctional Center from February 24, 2025 to May 14, 2025 and is likely to be returned to that facility upon release from criminal custody.

## LEGAL FRAMEWORK

### *Process and Penalties for Failure to Declare*

24.     The law governing the process and penalties for failure to declare an article on a customs

form or upon interrogation at the time of entry to the United States is the Tariff Act of 1930, also

known as the Smoot-Hawley Act. Pursuant to 19 U.S.C. § 1497, the statute provides:

> (a) In general
> (1) Any article which—
> (A) is not included in the declaration and entry as made or transmitted; and
> (B) is not mentioned before examination of the baggage begins—
> (i) in writing by such person, if written declaration and entry was required, or
> (ii) orally, if written declaration and entry was not required;
>
> shall be subject to forfeiture and such person shall be liable for a penalty determined under paragraph (2) with respect to such article.
> (2) The amount of the penalty imposed under paragraph (1) with respect to any article is equal to—
> (A) if the article is a controlled substance, either $500 or an amount equal to 1,000 percent of the value of the article, whichever amount is greater; and
> (B) if the article is not a controlled substance, the value of the article.

25.     The implementing regulations provide that CBP may seize "[a]ny article in the baggage

of a passenger arriving from a foreign country which is not declared" and "the personal penalty

prescribed by section 497, Tariff Act of 1930 (19 U.S.C. 1497), *shall* be demanded from the

passenger." 19 C.F.R. § 148.18(a) (emphasis added). If CBP elects not to seize the article, "a

claim for the personal penalty *shall* be made against the person who imported the article without

declaration." *Id.* (emphasis added).

26.     The regulations and guidelines further permit remission or mitigation of liability. Thus,

CBP is authorized to reduce or forgo the personal penalty and forfeiture of property. 19 C.F.R. §

148.18(b); Guidelines for Disposition of Violations of 19 U.S.C. 1497, available at

https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/Mitigation-Guidelines-Seizures-Penalties-Passenger-Failure-to-Declare.pdf (last visited on Feb. 23, 2025); Appendix A to Part 171—Guidelines for Disposition of Violations of 19 U.S.C. 1497, available at https://www.ecfr.gov/current/title-19/chapter-I/part-171/appendix-Appendix%20A%20to%20Part%20171 (last visited on May 21, 2025).

27.    The two penalties for failure to declare—seizure of the undeclared item and a monetary penalty under 19 U.S.C. § 1497—are confirmed in the "You Have Arrived" video posted by the U.S. Customs and Border Protection on YouTube: https://www.youtube.com/watch?v=WHt2xnXk8AI (last visited on May 21, 2025).

### *Smuggling (18 U.S.C. § 545)*

28.    18 U.S.C. § 545 criminalizes the unlawful importation of "merchandise" into the United States and penalizes the knowing receipt, concealment, or sale of such unlawfully imported goods:

> Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—
>
> Shall be fined under this title or imprisoned not more than 20 years, or both.

29.    When the inspecting CBP officer determines that there is a potential for a criminal charge due to a passenger's failure to declare an item, the usual protocol is for the CBP officer to summon the duty agent of the ICE Homeland Security Investigations (HSI) stationed at the port

of entry. **Exhibit A**, **Declaration of Peter A. Quinter**. The HSI agent then interviews the passenger and decides, sometimes after a consultation with a duty attorney at the local U.S. Attorney's Office, whether criminal charges should be pursued against the passenger. *Id*.

### *Expedited Removal Process*

**30.**     The expedited removal statute provides a process for removing noncitizens from the United States in an expedited fashion without the commencement of removal proceedings against the noncitizen. The process begins—and often effectively concludes—with an inspection by an ICE or CBP immigration officer. The officer must, first, determine if the individual is a noncitizen who is inadmissible because he or she has engaged in fraud to obtain an immigration benefit or lacks valid entry documents. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

**31.**     If the officer concludes that the individual is inadmissible under one of those two grounds (i.e., either fraud to obtain an immigration benefit or lack of valid entry documents)*,* the officer "shall," with the concurrence of a supervisor, 8 C.F.R. § 1235.3(b)(7), order the individual removed "without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

**32.**     At any time during the expedited removal process, the officer may permit the individual to withdraw her application for admission and allow the person to depart the country without issuing an expedited removal order. 8 U.S.C. § 1225(a)(4).

**33.**     For those who express a fear of return to their countries of origin, the expedited removal statute provides a limited additional screening. But the additional screening does not remotely approach the type of process that asylum seekers receive in regular immigration proceedings before an immigration judge under 8 U.S.C. § 1229a.

34.     During the inspection process, if an individual indicates an intention to apply for asylum or expresses fear of return to his or her country of origin, the immigration officer must refer the individual for a rudimentary screening interview with an asylum officer, referred to as a "credible fear" interview, to determine whether the expedited removal process should be placed on hold while the individual petitions for asylum and related humanitarian relief. 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. §§ 235.3(b)(4), 208.30(d)–(e). In order for the expedited removal process to be suspended, the noncitizen must show "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Noncitizens who satisfy the credible fear standard after the issuance of an expedited removal order have their expedited removal orders canceled by operation of law and are placed into removal proceedings under 8 U.S.C. § 1229a, where they have the opportunity to apply for asylum and other relief from removal, present and cross-examine evidence before an immigration judge (IJ), preserve objections, and appeal any adverse decision to the Board of Immigration Appeals and court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

35.     Applicants whom ICE has deemed to have not satisfied the credible fear standard may request review of the decision by an IJ, but are not entitled to a full hearing or any subsequent administrative appellate review. 8 U.S.C. § 1225(b)(1)(B)(iii)(II)–(III); *see also* 8 C.F.R. § 208.30(g)(1).

36.     During the inspection and credible fear stages of expedited removal, DHS typically detains the noncitizen. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii), (iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii). In *Jennings v. Rodriguez*, the Supreme Court held that individuals in expedited removal who

demonstrate a credible fear are not statutorily eligible for bond hearings. 583 U.S. 281, 297-303 (2018).

37.     At any time during the credible fear stages of expedited removal, ICE has discretionary authority to release noncitizens on parole, provided they "present neither a security risk nor a risk of absconding." *See* 8 U.S.C. § 1182(d)(5), 8 C.F.R. 212.5(b).

### *Visa Cancellations by CBP Officers*

38.     Pursuant to 8 U.S.C. § 1201(i), the authority to revoke and/or cancel properly issued visas rests with consular officials or the Secretary of State: "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation."

39.     Immigration officers in the United States have limited authority "to revoke a valid visa by physically canceling it" in nine distinct instances described in 22 C.F.R. § 41.112(e). Relevant here, an immigration officer is authorized to revoke a visa when the noncitizen is "removed from the United States pursuant to [8 U.S.C. § 1225(b)]" or when the noncitizen "requests and is granted permission to withdraw the application for admission." 22 C.F.R. § 41.112(e)(2), (e)(3).

### *Freedom of Information and Privacy Act*

40.     FOIA requires each agency, upon a request for records: (a) to conduct a search reasonably calculated to uncover all responsive documents; (b) to make the records available in the form or format requested if they are readily reproducible in that format; and (c) to promptly make available responsive records. 5 U.S.C. § 552(a)(3)(A)–(C).

41.     FOIA also requires the agency to make a determination of whether it will comply with the request within 20 business days. 5 U.S.C. § 552(a)(6)(A)(i); 6 C.F.R. § 5.6(c).

**42.**     If the agency finds that unusual circumstances apply, it must request, by written notice, no more than an additional 10 business days to issue its determination. 5 U.S.C. § 552(a)(6)(B)(i).

**43.**     If an agency fails to comply with the time periods set forth in the statute, the requester is "deemed to have exhausted his administrative remedies" and may seek judicial review. 5 U.S.C. § 552(a)(6)(C)(i).

## STATEMENT OF FACTS

**44.**     Kseniia Petrova is a 30-year-old research scientist born in Russia. On May 11, 2023, she entered the United States on a valid J-1 visa. A J-1 visa is a non-immigrant visa that allows people to participate in exchange visitor programs in the United States. The programs are intended to promote cultural exchange and international cooperation. Research scholars and professors regularly hold J-1 status.

**45.**     Ms. Petrova has been conducting groundbreaking scientific research at Harvard University in the fields of embryology and the biology of aging. The research she has been conducting "is essential for understanding how cells and organisms develop, grow, and age, and how these processes go awry in diseases, including cancers." **Exhibit C**, **Letter from Martin Chalfie**.

**46.**     Since May 2023, Ms. Petrova has traveled in and out of the United States on several occasions without issue. She has never violated the terms or conditions of her nonimmigrant status.

**47.**     On or about January 23, 2025, Ms. Petrova traveled to Europe on vacation.

**48.**     Prior to her return from the trip, Dr. Leon Peshkin—Ms. Petrova's boss at Harvard University—asked her to bring histological samples of frog embryos from his scientific

collaborators at the *Institut Curie* in France back to Harvard, so that their lab could continue processing and analyzing data from them.

49.    The samples were non-hazardous, noninfectious, and non-toxic, intended solely for fundamental research purposes. The embryos were non-living, embedded in paraffin, and "incapable of growing or transmitting disease. (Similar material can be found in high school and college biology laboratories throughout the United States.)." **Exhibit A**.

50.    Under applicable customs laws and regulations, the embryos were not classified as prohibited items and did not require a permit for importation into the United States. **Exhibit B, Declaration of U.S. Customs Broker**.

51.    Dr. Peshkin's request for Ms. Petrova to transport the samples in person stemmed from his prior experience in shipping similar samples that were either seriously delayed or lost in transit. Dkt. 1-2.

52.    Having no prior experience transporting research samples, Ms. Petrova was unfamiliar with U.S. customs requirements regarding these samples. She placed the samples in her luggage, and did not declare them to CBP at the time of her entry on Sunday, February 16, 2025, at Boston Logan International Airport.

53.    At the airport, Ms. Petrova presented her valid J-1 visa to the inspecting CBP officer, who verified her documentation and continuous J-1 status. The officer then placed an admission stamp in her passport, indicating her admission to the United States as a J-1 visa holder. Around the same time, CBP generated an I-94 Record of Admission for Ms. Petrova in accordance with standard CBP protocols.

54.    At the luggage conveyor belt, Ms. Petrova was approached by another CBP officer and escorted to a room for examination of her luggage.

55.     Upon discovery of the samples following a search of her luggage, the CBP officer failed to pursue the statutory and regulatory process for failure to declare an article in luggage. Ms. Petrova was neither served with any customs-related documentation nor issued a penalty under 19 U.S.C. § 1497 for failure to declare an article in her possession.

56.     Because Ms. Petrova's research samples were seized, the CBP officer was required to "refer the matter to the nearest CBP Fines, Penalties, and Forfeitures Office, which would issue a formal Notice of Seizure." **Exhibit A**. CBP has never provided a Notice of Seizure to Ms. Petrova or her counsel.

57.     Instead of following the statutory and regulatory requirements to address Ms. Petrova's alleged customs violation, the officer referred Ms. Petrova to another CBP officer who conducted a second interview into her immigration status, a process commonly referred to as "secondary inspection."

58.     This "secondary" officer asked Ms. Petrova a series of purely customs-related questions, and then abruptly declared Ms. Petrova "inadmissible pursuant to INA 212(a)(7)(A)(i)(I) as an immigrant without a valid and unexpired immigrant document." (*See* Dkt. 24 at 14)

59.     The "secondary" officer, or another CBP officer at Logan, then marked the J-1 visa in Ms. Petrova's passport as "CANCELLED – BOS." **Exhibit D**, **Canceled J-1 Visa**. Upon information and belief, the J-1 admission stamp in Ms. Petrova's passport was also canceled, as was her I-94 Record of Admission, as per CBP's protocol.

60.     After putting the "CANCELLED – BOS" stamp on Ms. Petrova's visa, the CBP officer added some handwritten notations on the face of the canceled visa. Id. These notations reference 22 C.F.R. § 41.122—which allows immigration officers to cancel a visa for someone "who requests and is granted permission to withdraw the application for admission"—and 8 U.S.C. §

14

1182(a)(7)(A)(i)(I), which renders inadmissible "any immigrant …who is not in possession of a valid unexpired immigrant visa."

**61.** The handwritten notations did not include any reference to 8 U.S.C. § 1182(a)(7)(B) which renders inadmissible "any *nonimmigrant* who… is not in possession of a valid *nonimmigrant* visa…"

**62.** There was no legal basis for the CBP officer to cancel Ms. Petrova's valid, unexpired J-1 visa. Ms. Petrova was never granted permission to withdraw her application for admission. *See* 22 C.F.R. § 41.112(e)(3). She had always maintained her lawful nonimmigrant status and had been previously inspected and admitted to the United States as a bona fide nonimmigrant on multiple occasions.

**63.** When announcing the filing of the criminal complaint against Ms. Petrova on May 14, 2025, the United States Attorney for the District of Massachusetts once again confirmed that Ms. Petrova's visa was canceled as a result of her customs violation. U.S. Attorney's Office, District of Massachusetts. (May 14, 2025). *Russian National Charged with Smuggling Biological Material Into Boston* [Post]. https://x.com/DMAnews1/status/1922765637815849015 (last visited on May 21, 2025).

**64.** After declaring Ms. Petrova inadmissible, the "secondary" officer presented Ms. Petrova with a choice: to withdraw her application for admission and apply for a new visa overseas or be subjected to expedited removal and barred from admission to the United States for five years.

**65.** Ms. Petrova requested that her admission be withdrawn and asked to return to Paris, France, from whence her journey originated.

**66.** Ms. Petrova has a valid Schengen visa (which allows her entry to 29 countries in Europe, including France). **Exhibit E**, **Petitioner's Schengen Visa**.

**67.** Instead of granting Ms. Petrova permission to withdraw her application for admission, the CBP officer then asked her: "Would you like the U.S. government to contact the Russian government to let them know you are here?" Dkt. 24 at 15.

**68.** Ms. Petrova requested that the Russian government not be contacted and indicated that she had a fear of returning to Russia, stating "I am afraid the Russian Federation will kill me for protesting against them." *Id*.

**69.** At this point CBP apprehended and detained Ms. Petrova.

**70.** CBP then issued Form I-860 (Notice and Order of Expedited Removal) alleging that Ms. Petrova is subject to expedited removal under 8 U.S.C. § 1225(b)(1) for being inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for being "an immigrant not in possession of a valid, unexpired immigrant visa." Dkt. 1-4. As a justification for the inadmissibility finding, the notice stated that Ms. Petrova was "an intending immigrant …as [she] claimed credible fear to return to [her] home country of Russia," *id.,* even though Ms. Petrova did not express a fear of the Russian Federation until *after* the CBP officer had made the inadmissibility finding. Dkt. 24 at 14-15.

**71.** The bottom portion of the Form I-860, containing the expedited removal order to be signed by a supervisory officer, was never completed. *Id*.

**72.** On February 17, 2025, Ms. Petrova was transferred to ICE custody and transported to the Chittenden Regional Correctional Facility in South Burlington, Vermont, purportedly to await her credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii).

**73.** On February 21, Petitioner's counsel submitted a request for parole under 8 U.S.C. § 212(d)(5), along with supporting documentation demonstrating that Ms. Petrova poses neither a danger to the community nor a flight risk. The request was submitted to the Acting Director of the ICE's Boston Enforcement and Removal Operations (ERO) Field Office, which has

jurisdiction over detainees at the Chittenden Regional Correctional Facility. Dkt. 32-2. The supporting materials included affidavits from Ms. Petrova's friends and colleagues, a letter from her landlord, a letter from Senator Edward Markey, and other documentation attesting to her exemplary character and community ties. *Id*. The Boston ERO Field Office has never responded to this request.

74. On February 23, 2025, Petitioner filed a petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief with this Court. Dkt. 1.

75. On February 24, 2025, with no notice to her counsel, Petitioner was transferred to the Richwood Correctional Center in Monroe, Louisiana.

76. Petitioner was never afforded an opportunity to have a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii). Instead, ICE served her with a Notice to Appear and placed her in full removal proceedings under 8 U.S.C. § 1229a, in an attempt to moot both her habeas petition and her mandamus claim before this Court. Dkt. 24 at 24, ¶ 5.

77. On March 13, 2025, Petitioner's counsel submitted a second request for parole under 8 U.S.C. § 212(d)(5), along with supporting documentation demonstrating that Ms. Petrova poses neither a danger to the community nor a flight risk. The request was submitted to the deportation officer assigned to Ms. Petrova's case. The supporting materials again included affidavits from Ms. Petrova's friends and colleagues, a letter from her landlord, and other documentation attesting to her exemplary character and community ties. *Id*.

78. On March 14, 2025, ICE denied Ms. Petrova's parole request citing concerns that she posed a flight risk. Dkt. 32-3.

**79.**     After several reconsideration requests by Petitioner's counsel, ICE produced a new

decision dated March 30, 2025, denying Ms. Petrova's request for release on parole, this time

finding that Ms. Petrova is not only a flight risk, but a danger to the community. Dkt. 32-4.

**80.**     On April 10, 2025, Petitioner's counsel submitted a request under the Freedom of Information

Act (FOIA) to U.S. Customs and Border Protection, seeking "any and all records regarding [Ms.

Petrova's] entry/admission at Boston Logan Airport …on February 16, 2025" and "any and all

records related to an alleged customs violation on or around February 16, 2025." **Exhibit F**,

**Confirmation of FOIA Submission**.

**81.**     CBP has not responded to the FOIA request.

**82.**     On May 14, 2025—within two hours of this Court setting a bail hearing to consider Ms.

Petrova's release—the U.S. Department of Justice initiated her arrest and transfer from ICE

custody into the custody of the United States Marshals Service.

**83.**     On the same day, the government unsealed a criminal complaint charging Ms. Petrova with

smuggling—based on the same alleged failure to declare the research samples that she had in her

possession on February 16, 2025, at Logan Airport. **Exhibit G**, **Criminal Complaint and Affidavit**.

**84.**     Simultaneously, the U.S. Department of Homeland Security (DHS) issued a

memorandum stating that ICE has "lodged an immigration detainer" in Ms. Petrova's case. Such

"detainer" requires U. S. government agencies, including the Federal Bureau of Prisons and the

U. S. Marshalls Service, to turn Ms. Petrova over to ICE to be re-detained in immigration

custody upon any release from criminal custody. **Exhibit H**, **United States Government**

**Memorandum**.

**85.**     The same U.S. Government memorandum acknowledges that Ms. Petrova "does not pose

a danger to the community," directly contradicting ICE's March 30, 2025 determination. *Id*.

86.    In its motion to seal the complaint filed on May 12, 2025—while Petitioner remained in ICE custody at the Richwood Correctional Center—the government claimed that that public disclosure of the criminal complaint might jeopardize...the government's ability to arrest the defendant." **Exhibit I**, **Motion to Seal Complaint**.

87.    Upon information and belief, Ms. Petrova is currently detained at the Ouachita Correctional Center in Monroe, Louisiana. On May 15, 2025, the United States District Court for the Western District of Louisiana issued an Order of Commitment to Another District, directing the U.S. Marshals to transport her to Boston, Massachusetts.

88.    On May 18, 2025, Petitioner's counsel contacted counsel for DHS and offered to postpone the bail hearing scheduled for May 28, 2025, if DHS would agree not to re-detain Ms. Petrova following her potential release from criminal custody.

89.    On May 20, 2025, counsel for DHS responded as follows: "DHS advised that it may detain Ms. Petrova as part of her ongoing removal proceedings if she is released from pre-trial criminal custody…"

90.    On information and belief, and consistent with ICE's policy and practice of transferring detained noncitizens to larger immigration facilities in the Southern part of the United States, ICE is likely to transfer Ms. Petrova—upon her release from criminal custody—from Massachusetts back to the Richwood Correctional Center or a similar facility in a "jurisdiction that is more favorable to the Trump administration deportation agenda." **Exhibit J**, **Senators' Letter to DHS**.

91.    If Ms. Petrova is re-detained by ICE, there is a substantial risk that she will be unlawfully removed to Russia, as a result of ICE's documented failures to comply with applicable immigration laws and federal court orders. As the latest example, on May 21, 2025, ABC News

reported that the Department of Homeland Security unlawfully deported eight migrants to South Sudan in violation of a federal court order.[1]

92.     Ms. Petrova's continued detention and her absence from the research group at Harvard is harming the research being conducted and the public interest in the potentially ground-breaking results of that research. "[Ms. Petrova] brings important skills and talents to our country that enrich our labs, spark innovation, and advance research and development." **Exhibit C**.

## CLAIMS FOR RELIEF

### COUNT ONE

### Violation of Administrative Procedure Act 5 U.S.C. § 706

93.     Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

94.     Upon discovering that Ms. Petrova failed to disclose the research samples, CBP was required to follow the process set forth in 19 U.S.C. § 1497, its implementing regulations, and associated guidelines. This process is mandatory.

95.     CBP had no authority to bypass this mandatory process in favor of an entirely different enforcement process.

96.     CBP had no authority to declare Ms. Petrova inadmissible for her alleged customs violation because a customs violation is not a ground of inadmissibility under section 212 of the Immigration and Nationality Act (8 U.S.C. § 1182). In finding Ms. Petrova inadmissible for the alleged customs violation, CBP action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

---

[1]      Quinn Owen, *8 Migrants Deported to South Sudan Despite Court Order, Officials Confirm*, ABC News (May 21, 2025), https://abcnews.go.com/Politics/8-migrants-south-sudan-deportation-flight-officials-confirm/story?id=122033692.

right," and "(D) without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(A)-(D).

97.     CBP had no authority to <u>cancel Ms. Petrova's valid nonimmigrant visa</u>. In so doing, CBP action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "(D) without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(A)-(D).

98.     CBP had no authority to <u>cancel Ms. Petrova's admission stamp and her Form I-94 Record of Admission</u> for her alleged customs violation. In so doing, CBP action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "(D) without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(A)-(D).

99.     Because CBP had no authority to revoke Ms. Petrova's valid nonimmigration visa, find her inadmissible, and cancel her admission stamp and her Form I-94 Record of Admission, this Court must find that CBP acted unlawfully and set aside the unlawful actions pursuant to 5 U.S.C. § 706(2).

## COUNT TWO

**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Conduct an Adequate Search for Responsive Records**

100.    Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

101.    CBP is obligated under 5 U.S.C. § 552(a)(3) to conduct a reasonable search for records responsive to Petitioner's FOIA request submitted on April 10, 2025.

**102.** Petitioner has a legal right to obtain such records, and no legal basis exists for Respondents' failure to search for them.

**103.** CBP's online portal indicates that the agency has not begun a search of its records.

**104.** CBP's failure to conduct a reasonable search for records responsive to Petitioner's FOIA request violates, at a minimum, 5 U.S.C. § 552(a)(3)(C), as well as the regulations promulgated thereunder.

**COUNT THREE**

**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Disclose Responsive Records**

**105.** Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

**106.** CBP is obligated under 5 U.S.C. § 552(a)(3) to promptly produce records responsive to Petitioner's FOIA request.

**107.** Petitioner has a legal right to obtain such records, and no legal basis exists for Respondents' failure to disclose them.

**108.** CBP's failure to disclose all responsive records violates, at a minimum, 5 U.S.C. § 552(a)(3)(A), as well as the regulations promulgated thereunder.

**COUNT FOUR**

**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Timely Respond**

**109.** Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

**110.** CBP is obligated under 5 U.S.C. § 552(a)(6)(A)(i) to promptly produce records responsive to Petitioner's FOIA request.

**111.** CBP has not made a determination on Petitioner's FOIA request within the statutory time period under FOIA.

**112.**    Petitioner has a legal right to obtain such records, and no legal basis exists for Respondents' failure to disclose them.

**113.**    CBP's failure to disclose all responsive records within the statutory time period violates, at a minimum, 5 U.S.C. §§ 552(a)(3)(A) and (a)(6)(A), as well as the regulations promulgated thereunder.

**COUNT FIVE**

**Violation of Due Process**

**114.**    Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

**115.**    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

**116.**    CBP's unlawful actions in revoking Ms. Petrova's valid nonimmigrant visa and canceling her admission stamp and Form I-94 Record of Admission without any basis in law or fact violate Ms. Petrova's right to Fifth Amendment due process.

**117.**    In light of CBP's clearly erroneous actions at Logan Airport on February 16, 2025, the government's decision to continue detaining Ms. Petrova for over three months—despite overwhelming evidence that she poses no danger to the community or risk of flight—violates her right to Fifth Amendment due process.

**118.**    The government's decision to initiate criminal prosecution against Ms. Petrova to obtain leverage in her immigration case is appalling, unbecoming of the U.S. government, and violates Ms. Petrova's right to Fifth Amendment due process.

## PRAYERS FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1)    Assume jurisdiction over this matter;

(2)    Declare CBP's finding of inadmissibility against Ms. Petrova unlawful and set it aside;

(3)    Declare CBP's revocation of Ms. Petrova's valid nonimmigrant visa unlawful, set it aside, and order Respondents to reinstate it;

(4)    Declare CBP's cancellation of Ms. Petrova's valid admission stamp unlawful, set it aside, and order CBP to issue a new admission stamp dated February 16, 2025;

(5)    Declare CBP's cancellation of Ms. Petrova's Form I-94 Record of Admission unlawful, set it aside, and order CBP to create a new I-94 record of admission under 8 C.F.R. § 101.2 and in accordance with CBP protocol (*see CBP Inspector's Field Manual* § 15.12(b));

(6)    Declare that after the inadmissibility finding has been set aside, and the revocation of Ms. Petrova's visa has been set aside, and the cancellation of Ms. Petrova's admission stamp has been set aside, and the cancellation of Ms. Petrova's Form I-94 Record of Admission has been set aside, Ms. Petrova is, by law, lawfully admitted to the United States in J-1 visa status;

(7)    Order CBP to conduct a search for any and all records responsive to Petitioner's FOIA request and demonstrate that it employed search methods reasonably likely to lead to the discovery of records responsive to Petitioner's FOIA request;

(8)    Order Defendant to produce, by a date certain, any and all non-exempt records responsive to Petitioner's FOIA request and a *Vaughn* index of any responsive records withheld under claim of exemption;

(9)    Issue an Order to Show Cause ordering Respondents to show cause why Ms. Petrova's habeas petition should not be granted;

(10)    Order Ms. Petrova's immediate release from custody;

(11)    Issue an Order enjoining Respondents from re-detaining Petitioner upon release from criminal custody;

(12)    In the alternative, issue an order enjoining Respondents from transferring Petitioner outside of the six New England states of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine;

(13)    Award Petitioner attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

(14)    Award Petitioner attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and on any other basis justified under law; and

(15)    Grant any further relief this Court deems just and proper.


Dated: May 22, 2025                                    Respectfully submitted,

/s/ *Brian Scott Green*                                /s/ *Gregory Romanovsky**
Brian Scott Green                                     Gregory Romanovsky
Law Office of Brian Green                             Romanovsky Law Offices
9609 S University Boulevard #630084                   12 Marshall Street
Highlands Ranch, CO 80130                             Boston, MA 02108
(443) 799-4225                                        (617) 787-0000
briangreen@greenusimmigration.com                    gr@romanovskylaw.com

                                                      *Admitted pro hac vice*

*Attorneys for Petitioner*

# EXHIBIT A

## DECLARATION OF PETER A. QUINTER

I, Peter A. Quinter, Esq., declare:

1.　I am the Shareholder in Charge of the U.S. Customs and International Trade Law Group at Gunster, a nationally recognized law firm with 13 offices throughout the State of Florida. Prior to joining Gunster, I was a partner at a major commercial law firm, and head of its U.S. Customs and International Trade Law practice. I am Board Certified in International Law by the Florida Bar.

2.　I have practiced U.S. Customs and International Trade Law for over 30 years, advising individuals and companies involved in the wide variety of legal issues related to international trade and transportation. I am ranked both globally and in the United States in the prestigious Chambers USA and Chambers Global legal directories as a premier U.S. Customs and International Trade attorney.

3.　One of the main areas of my expertise is regulatory compliance and enforcement by the U.S. Department of Homeland Security (DHS) including U.S. Customs and Border Protection (CBP), Transportation Security Administration (TSA) and Immigration and Customs Enforcement (ICE). I advise individual and corporate clients on U.S. Food and Drug Administration (FDA)-regulated products, such as food, dietary supplements, and cosmetics, including matters involving detained or refused merchandise.

4.　In my career as a customs attorney, I have filed thousands of administrative petitions with the Fines, Penalties and Forfeiture Offices of CBP around the United States in various cases, including those involving allegations of violations under both 19 U.S.C. § 1497 (failure to declare) and 18 U.S.C. § 545 (smuggling).

5.        Prior to private practice, I served as legal counsel at the Southeast Regional Headquarters of the U.S. Customs Service (now known as U.S. Customs and Border Protection) in Miami, Florida. My responsibilities included providing legal advice and representation to U.S. Customs management on all matters involving the administration and enforcement of the customs and international trade laws.

6.        In my capacity as legal counsel for the U.S. Customs Service, I was regularly consulted by U.S. Customs Special Agents and Inspectors about search and seizure matters, including declarations by arriving international passengers. I was also consulted by Federal Prosecutors requesting legal support for actions contemplated or taken by U.S. Customs personnel.

7.        I have reviewed the following documentation in connection with Kseniia Petrova's immigration and criminal cases:

   - Form I-867A, *Record of the Sworn Statement in Proceedings Under Section 235(b)(1) of the Act*;

   - Form I-867B, *Jurat for Record of the Sworn Statement in Proceedings Under Section 235(b)(1) of the Act*;

   - Form I-213, *Record of Deportable/Inadmissible Alien*, submitted in connection with Ms. Petrova's removal proceedings;

   - Form I-261, *Additional Charges of Inadmissibility / Deportability*, submitted in connection with Ms. Petrova's removal proceedings;

   - Criminal complaint against Ms. Petrova, including an affidavit in support of the complaint signed by Special Agent Brian Goldsworthy from Homeland Security Investigations;

   - The government's motion to seal the criminal complaint.

8.     Some of the information contained in the documents I reviewed is internally inconsistent

and conflicts with agency regulations, procedures, and protocols.  Specifically:

    a.   CBP officers have considerable discretion in enforcing immigration laws, but

          their authority is limited by the Immigration and Nationality Act (INA) and the

          Code of Federal Regulations (CFR).

    b.   In Form I-261, Department of Homeland Security alleges that "an immigration

          officer found [Kseniia Petrova] to be inadmissible to the United States due to

          having undeclared biological material, to wit, frog embryos, in [her] possession."

    c.   Failure to declare an item by itself does not make a noncitizen inadmissible.

          Never in my 35-year career in the customs field have I heard of an instance where

          someone is found inadmissible simply for failure to declare an item.

    d.   There is a protocol CBP officers follow when they discover an undeclared item in

          the person's luggage.  The officers rely on 19 U.S.C. § 1497 and 19 C.F.R. §

          148.18 to address these situations.  Depending on whether the *de minimis*

          exception ($800.00 or less) applies and the circumstances of each individual case

          (such as the type of item that was undeclared and whether the failure to declare

          was willful), the CBP officers may confiscate the item, impose a monetary

          penalty up to $500.00, or both. If there is a seizure of the undeclared merchandise,

          the CBP officer would refer the matter to the nearest CBP Fines, Penalties, and

          Forfeitures Office, which would issue a formal Notice of Seizure.

    e.   The aforementioned two penalties for failure to declare – seizure of the

          undeclared item and a monetary penalty under 19 U.S.C. § 1497 – are confirmed

in the "You Have Arrived" video posted by the U.S. Customs and Border Protection on YouTube: https://www.youtube.com/watch?v=WHt2xnXk8AI.

f.  Ms. Petrova's failure to declare the frog embryos should have been handled in accordance with the aforementioned customs protocol. I do not know what the value of the frog embryos was and whether the $800.00 *de minimis* exception to the declaration requirements applies.  Assuming Ms. Petrova was required to declare the embryos, the appropriate penalties for her failure to declare were seizure of the embryos and a potential monetary penalty.  If this was Ms. Petrova's first customs violation, if I were Ms. Petrova's customs attorney, I would have petitioned to mitigate the penalty to $50.00 and requested the return of the seized merchandise. In my experience, such petitions in failure-to-declare cases are typically granted, particularly when it is the passenger's first violation.

g.  From the documentation I reviewed, it appears that the CBP officers at Logan Airport did not follow the required protocol and decided to cancel Ms. Petrova's visa instead.  I have not seen a formal Notice of Seizure or any other evidence indicating that the CBP officers followed the proper customs protocol in this case.

h.  The typical scenarios in which a person seeking entry into the United States may be charged with smuggling include bringing in prohibited items (such as narcotics) or attempting to evade customs duties by failing to declare large amounts of merchandise or currency.

i.  Never in my career as legal counsel for the U.S. Customs Service or as a customs attorney have I seen CBP pursue smuggling charges for failure to declare a

research sample, or a similar item, whether the failure to declare was willful or not.

j.   When the inspecting CBP officer determines that there is a potential for a criminal charge due to a passenger's failure to declare an item, the usual protocol is for the CBP officer to summon the duty agent of the ICE Homeland Security Investigations (HSI) stationed at the port of entry precisely for this purpose. The HSI agent then interviews the passenger and decides, sometimes after a consultation with a duty attorney at the local U.S. Attorney's Office, whether criminal charges should be pursued against the passenger.

k.   From my review of the affidavit submitted by HSI Special Agent Brian Goldsworthy in support of the criminal complaint, I see no evidence that Special Agent Goldsworthy, or any other HSI agent, interviewed Ms. Petrova. Indeed, Special Agent Goldsworthy appears to have not been present or personally involved in the events that occurred on February 16, 2025, at Logan Airport. The affidavit indicates that the CBP officer elected to bypass the standard customs procedures, including any consideration of smuggling charges, and instead initiated immigration-related penalties against Ms. Petrova.

l.   Never in my 35-year career as legal counsel for the U.S. Customs Service and as a customs attorney have I seen a situation, in which someone is not even processed for a "failure to declare" violation, and then charged with smuggling in connection with the same incident three months later.

m.   While the Record of Sworn Statement classifies the frog embryos as "biological material," under the regulations promulgated by the United States Department of

Agriculture – the appropriate agency that regulates the imported material – it would not be classified as a biological material. A biological product is defined in 9 C.F.R. § 101.2, as:

> The term biological products, also referred to in this subchapter as biologics, biologicals, or products, shall mean all viruses, serums, toxins (excluding substances that are selectively toxic to microorganisms, e.g., antibiotics), or analogous products at any stage of production, shipment, distribution, or sale, which are intended for use in the treatment of animals and which act primarily through the direct stimulation, supplementation, enhancement, or modulation of the immune system or immune response. The term "biological products" includes but is not limited to vaccines, bacterins, allergens, antibodies, antitoxins, toxoids, immunostimulants, certain cytokines, antigenic or immunizing components of live organisms, and diagnostic components, that are of natural or synthetic origin, or that are derived from synthesizing or altering various substances or components of substances such as microorganisms, genes or genetic sequences, carbohydrates, proteins, antigens, allergens, or antibodies.

n. The Record of Sworn Statement suggests that Ms. Petrova was asked whether she was "traveling with any biologicals materials." This is not a kind of question CBP officers typically ask during primary inspection, which usually lasts less than one minute. In my 35-year customs career, I have not heard a CBP officer at the primary inspection ask a person whether they are "traveling with any biological materials." The phrasing used – 'biological materials' – suggests that this questioning may have occurred at secondary inspection, despite the implications to the contrary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of knowledge and belief.

Executed on May 19, 2025

Peter A. Quinter

# EXHIBIT B

May 21, 2025

Declaration of Andrea Nicole Wilson – LCB, CCS

My name is Andrea Nicole Wilson, and I am a Licensed U.S. Customs Broker. I have worked in the customs and international trade industry for over 15 years, processing thousands of import entries across all modes of transportation, including air cargo, ocean freight, land border crossings, and passenger hand-carried items. I specialize in imports involving live animals, preserved specimens, and agricultural products, which often fall under the jurisdiction of multiple federal agencies.

As a Customs Broker, my role is to ensure compliance with all applicable U.S. import regulations, including those enforced by U.S. Customs and Border Protection (CBP) and other Participating Government Agencies (PGAs) such as the U.S. Department of Agriculture (USDA), the U.S. Fish and Wildlife Service (FWS), and the Centers for Disease Control and Prevention (CDC).

I have reviewed the following documentation in connection with the case of Kseniia Petrova:

- A letter from the Research Center at Institute Curie in France, which describes the research samples Ms. Petrova was bringing to the United States;

- Mr. Petrova's Record of Sworn Statement dated February 16, 2025.

As a Licensed U.S. Customs Broker, after reviewing the details of the merchandise in question, I can state that—based on my professional experience and knowledge of applicable import procedures—this item is not prohibited, would not require a permit, and would typically be cleared through standard formal entry procedures.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully,

Andrea Nicole Wilson
Licensed U.S. Customs Broker
**Global Customs Brokers LLC**
7500 NW 25th St. Suite 216 Miami, FL 33122
Phone: 305.597.0551 |Cel. 786.222.8896 |Email. nicole@gcbusa.com
www.globalcustomsbrokers.com



# EXHIBIT C



Sciences
Engineering
Medicine

## Committee on Human Rights

May 1, 2025

To Whom It May Concern:

As Chair of the Committee on Human Rights (CHR) of the U.S. National Academy of Sciences, National Academy of Engineering, and National Academy of Medicine, I am writing regarding the situation of Kseniia Petrova, a Harvard Medical School researcher.

The CHR—composed of members of the three National Academies—has worked for nearly half a century to support at-risk scientific colleagues around the world. Individuals whom we have assisted include those who have been arbitrarily detained in connection with their scientific work. We also provide assistance to colleagues who have fled their country after experiencing persecution and are seeking to pursue their research elsewhere, most often in the United States.

I was deeply dismayed to learn about the situation of Ms. Petrova, a talented scientist who has been conducting medical research in the United States for the past two years. It is my understanding that, while returning to the United States from a trip to France on February 16, she failed to declare frog embryos she was bringing from a French laboratory at the request of her supervisor. The embryos were non-living, embedded in paraffin, and incapable of growing or transmitting disease. (Similar material can be found in high school and college biology laboratories throughout the United States.) I am concerned that Customs and Border Protection officers canceled Ms. Petrova's J-1 visa based on a customs violation that, to my understanding, does not carry any immigration penalties. I am particularly alarmed that she remains detained to this day, and that her application for parole has been denied twice, citing concerns that she poses a threat to national security and is a flight risk.

Far from being a danger to the community, Ms. Petrova has made significant contributions to the United States through her research. She is an exceptionally accomplished bioinformatician working on early cell development—research that is essential for understanding how cells and organisms develop, grow, and age, and how these processes go awry in diseases, including cancers. Ms. Petrova's unique skills in computer-aided design and analysis of biological experiments have been important for Harvard Medical School's NIH-supported project from the

---

500 Fifth Street, NW, Washington, DC 20001
chr@nas.edu | www.nationalacademies.org/chr

*The Committee on Human Rights is a standing membership body of the National Academy of Sciences, National Academy of Engineering, and National Academy of Medicine. The views expressed by the Committee are not necessarily those of the National Academies.*

National Institute on Aging on degenerative disease and how tissues age. With Ms. Petrova's outstanding contributions, the research group has perfected a combined microscopic and computer-based image analysis that experts believe will be used for many applications in the study of degenerative disease. The first specific application has focused on kidney damage.

Many of us conducting research at universities across the country are deeply concerned about the treatment of Ms. Petrova. Like other talented international researchers, she brings important skills and talents to our country that enrich our labs, spark innovation, and advance research and development. I fear that, because of Ms. Petrova's situation and intensified immigration actions in recent months targeting international scholars and students, some of our accomplished international researchers will decide they must leave the United States and others will be dissuaded from pursuing scientific careers here.

I sincerely hope that Ms. Petrova will be able to return to her important scientific research as soon as possible.

Yours sincerely,

Martin Chalfie, Ph.D.
CHR Chair
(2008 Nobel Laureate, Chemistry)

# EXHIBIT D

15

15

**VISA**    **UNITED STATES OF AMERICA**

| | |
|---|---|
| Issuing Post Name | Control Number |
| TEL AVIV | 20231172430001 |
| Surname | |
| PETROVA | |
| Given Name | Visa Type /Class |
| KSENIIA DMITRIEVNA | R J1 |
| Passport Number | Sex | Birth Date | Nationality |
| 768044550 | F | 29DEC1994 | RUS |
| Entries | Issue Date | Expiration Date | |
| M | 21MAR2023 | 21MAR2026 | 1011 |
| Annotation | |
| N0034204909   J-1-00124 | |
| HARVARD UNIVERSITY | 4502206 |
| BEARER IS NOT SUBJECT TO SEC 212(E). | |
| TWO YEAR RULE DOES NOT APPLY | |

CANCELLED - BOS

VNUSAPETROVA<<KSENIIA<DMITRIEVNA<<<<<<<<<<
7680445501RUS9412295F2604262JTTLV1Y83V041391

*(handwritten annotations overlaid:)*
22 CFR 41.122(e)(3)
01/10/18    2018
A# 248.
212 (a)(1)(A)(i)

# EXHIBIT E



VISA   FRA   611445167
FRANCE / FRANCE / FRANCE FRA

ETATS SCHENGEN
17-01-25       16-07-25       90
C      766044550       MULT
WASHINGTON       03-01-25
PETROVA KSENIA
TOURISME

Signé :
Sophie BRAND

VCFRAPETROVA<<KSENIIA<<<<<<<<<<<<<<
6114451673RUS9412295F2507167<M900117

EXHIBIT F

**SecureRelease™ Portal**



Request Number: CBP-FO-2025-102743

## Details of Request
(Read only details of request)

**CREATE APPEAL**  **CANCEL**

| | |
|---|---|
| **Request Description:** | Any and all records regarding the entry/admission at Boston Logan Airport that took place on or around February 16, 2025. Also, any and all records related to an alleged customs violation on or around February 16, 2025. |
| **Agency:** | Department of Homeland Security |
| **Component:** | U.S. Customs & Border Protection |
| **Processing Track:** | Simple |
| **Request Type:** | FOIA Request |
| **Submitted Date:** | 04/10/2025 |
| **Request Status:** | Initial Determination |
| **Identity Verification Status:** | Not Requested by Agency |

| | |
|---|---|
| **Fee Waiver Requested? :** | Not Requested |
| **Reason for Fee Waiver:** | - |
| **Expedited Processing?:** | Not Requested |
| **Reason for Expedited Processing:** | - |
| **Alien Number:** | 240485724 |
| **Date Of Birth:** | 12-29-1994 |
| **Parents Names:** | Irina Zaborskaya, Dmitrii Petrov |
| **Country Of Birth:** | Russia |
| **Passport Number:** | 768044550 |
| **Subject Of Record-Last Name:** | Petrova |
| **Subject Of Record-First Name:** | Kseniia |

### Files uploaded by user
- A maximum of 1 file, not exceeding 20 MB in size, can be attached.

🔍 Search

| File Name | Attachment Type |
|---|---|
| G-28 CBP FOIA.pdf | General Documentation |

5 rows

1-1 of 1

SUPPORT    LICENSES    PRIVACY NOTICE    COOKIE NOTICE

COOKIE SETTINGS    GOVERNMENT SYSTEM NOTICE

© 2025 Powered by  Deloitte

# EXHIBIT G

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

District of Massachusetts

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Kseniia Petrova | ) | 25-5150-JGD |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __February 16, 2025__ in the county of __United States__ in the District of __Massachusetts__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 545 | Smuggling goods into the United States |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

☑ Continued on the attached sheet.

*Brian Goldsworthy*

*Complainant's signature*

Special Agent Brian Goldsworthy, HSI

*Printed name and title*

Subscribed and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1.

Date: __05/12/2025__

*Judith G. Dein*

*Judge's signature*

City and state: __Boston, Massachusetts__

Hon. Judith G. Dein, U.S. Magistrate Judge

*Printed name and title*

**Criminal Case Cover Sheet**                               **U.S. District Court - District of Massachusetts**

| | | |
|---|---|---|
| **Place of Offense:** _____ | **Category No.** II | **Investigating Agency** Homeland Security Investigations |

**City** Boston

**County** Suffolk

**Related Case Information:**

Superseding Ind./ Inf. _____  Case No. _____

Same Defendant _____  New Defendant X

Magistrate Judge Case Number 25-5150-JGD

Search Warrant Case Number _____

R 20/R 40 from District of _____

**Defendant Information:**

Is this case related to an existing criminal action pursuant to Rule 40.1(h)? If yes, case number _____ ☐ Yes  ☑ No

Defendant Name Kseniia Petrova      Juvenile: ☐ Yes  ☑ No

Is this person an attorney and/or a member of any state/federal bar: ☐ Yes  ☑ No

Alias Name: _____

Address: Boston Park Drive,Boston, MA

Birth date (Yr only): 1994  SSN (last 4#): _____  Sex: F  Race White  Nationality: Russia

**Defense Counsel if known:** _____   Address: _____

Bar Number: _____

**U.S. Attorney Information**

AUSA: Nadine Pellegrini    Bar Number if applicable: 545606

**Interpreter:** ☐ Yes ☑ No    List language and/or dialect: _____

**Victims:** ☐ Yes ☑ No    If yes, are there multiple crime victims under 18 USC§3771(d)(2) ☐ Yes ☐ No

**Matter to be SEALED:** ☑ Yes ☐ No

☑ Warrant Requested    ☐ Regular Process    ☐ In Custody

**Location Status:** ICE Detention Facility Louisiana

**Arrest Date:** 2/16/2025 detained by ICE

☐ Already in Federal Custody as of _____ in _____ .

☐ Already in State Custody at _____ ☐ Serving Sentence  ☐ Awaiting Trial

☐ On Pretrial Release: Ordered by: _____ on _____

**Charging Document:** ☑ Complaint  ☐ Information  ☐ Indictment

**Total # of Counts:** ☐ Petty _____  ☐ Misdemeanor _____  ☑ Felony 1

Continue on Page 2 for Entry of U.S.C. Citations

☑ **I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.**

Date: 05/12/2025    Signature of AUSA: /s/ Nadine Pellegrini

JS 45  (5/97)  (Revised U.S.D.C. MA 9/20/2023) Page 2 of 2 or Reverse

**District Court Case Number**  (To be filled in by deputy clerk): _____

**Name of Defendant**    Kseniia Petrova

**U.S.C. Citations**

| | Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|---|
| Set 1 | 18 U.S.C.§ 545 | Smuggling | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**

USAMA *CRIM* - Criminal Case Cover Sheet.pdf  3/4/2013

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

KSENIIA PETROVA,
          Defendant

**FILED UNDER SEAL**

CRIMINAL No. 25-5150-JGD

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT**

**Introduction and Agent Background**

Brian M. Goldsworthy, being duly sworn, depose and state as follows:

1.    I am presently employed as a Special Agent with U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), assigned to the Boston Field Office.  I have been an HSI Special Agent for approximately 18 years.  As a Special Agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

2.    As a Special Agent with HSI, I have received specialized training and have personal experience conducting investigations in the areas of technology transfer, import/export violations, narcotics, and smuggling.   I have received specialized training on how to conduct investigations involving the illegal importation/exportation of merchandise, weapons, technology, and other controlled commodities.  I have also received specialized training on the federal criminal statutes that regulate and, in certain instances, prohibit the import and export of U.S. controlled commodities, including weapons systems, military equipment, commercial merchandise, technology, and other controlled items.

3.    I submit this affidavit in support of a criminal complaint charging Kseniia PETROVA  (hereinafter, "PETROVA"), born in 1994, with Smuggling Goods into the United States in violation of 18 U.S.C. § 545 (the "Target Offense").  As set forth below, there is probable cause to believe that on or about February 16, 2025, PETROVA, in the District of Massachusetts,  fraudulently and knowingly imported and brought into the United States merchandise contrary to law  to wit, biological specimens, including  multiple clawed frog (*Xenopus tropicalis* and *Xenopus laevis*) embryos and embryonic samples in paraffin well stages and on mounted dyed slides(hereinafter, "the biological items").[1]

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is submitted for the limited purpose of establishing probable cause to believe that PETROVA has committed the Target Offense. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation. I have set forth only the facts that I believe are needed to establish the requisite probable cause.

### Relevant Legal Authority

5.    It is a violation of Title 18, United States Code, Section 545 for any person to fraudulently and knowingly import and bring  into the United States, any merchandise contrary to law; in this case, undeclared and unpermitted biological specimens.[2]

---

[1] Xenopus is a genus of aquatic frogs that are non-native to the United States. In lay terms, it is referred to as the clawed frog.

[2] See 19 C.F.R. Part 148.11 – Personal Declarations and Exemptions which requires that "[a]ll articles brought into the United States by any individual must be declared to a CBP officer at the port of first arrival in the United States, on a conveyance en route to the United States on which a CBP officer is assigned for that purpose, or at a preclearance office in a foreign country where a United States CBP officer is stationed for that purpose.

## Facts Supporting Probable Cause

6.       On or about February 16, 2025, PETROVA, a Russian citizen, arrived at Logan

International Airport ("Logan"), in Boston, Massachusetts, via an inbound flight from Paris,

France.

7.       Upon her arrival at Logan, PETROVA's checked luggage—a duffle bag—was

placed on a baggage carousel.  There, a Customs and Border Protection ("CBP") canine alerted

his handler to PETROVA's bag.  Per protocol, the CBP officer removed the bag from the

carousel and brought it to  an agricultural secondary inspection area for further screening.  There,

a CBP officer inspected the contents of the bag and discovered the biological items.

8.       PETROVA was asked to present herself at the secondary inspection area.  She was

wearing a backpack and carrying a plastic bag.  When questioned about her luggage, PETROVA

denied carrying any biological material.  When the CBP officer asked her again, PETROVA

identified the plastic bag she was carrying as having biological material.  An inspection of the

bag revealed a foam box containing frog embryos in microcentrifuges, as well as embryo slides.

A CBP officer interviewed PETROVA under oath and conducted a manual review of her cell

phone.  PETROVA admitted that the items in her duffle bag and in the plastic bag were

biological specimens.  PETROVA was asked if she knew that she was supposed to declare

biological material when entering the United States.  After a long pause, she answered she was

not sure.  The CBP officer then confronted PETROVA with a text message on her phone from an

individual who she identified as her colleague at a Boston-area medical school, where she is

currently a research assistant.   The individual wrote, "if you bring samples or antibody back,

---

See also 9 C.F.R. Part 104  (Permits for Biological Products) which prohibits any biological
product be permitted to be brought into the United States unless a permit has been issued for
such product.

make sure you get the permission etc. Like that link I sent to leon-/group chat about frog

embryos because TSA went through my bags at customs in Boston." When asked again whether

she knew she was supposed to declare the items, she responded that she "was not sure about

embryos specifically"

      9.      Another text message on PETROVA's phone contained the following question

from her medical school colleague: "What is your plan to pass the American [referred to as US

in PETROVA's interview] Customs with samples? This is the most delicate place of the

trajectory."

      10.     The CBP officer confronted PETROVA with another text message between her

and another individual who she identified as her principal investigator in which she was asked by

this individual: "what is your plan for getting through customs with samples?"  To that question,

PETROVA replied, "No plan yet.  I won't be able to swallow them."

      11.     PETROVA told CBP  agents that she was educated in Russia and worked at the

Moscow Center for Genetics as a bioinformatician of genetic disorders from 2016 to 2023.

When asked if this was a Russian government institution, she replied that about half of the

scientists worked for the Russian government and the other half for hospitals.  She also stated

that she was most recently employed by the Institute of Genetic Biology in Moscow from 2023

to 2024.

      12.     The CBP officer advised PETROVA that she was ineligible for entry into the

United States.  The officer asked if she wished to willingly withdraw her application for

admission to the United States at this time.  PETROVA  responded yes.  PETROVA  was

advised that her visa would be canceled, and she was asked if there was anything she would like

to add. PETROVA  responded "no."  When she was asked if she would like the Russian

government to be notified that she was in the United States, she claimed that she was in fear of going back to Russia. She claimed she had protested the Russian Federation. She provided no other details.

13.     The biological items found on PETROVA's possession and in her checked bag were examined by the National Bioforensic Analysis Center (NBFAC) and it was determined items contained clawed frog (*Xenopus tropicalis* and *Xenopus laevis*) embryos and embryonic samples, among other things.

## CONCLUSION

14.     Based upon the information described herein, there is probable cause to believe that, on or about February 16, 2025, Kseniia PETROVA knowingly and willfully, with the intent to defraud the United States, smuggled, and clandestinely introduced, and attempted to smuggle or clandestinely introduce into the United States, merchandise, specifically biological items, which should have been invoiced, all in violation of 18 U.S.C. § 545.

The requested Complaint and accompanying arrest warrant should issue.

Brian Goldsworthy
Brian Goldsworthy
Special Agent
Homeland Security Investigations

**May 12, 2025**

Sworn and subscribed to me telephonically on May ___, 2025.

Judith G. Dein
HON. JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT H

# United States Government Memorandum

**To:**       Honorable Kayla McClusky
              U.S. Magistrate Judge
              Western District of Louisiana

**From:**     Kristin Vidrine
              Supervising U.S. Probation Officer
              Western District of Louisiana
              Rule 5 Out

**Subject:**  PETROVA, Ksensiia
              WDLA 3:25-mj-00092
              DMA 25-5150-JGD

**Date:**     May 14, 2025

---

The above identified defendant was arrested on May 14, 2015, pursuant to a Warrant and Complaint originating in the District of Massachusetts.  The Complaint charges Smuggling Goods into the United States, a violation of 18 U.S.C. §545.  The government has moved for detention. Further, the Department of Homeland Security, Immigration and Customs Enforcement, has lodged an immigration detainer based on the pendency of ongoing removal proceedings and biometric confirmation of her identity.

Ms. Petrova is a native of Russia.  She has no known prior criminal history.  Considering the lack of criminal history, she does not pose a danger to the community.  However, due to her ties outside of the United States and Immigration status, she poses a risk of nonappearance.

Ms. Petrova is not an acceptable candidate for release at this time.

# EXHIBIT I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 25-5150-JGD |
| | ) | |
| KSENIIA PETROVA | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S MOTION TO SEAL**
**COMPLAINT**

The United States Attorney hereby respectfully moves the Court to seal the complaint, supporting affidavit, this motion and the Court's order on this motion, and any other paperwork related to this matter, until further order of this Court. As grounds for this motion, the government states that public disclosure of these materials might jeopardize the ongoing investigation of this case, as well as the government's ability to arrest the defendant.

The United States Attorney further moves pursuant to General Order 06-05 that the United States Attorney be provided copies of all sealed documents that the United States Attorney has filed in the above-styled matter.

**Motion to seal allowed**

May 12, 2025

*Judith Gail Dein*
*U.S.M.J.*

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By  */s/ Nadine Pellegrini*
Nadine Pellegrini
Assistant U.S. Attorney

Date: May 12, 2025

EXHIBIT J

April 22, 2025

The Honorable Kristi Noem
Secretary of Homeland Security
U.S. Department of Homeland Security
2707 Martin Luther King Jr Avenue, SE
Washington, DC 20528

Todd M. Lyons
Acting Director
U.S. Immigration and Customs Enforcement
500 12th Street, SW
Washington, DC 20536

Dear Secretary Noem and Acting Director Lyons:

The recent apprehension in Somerville, Massachusetts of Rümeysa Öztürk, a Turkish national and fifth-year doctoral student at Tufts University, by U.S. Immigration and Customs Enforcement (ICE), and her subsequent transfer to an ICE detention facility in Louisiana, raises serious questions about the fairness and integrity of our immigration enforcement system. Based on news reports and court filings, the evidence suggests that ICE did not transfer Öztürk to a Louisiana detention facility due to a lack of bed space in New England, as the government has claimed, but instead deliberately relocated her to a jurisdiction more favorable to the Trump administration's deportation agenda. We demand answers about this apparent judicial forum shopping.

On March 25, 2025, six plainclothes ICE agents wearing masks to conceal their faces arrested Öztürk near her residence in Somerville, Massachusetts, as she was walking to an Iftar dinner.[1] Surveillance footage shows that the agents surrounded her without immediately identifying themselves, handcuffed her, placed her in an unmarked vehicle, and moved her on a circuitous route through Massachusetts, New Hampshire, and Vermont, before placing her on a flight to Louisiana the following morning.[2] Her legal team, unaware of her location at the time, filed a *habeas* petition in U.S. District Court in the District of Massachusetts at 10:02 p.m. the night she was detained, but by then she had already begun her journey out of the state.[3] Öztürk's counsel, family, and friends were unable to locate the student for more than 20 hours after her arrest, despite multiple inquiries by Öztürk's counsel to the government.

---

[1] Nick Stoico & John R. Ellement, *A timeline of how the arrest of a Tufts student by federal agents unfolded, and where the case stands*, Boston Globe (Apr. 2, 2025), https://www.bostonglobe.com/2025/03/31/metro/tufts-student-arrested-by-ice-timeline/?p1=BGSearch_Overlay_Results&p1=Article_Inline_Text_Link.
[2] *Id.*
[3] *Id.*

ICE has claimed there was no bed space available for Öztürk in New England. But officials at various jails in the region that contract with ICE have stated otherwise. The Cumberland County Jail in Portland, Maine, had 198 available beds.[4] The Strafford County Jail in Dover, New Hampshire, also had capacity of more than 100 beds, including at least 16 open beds for female detainees.[5] Other facilities in the region that house female detainees include the Wyatt Detention Facility in Rhode Island and the Chittenden Regional Correctional Facility in Vermont.[6] According to a Massachusetts immigration lawyer, ICE is also able to hold female detainees for short-term or overnight detention in its local offices, including at the ICE Enforcement and Removal Operations ("ERO") Boston Field Office in Burlington, Massachusetts.[7] Yet, ICE asserts that no bed space was available anywhere in the region, raising serious questions about whether the agency is intentionally misrepresenting facts to justify strategic relocations.

In court filings, immigration lawyers described ICE's treatment of Öztürk as irregular, declaring they had never seen or heard of an ICE detainee arrested in Massachusetts be so quickly shuttled out of Massachusetts and to multiple separate locations.[8] This quick movement —coupled with the government's delayed notice regarding a detainee's whereabouts—risks frustrating the filing of *habeas* petitions.

The government has since argued that Öztürk's legal challenge must be heard in Louisiana, within the Fifth Circuit, where she is currently detained—a jurisdiction known for its strict immigration rulings. According to Mary Yanik, a clinical associate professor of law at Tulane University, in Louisiana the majority of ICE detention centers are within the jurisdiction of Louisiana's Western District, which is the "slowest moving" of the district courts in the state, very conservative, and whose release of detainees by formal order is "exceedingly rare."[9] Decisions from federal district courts and immigration courts in Louisiana can eventually be appealed to the U.S. Court of Appeals for the Fifth Circuit, which the Center for American Progress has described as "arguably the most right-wing federal appellate court in the country."[10] Legal experts and immigrant rights advocates have noted a troubling pattern in which ICE transfers detainees to jurisdictions with stricter immigration enforcement — such as Louisiana — thereby increasing the likelihood of deportation and limiting detainees' access to legal representation and family support.[11]

---

[4] Samantha J. Gross, *Detained Tufts graduate student Rümeysa Öztürk was one of several sent by ICE to Louisiana. Here's why.*, Boston Globe (Apr. 2, 2025), https://www.bostonglobe.com/2025/04/02/metro/tufts-student-arrest-louisiana-ice-detention-2/?p1=Article_Inline_Related_Box.

[5] *Id.*; Pet'r's Reply Br. Am. Pet. for Writ of Habeas Corpus and Compl. Ex. 5, *Öztürk v. Trump*, No. 25-cv-10695 (D. Mass. Apr. 2, 2025).

[6] Pet'r's Reply Br. Am. Pet. for Writ of Habeas Corpus and Compl. Ex. 3, *Öztürk v. Trump*, No. 25-cv-10695 (D. Mass. Apr. 2, 2025).

[7] *Id.*

[8] *Id.*, Exs. 3-6.

[9] Ivana Saric, *Why the Trump administration wants to try immigration cases in Louisiana*, Axios (Mar. 27, 2025), https://www.axios.com/2025/03/27/trump-immigration-louisiana-5th-circuit.

[10] Jeevna Sheth & Devon Ombres, *The 5th Circuit Court of Appeals Is Spearheading a Judicial Power Grab*, CAP (May 15, 2024), https://www.americanprogress.org/article/the-5th-circuit-court-of-appeals-is-spearheading-a-judicial-power-grab/.

[11] *See* Daniella Silva, *Detained immigrant students sent to remote Louisiana facilities accused of human rights abuses*, NBC News (Apr. 1, 2025), https://www.nbcnews.com/news/us-news/ice-student-detainees-louisiana-

Further compounding concerns, Öztürk is currently being held at the South Louisiana ICE Processing Center in Basile, Louisiana—a facility operated by the for-profit GEO Group, rather than the federal government. Numerous reports, including a 2024 review by Robert F. Kennedy Human Rights and others, have documented human rights abuses at ICE detention centers in Louisiana, including medical neglect, unsanitary conditions, and lack of access to legal resources.[12] These organizations have described these facilities as "a black hole," given their remote locations and limited transparency. Öztürk herself has experienced asthma attacks while in the Louisiana detention center and lacked access to medications.

Öztürk is not alone. At least two other students—Mahmoud Khalil of Columbia University and Alireza Doroudi of the University of Alabama—have also been arrested and transferred to remote detention centers in Louisiana.[13] ICE detained all three students near their homes and swiftly relocated them to a state where immigration rulings are more likely to favor the government. These actions suggest a systematic effort by ICE to remove individuals from their communities and place them in legal environments where their rights are more difficult to defend.

In light of these serious concerns about ICE's conduct, we request written responses to the following questions by May 6, 2025:

1. What specific criteria led ICE to determine that no bed space was available for Öztürk in New England?
2. Why was Öztürk transported to New Hampshire and Vermont before being flown to Louisiana, rather than being placed in a nearby facility in Massachusetts? Why was Öztürk transported to three separate locations in three different states before being flown to Louisiana?
3. When was the decision made to transport Öztürk to Louisiana? Who made this decision? What steps and protocols were undertaken in this decision-making process?
4. What is the total cost incurred by the government for Öztürk's transportation from her arrest to her arrival in Louisiana, including flights and other logistical expenses?
5. Did the jurisdictional implications of placing Öztürk in Louisiana, within a federal judicial circuit known for its pro-government immigration rulings, factor into ICE's decision to transfer her there?
6. What policies and procedures are in place to prevent forum shopping by ICE in detainee transfers?
7. Given the documented history of abuse and inadequate legal access at ICE detention facilities in Louisiana, what justifications does ICE have for continuing to send detainees there?

mahmoud-khalil-alireza-doroudi-rcna198959.

[12] Sarah Decker & Anthony Enriquez, *Inside the Black Hole, Systematic Human Rights Abuses Against Immigrants Disappeared & Detained in Louisiana*, Robert F. Kennedy Human Rights (Aug. 2024), https://cdn.prod.website-files.com/66324b38260b26fc98b4f52f/66c77c4848f4fc74670650f5_Inside%20the%20Black%20Hole_Systemic%20Human%20Rights%20Abuses%20Against%20Immigrants%20Detained.pdf.
[13] Eduardo Cuevas, *University of Alabama doctoral student detained by ICE amid Trump crackdown on visas*, USA Today (Mar. 27, 2025), https://www.usatoday.com/story/news/nation/2025/03/27/ice-detains-alireza-doroudi-university-of-alabama-doctoral-student/82685586007/.

The transfer and detention of Ms. Öztürk—along with other students—raises urgent concerns about due process, transparency, and judicial forum shopping, threatening to undermine public trust in our immigration system. We urge your prompt and thorough response to these inquiries.

Sincerely,


Edward J. Markey
United States Senator

Ayanna Pressley
Member of Congress


Elizabeth Warren
United States Senator