## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| _____ | ) | |
| KSENIIA PETROVA, | ) | |
| | ) | Case No. 2:25-cv-00240-CR |
| Petitioner, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | **)** | |
| v. | ) | |
| | ) | **FIRST AMENDED PETITION FOR** |
| UNITED STATES DEPARTMENT OF | ) | **WRIT OF HABEAS CORPUS** |
| HOMELAND SECURITY; | ) | **AND** |
| | ) | **COMPLAINT FOR DECLARATORY** |
| KRISTI NOEM, Secretary, | ) | **AND INJUNCTIVE RELIEF** |
| U.S. Department of Homeland Security; | ) | |
| | ) | |
| PETE R. FLORES, Acting Commissioner, | ) | (Leave to File Granted on May 28, 2025) |
| U.S. Customs and Border Protection; | ) | |
| | ) | |
| JULIO CARAVIA, Director, | ) | |
| Boston Logan Airport Port of Entry, | ) | |
| U.S. Customs and Border Protection; | ) | |
| | ) | |
| PAMELA J. BONDI, U.S. Attorney General; | ) | |
| | ) | |
| THERESA MESSIER, Superintendent, | ) | |
| Chittenden Regional Correctional Facility, | ) | |
| South Burlington, VT | ) | |
| | ) | |
| PAUL CAMPBELL, Warden, | ) | |
| Ouachita Correctional Center, Monroe, LA | ) | |
| | ) | |
| KEITH DEVILLE, Warden, | ) | |
| Richwood Correctional Center, Monroe, LA | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

# SUMMARY OF THE CASE AND REQUESTED RELIEF

1.      This is an amended petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief on behalf of Kseniia Petrova, a research scientist at Harvard University, whom the United States government has unlawfully detained for over three months. The detention stems from arbitrary, capricious, and unlawful actions by U.S. Customs and Border Protection (CBP) at Boston Logan Airport on February 16, 2025.

2.      The original petition was filed on February 23, 2025, while Ms. Petrova was detained at the Chittenden Regional Correctional Facility in Vermont. It invoked habeas jurisdiction under 8 U.S.C. § 1252(e)(2), based on the government's assertion that Ms. Petrova had been ordered removed under the expedited removal statute, 8 U.S.C. § 1225(b)(1)(A)(i). The petition accordingly sought the limited relief authorized by § 1252(e)(4)(B).

3.      The government has now conceded that no expedited order of removal was ever issued against Ms. Petrova. As such, she is not subject to the limitations set forth in § 1252(e)(4)(B) and now seeks immediate release under 28 U.S.C. § 2241.

4.      Respondents have repeatedly confirmed that CBP's decision to deem Ms. Petrova inadmissible and to cancel her J-1 visa was based on her failure to declare research materials she was transporting from *Institut Curie* in France to her lab at Harvard University.

5.      Ms. Petrova's subsequent detention by U.S. Immigration and Customs Enforcement (ICE) resulted directly from CBP's inadmissibility finding and visa cancellation. Because CBP lacked a lawful basis for either action, Ms. Petrova challenged the resulting ICE detention as blatantly unlawful.

6.      On May 14, 2025—less than two hours after this Court set a bail hearing to consider Ms. Petrova's release—the U.S. Department of Justice initiated her arrest and transfer from ICE to

U.S. Marshals custody. Simultaneously, U.S. Department of Homeland Security (DHS) lodged an immigration "detainer" expressly designed to ensure Ms. Petrova's re-detention by ICE upon any release from criminal custody.

7.      Upon information and belief, Ms. Petrova is currently detained at the Ouachita Correctional Center in Monroe, Louisiana. On May 15, 2025, the United States District Court for the Western District of Louisiana issued an Order of Commitment to Another District, directing the U.S. Marshals to transport her to Boston, Massachusetts, to face a criminal charge of smuggling—based on the same alleged failure to declare the research samples Ms. Petrova had in her possession on February 16, 2025, at Logan Airport.

8.      This Court should exercise its authority to enjoin DHS from re-detaining Ms. Petrova upon her potential release on bail from criminal custody. Alternatively, this Court should prohibit her transfer outside New England—away from her immigration and criminal counsel, her colleagues at Harvard University, and potential witnesses relevant to her removal proceedings in immigration court—if she is re-detained by ICE.

## **<u>JURISDICTION</u>**

9.      This action arises under the Constitution of the United States, the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*., and the Tariff Act of 1930, 19 U.S.C. §§ 1202.

10.     This Court has habeas jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), and Article I, § 9, cl. 2 of the United States Constitution (Suspension Clause). The Court may grant habeas relief pursuant to 28 U.S.C. § 2241 *et seq*., the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the All Writs Act, 28 U.S.C. § 1651.

11.     This Court also has subject matter jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., and 28 U.S.C. § 1331 (federal question). The APA directs that courts "shall

hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 702(2)(A). The Court may grant declaratory and injunctive relief pursuant to 5 U.S.C. §§ 702, 706; 28 U.S.C. §§ 2201–02; and 28 U.S.C. § 1651. The government has waived its sovereign immunity pursuant to 5 U.S.C. § 702.

12.    This Court has jurisdiction over the alleged FOIA violation under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, *et seq*., 28 U.S.C. § 1331 (federal question), and 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act). CBP's failure to make a determination on Petitioner's properly filed FOIA request within the statutory time period constitutes a constructive denial of her FOIA request. Thus, Petitioner is deemed to have exhausted her administrative remedy. 5 U.S.C. § 552(a)(6)(C)(i).

## VENUE

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because this civil action is brought against officers or employees of the United States, and Petitioner was detained at the Chittenden Regional Correctional Facility in South Burlington, Vermont—within the jurisdiction of this District—at the time of the initial filing. Although Petitioner was subsequently transferred outside this District, this Court retains jurisdiction under *Ex parte Endo*, 323 U.S. 283, 306 (1944); *see also Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004) ("Endo stands for the important but limited proposition that when the Government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction.").

## REQUIREMENTS OF 28 U.S.C. § 2243

14.    With respect to Petitioner's habeas claim, the Court must grant the petition for writ of habeas corpus or issue an order to show cause (OSC) to Respondents "forthwith," unless Petitioner is not entitled to relief. 28 U.S.C. § 2243. If an OSC is issued, the Court must require Respondents to file a return "within *three days* unless for good cause additional time, not exceeding twenty days, is allowed." *Id.* (emphasis added).

15.    Courts have long recognized the significance of the habeas statute in protecting individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most important writ known to the constitutional law of England, affording as it does a *swift* and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

## PARTIES

16.    Petitioner Kseniia Petrova is native of Russia and a resident of Boston, Massachusetts. She has been conducting research at Harvard University since May 2023 pursuant to a valid J-1 exchange visitor visa. She is currently detained at the Ouachita Correctional Center in Monroe, Louisiana.

17.    Respondent U.S. Department of Homeland Security is the federal agency responsible for implementing and enforcing the Immigration and Nationality Act and the Tariff Act of 1930. DHS oversees its component agencies, including U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement. Relevant here, CBP is responsible for the inspection and admission of noncitizens arriving in the United States, and ICE is responsible for the detention and removal of noncitizens.

18.    Respondent Kristi Noem is sued in her official capacity as the Secretary of the U.S.

5

Department of Homeland Security (DHS). In this capacity, she is responsible for the implementation and enforcement of the Immigration and Nationality Act and Tariff Act of 1930. Secretary Noem is responsible for the oversight of CBP and ICE, and is a legal custodian of Ms. Petrova.

19.     Respondent Pete R. Flores is sued in his official capacity as Acting Commissioner of the U.S. Customs and Border Protection, a component agency of DHS. Mr. Flores has served as the Acting Commissioner of CBP since January 20, 2025, overseeing all CBP operations nationwide.

20.     Respondent Julio Caravia is sued in his official capacity as the Director of the Boston Logan Airport Port of Entry, U.S. Customs and Border Protection. As Port Director, Mr. Caravia is responsible for CBP operations at Boston Logan International Airport in Boston, Massachusetts.

21.     Respondent Theresa Messier is the Superintendent of the Chittenden Regional Correctional Facility. When the initial complaint was filed, Superintendent Messier had physical custody of Ms. Petrova pursuant to the facility's contract with ICE to detain noncitizens.

22.     Respondent Paul Campbell is the Warden of the Ouachita Correctional Center in Monroe, Louisiana. Because Petitioner is currently detained at that facility, Warden Campbell is her immediate custodian for purposes of this action.

23.     Respondent Keith Deville is the Warden of the Richwood Correctional Center, Monroe, Louisiana. Upon information and belief, Petitioner was continuously detained at the Richwood Correctional Center from February 24, 2025 to May 14, 2025 and is likely to be returned to that facility upon release from criminal custody.

# LEGAL FRAMEWORK

### *Process and Penalties for Failure to Declare*

24.    The law governing the process and penalties for failure to declare an article on a customs form or upon interrogation at the time of entry to the United States is the Tariff Act of 1930, also known as the Smoot-Hawley Act. Pursuant to 19 U.S.C. § 1497, the statute provides:

> (a) In general
> (1) Any article which—
> (A) is not included in the declaration and entry as made or transmitted; and
> (B) is not mentioned before examination of the baggage begins—
> (i) in writing by such person, if written declaration and entry was required, or
> (ii) orally, if written declaration and entry was not required;
>
> shall be subject to forfeiture and such person shall be liable for a penalty determined under paragraph (2) with respect to such article.
> (2) The amount of the penalty imposed under paragraph (1) with respect to any article is equal to—
> (A) if the article is a controlled substance, either $500 or an amount equal to 1,000 percent of the value of the article, whichever amount is greater; and
> (B) if the article is not a controlled substance, the value of the article.

25.    The implementing regulations provide that CBP may seize "[a]ny article in the baggage of a passenger arriving from a foreign country which is not declared" and "the personal penalty prescribed by section 497, Tariff Act of 1930 (19 U.S.C. 1497), *shall* be demanded from the passenger." 19 C.F.R. § 148.18(a) (emphasis added). If CBP elects not to seize the article, "a claim for the personal penalty *shall* be made against the person who imported the article without declaration." *Id.* (emphasis added).

26.    The regulations and guidelines further permit remission or mitigation of liability. Thus, CBP is authorized to reduce or forgo the personal penalty and forfeiture of property. 19 C.F.R. § 148.18(b); Guidelines for Disposition of Violations of 19 U.S.C. 1497, available at

https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/Mitigation-Guidelines-

Seizures-Penalties-Passenger-Failure-to-Declare.pdf (last visited on Feb. 23, 2025); Appendix A

to Part 171—Guidelines for Disposition of Violations of 19 U.S.C. 1497, available at

https://www.ecfr.gov/current/title-19/chapter-I/part-171/appendix-

Appendix%20A%20to%20Part%20171 (last visited on May 21, 2025).

27.     The two penalties for failure to declare—seizure of the undeclared item and a monetary penalty

under 19 U.S.C. § 1497—are confirmed in the "You Have Arrived" video posted by the U.S. Customs

and Border Protection on YouTube: https://www.youtube.com/watch?v=WHt2xnXk8AI (last visited

on May 21, 2025).

### *Smuggling (18 U.S.C. § 545)*

28.     18 U.S.C. § 545 criminalizes the unlawful importation of "merchandise" into the United

States and penalizes the knowing receipt, concealment, or sale of such unlawfully imported

goods:

> Whoever knowingly and willfully, with intent to defraud the United States,
> smuggles, or clandestinely introduces or attempts to smuggle or clandestinely
> introduce into the United States any merchandise which should have been
> invoiced, or makes out or passes, or attempts to pass, through the customhouse
> any false, forged, or fraudulent invoice, or other document or paper; or
> Whoever fraudulently or knowingly imports or brings into the United States, any
> merchandise contrary to law, or receives, conceals, buys, sells, or in any manner
> facilitates the transportation, concealment, or sale of such merchandise after
> importation, knowing the same to have been imported or brought into the United
> States contrary to law—
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

29.     When the inspecting CBP officer determines that there is a potential for a criminal charge

due to a passenger's failure to declare an item, the usual protocol is for the CBP officer to

summon the duty agent of the ICE Homeland Security Investigations (HSI) stationed at the port

of entry. **Exhibit A**, **Declaration of Peter A. Quinter**. The HSI agent then interviews the passenger and decides, sometimes after a consultation with a duty attorney at the local U.S. Attorney's Office, whether criminal charges should be pursued against the passenger. *Id*.

### *Expedited Removal Process*

**30.**    The expedited removal statute provides a process for removing noncitizens from the United States in an expedited fashion without the commencement of removal proceedings against the noncitizen. The process begins—and often effectively concludes—with an inspection by an ICE or CBP immigration officer. The officer must, first, determine if the individual is a noncitizen who is inadmissible because he or she has engaged in fraud to obtain an immigration benefit or lacks valid entry documents. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii) (citing 8 U.S.C. § 1182(a)(6)(C), (a)(7)).

**31.**    If the officer concludes that the individual is inadmissible under one of those two grounds (i.e., either fraud to obtain an immigration benefit or lack of valid entry documents)*,* the officer "shall," with the concurrence of a supervisor, 8 C.F.R. § 1235.3(b)(7), order the individual removed "without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

**32.**    At any time during the expedited removal process, the officer may permit the individual to withdraw her application for admission and allow the person to depart the country without issuing an expedited removal order. 8 U.S.C. § 1225(a)(4).

**33.**    For those who express a fear of return to their countries of origin, the expedited removal statute provides a limited additional screening. But the additional screening does not remotely approach the type of process that asylum seekers receive in regular immigration proceedings before an immigration judge under 8 U.S.C. § 1229a.

34.     During the inspection process, if an individual indicates an intention to apply for asylum or expresses fear of return to his or her country of origin, the immigration officer must refer the individual for a rudimentary screening interview with an asylum officer, referred to as a "credible fear" interview, to determine whether the expedited removal process should be placed on hold while the individual petitions for asylum and related humanitarian relief. 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. §§ 235.3(b)(4), 208.30(d)–(e). In order for the expedited removal process to be suspended, the noncitizen must show "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Noncitizens who satisfy the credible fear standard after the issuance of an expedited removal order have their expedited removal orders canceled by operation of law and are placed into removal proceedings under 8 U.S.C. § 1229a, where they have the opportunity to apply for asylum and other relief from removal, present and cross-examine evidence before an immigration judge (IJ), preserve objections, and appeal any adverse decision to the Board of Immigration Appeals and court of appeals. 8 C.F.R. § 208.30(f); *see also* 8 U.S.C. § 1225(b)(1)(B)(ii).

35.     Applicants whom ICE has deemed to have not satisfied the credible fear standard may request review of the decision by an IJ, but are not entitled to a full hearing or any subsequent administrative appellate review. 8 U.S.C. § 1225(b)(1)(B)(iii)(II)–(III); *see also* 8 C.F.R. § 208.30(g)(1).

36.     During the inspection and credible fear stages of expedited removal, DHS typically detains the noncitizen. *See* 8 U.S.C. §§ 1225(b)(1)(B)(ii), (iii)(IV); 8 C.F.R. § 235.3(b)(2)(iii). In *Jennings v. Rodriguez*, the Supreme Court held that individuals in expedited removal who

demonstrate a credible fear are not statutorily eligible for bond hearings. 583 U.S. 281, 297-303 (2018).

37.     At any time during the credible fear stages of expedited removal, ICE has discretionary authority to release noncitizens on parole, provided they "present neither a security risk nor a risk of absconding." *See* 8 U.S.C. § 1182(d)(5), 8 C.F.R. 212.5(b).

### *Visa Cancellations by CBP Officers*

38.     Pursuant to 8 U.S.C. § 1201(i), the authority to revoke and/or cancel properly issued visas rests with consular officials or the Secretary of State: "After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation."

39.     Immigration officers in the United States have limited authority "to revoke a valid visa by physically canceling it" in nine distinct instances described in 22 C.F.R. § 41.112(e). Relevant here, an immigration officer is authorized to revoke a visa when the noncitizen is "removed from the United States pursuant to [8 U.S.C. § 1225(b)]" or when the noncitizen "requests and is granted permission to withdraw the application for admission." 22 C.F.R. § 41.112(e)(2), (e)(3).

### *Freedom of Information and Privacy Act*

40.     FOIA requires each agency, upon a request for records: (a) to conduct a search reasonably calculated to uncover all responsive documents; (b) to make the records available in the form or format requested if they are readily reproducible in that format; and (c) to promptly make available responsive records. 5 U.S.C. § 552(a)(3)(A)–(C).

41.     FOIA also requires the agency to make a determination of whether it will comply with the request within 20 business days. 5 U.S.C. § 552(a)(6)(A)(i); 6 C.F.R. § 5.6(c).

42.     If the agency finds that unusual circumstances apply, it must request, by written notice, no more than an additional 10 business days to issue its determination. 5 U.S.C. § 552(a)(6)(B)(i).

43.     If an agency fails to comply with the time periods set forth in the statute, the requester is "deemed to have exhausted his administrative remedies" and may seek judicial review. 5 U.S.C. § 552(a)(6)(C)(i).

## STATEMENT OF FACTS

44.     Kseniia Petrova is a 30-year-old research scientist born in Russia. On May 11, 2023, she entered the United States on a valid J-1 visa. A J-1 visa is a non-immigrant visa that allows people to participate in exchange visitor programs in the United States. The programs are intended to promote cultural exchange and international cooperation. Research scholars and professors regularly hold J-1 status.

45.     Ms. Petrova has been conducting groundbreaking scientific research at Harvard University in the fields of embryology and the biology of aging. The research she has been conducting "is essential for understanding how cells and organisms develop, grow, and age, and how these processes go awry in diseases, including cancers." **Exhibit C**, **Letter from Martin Chalfie**.

46.     Since May 2023, Ms. Petrova has traveled in and out of the United States on several occasions without issue. She has never violated the terms or conditions of her nonimmigrant status.

47.     On or about January 23, 2025, Ms. Petrova traveled to Europe on vacation.

48.     Prior to her return from the trip, Dr. Leon Peshkin—Ms. Petrova's boss at Harvard University—asked her to bring histological samples of frog embryos from his scientific

collaborators at the *Institut Curie* in France back to Harvard, so that their lab could continue processing and analyzing data from them.

49.     The samples were non-hazardous, noninfectious, and non-toxic, intended solely for fundamental research purposes. The embryos were non-living, embedded in paraffin, and "incapable of growing or transmitting disease. (Similar material can be found in high school and college biology laboratories throughout the United States.)." **Exhibit A**.

50.     Under applicable customs laws and regulations, the embryos were not classified as prohibited items and did not require a permit for importation into the United States. **Exhibit B**, **Declaration of U.S. Customs Broker**.

51.     Dr. Peshkin's request for Ms. Petrova to transport the samples in person stemmed from his prior experience in shipping similar samples that were either seriously delayed or lost in transit. Dkt. 1-2.

52.     Having no prior experience transporting research samples, Ms. Petrova was unfamiliar with U.S. customs requirements regarding these samples. She placed the samples in her luggage, and did not declare them to CBP at the time of her entry on Sunday, February 16, 2025, at Boston Logan International Airport.

53.     At the airport, Ms. Petrova presented her valid J-1 visa to the inspecting CBP officer, who verified her documentation and continuous J-1 status. The officer then placed an admission stamp in her passport, indicating her admission to the United States as a J-1 visa holder.  Around the same time, CBP generated an I-94 Record of Admission for Ms. Petrova in accordance with standard CBP protocols.

54.     At the luggage conveyor belt, Ms. Petrova was approached by another CBP officer and escorted to a room for examination of her luggage.

55.     Upon discovery of the samples following a search of her luggage, the CBP officer failed to pursue the statutory and regulatory process for failure to declare an article in luggage. Ms. Petrova was neither served with any customs-related documentation nor issued a penalty under 19 U.S.C. § 1497 for failure to declare an article in her possession.

56.     Because Ms. Petrova's research samples were seized, the CBP officer was required to "refer the matter to the nearest CBP Fines, Penalties, and Forfeitures Office, which would issue a formal Notice of Seizure." **Exhibit A**. CBP has never provided a Notice of Seizure to Ms. Petrova or her counsel.

57.     Instead of following the statutory and regulatory requirements to address Ms. Petrova's alleged customs violation, the officer referred Ms. Petrova to another CBP officer who conducted a second interview into her immigration status, a process commonly referred to as "secondary inspection."

58.     This "secondary" officer asked Ms. Petrova a series of purely customs-related questions, and then abruptly declared Ms. Petrova "inadmissible pursuant to INA 212(a)(7)(A)(i)(I) as an immigrant without a valid and unexpired immigrant document." *See* Dkt. 24 at 14.

59.     The "secondary" officer, or another CBP officer at Logan, then marked the J-1 visa in Ms. Petrova's passport as "CANCELLED – BOS." **Exhibit D**, **Canceled J-1 Visa**. Upon information and belief, the J-1 admission stamp in Ms. Petrova's passport was also canceled, as was her I-94 Record of Admission, as per CBP's protocol.

60.     After putting the "CANCELLED – BOS" stamp on Ms. Petrova's visa, the CBP officer added some handwritten notations on the face of the canceled visa. *Id*. These notations reference 22 C.F.R. § 41.122—which allows immigration officers to cancel a visa for someone "who requests and is granted permission to withdraw the application for admission"—and 8 U.S.C. §

14

1182(a)(7)(A)(i)(I), which renders inadmissible "any immigrant …who is not in possession of a valid unexpired immigrant visa."

61.     The handwritten notations did not include any reference to 8 U.S.C. § 1182(a)(7)(B) which renders inadmissible "any *nonimmigrant* who… is not in possession of a valid *nonimmigrant* visa…"

62.     There was no legal basis for the CBP officer to cancel Ms. Petrova's valid, unexpired J-1 visa. Ms. Petrova was never granted permission to withdraw her application for admission. *See* 22 C.F.R. § 41.112(e)(3). She had always maintained her lawful nonimmigrant status and had been previously inspected and admitted to the United States as a bona fide nonimmigrant on multiple occasions.

63.     When announcing the filing of the criminal complaint against Ms. Petrova on May 14, 2025, the United States Attorney for the District of Massachusetts once again confirmed that Ms. Petrova's visa was canceled as a result of her customs violation. U.S. Attorney's Office, District of Massachusetts. (May 14, 2025). *Russian National Charged with Smuggling Biological Material Into Boston* [Post]. https://x.com/DMAnews1/status/1922765637815849015 (last visited on May 21, 2025).

64.     After declaring Ms. Petrova inadmissible, the "secondary" officer presented Ms. Petrova with a choice: to withdraw her application for admission and apply for a new visa overseas or be subjected to expedited removal and barred from admission to the United States for five years.

65.     Ms. Petrova requested that her admission be withdrawn and asked to return to Paris, France, from whence her journey originated.

66.     Ms. Petrova has a valid Schengen visa (which allows her entry to 29 countries in Europe, including France). **Exhibit E**, **Petitioner's Schengen Visa**.

67.     Instead of granting Ms. Petrova permission to withdraw her application for admission, the CBP officer then asked her: "Would you like the U.S. government to contact the Russian government to let them know you are here?" Dkt. 24 at 15.

68.     Ms. Petrova requested that the Russian government not be contacted and indicated that she had a fear of returning to Russia, stating "I am afraid the Russian Federation will kill me for protesting against them." *Id*.

69.     At this point CBP apprehended and detained Ms. Petrova.

70.     CBP then issued Form I-860 (Notice and Order of Expedited Removal) alleging that Ms. Petrova is subject to expedited removal under 8 U.S.C. § 1225(b)(1) for being inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for being "an immigrant not in possession of a valid, unexpired immigrant visa." Dkt. 1-4. As a justification for the inadmissibility finding, the notice stated that Ms. Petrova was "an intending immigrant …as [she] claimed credible fear to return to [her] home country of Russia," *id.,* even though Ms. Petrova did not express a fear of the Russian Federation until *after* the CBP officer had made the inadmissibility finding. Dkt. 24 at 14-15.

71.     The bottom portion of the Form I-860, containing the expedited removal order to be signed by a supervisory officer, was never completed. *Id*.

72.     On February 17, 2025, Ms. Petrova was transferred to ICE custody and transported to the Chittenden Regional Correctional Facility in South Burlington, Vermont, purportedly to await her credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii).

73.     On February 21, Petitioner's counsel submitted a request for parole under 8 U.S.C. § 212(d)(5), along with supporting documentation demonstrating that Ms. Petrova poses neither a danger to the community nor a flight risk. The request was submitted to the Acting Director of the ICE's Boston Enforcement and Removal Operations (ERO) Field Office, which has

jurisdiction over detainees at the Chittenden Regional Correctional Facility. Dkt. 32-2. The supporting materials included affidavits from Ms. Petrova's friends and colleagues, a letter from her landlord, a letter from Senator Edward Markey, and other documentation attesting to her exemplary character and community ties. *Id.* The Boston ERO Field Office has never responded to this request.

74.     On February 23, 2025, Petitioner filed a petition for a writ of habeas corpus and a complaint for declaratory and injunctive relief with this Court. Dkt. 1.

75.     On February 24, 2025, with no notice to her counsel, Petitioner was transferred to the Richwood Correctional Center in Monroe, Louisiana.

76.     Petitioner was never afforded an opportunity to have a credible fear interview under 8 U.S.C. § 1225(b)(1)(A)(ii). Instead, ICE served her with a Notice to Appear and placed her in full removal proceedings under 8 U.S.C. § 1229a, in an attempt to moot both her habeas petition and her mandamus claim before this Court. Dkt. 24 at 24, ¶ 5.

77.     On March 13, 2025, Petitioner's counsel submitted a second request for parole under 8 U.S.C. § 212(d)(5), along with supporting documentation demonstrating that Ms. Petrova poses neither a danger to the community nor a flight risk. The request was submitted to the deportation officer assigned to Ms. Petrova's case. The supporting materials again included affidavits from Ms. Petrova's friends and colleagues, a letter from her landlord, and other documentation attesting to her exemplary character and community ties. *Id.*

78.     On March 14, 2025, ICE denied Ms. Petrova's parole request citing concerns that she posed a flight risk. Dkt. 32-3.

**79.**     After several reconsideration requests by Petitioner's counsel, ICE produced a new decision dated March 30, 2025, denying Ms. Petrova's request for release on parole, this time finding that Ms. Petrova is not only a flight risk, but a danger to the community. Dkt. 32-4.

**80.**     On April 10, 2025, Petitioner's counsel submitted a request under the Freedom of Information Act (FOIA) to U.S. Customs and Border Protection, seeking "any and all records regarding [Ms. Petrova's] entry/admission at Boston Logan Airport …on February 16, 2025" and "any and all records related to an alleged customs violation on or around February 16, 2025." **Exhibit F**, **Confirmation of FOIA Submission**.

**81.**     CBP has not responded to the FOIA request.

**82.**     On May 14, 2025—within two hours of this Court setting a bail hearing to consider Ms. Petrova's release—the U.S. Department of Justice initiated her arrest and transfer from ICE custody into the custody of the United States Marshals Service.

**83.**     On the same day, the government unsealed a criminal complaint charging Ms. Petrova with smuggling—based on the same alleged failure to declare the research samples that she had in her possession on February 16, 2025, at Logan Airport. **Exhibit G**, **Criminal Complaint and Affidavit**.

**84.**     Simultaneously, the U.S. Department of Homeland Security (DHS) issued a memorandum stating that ICE has "lodged an immigration detainer" in Ms. Petrova's case. Such "detainer" requires U. S. government agencies, including the Federal Bureau of Prisons and the U. S. Marshalls Service, to turn Ms. Petrova over to ICE to be re-detained in immigration custody upon any release from criminal custody. **Exhibit H**, **United States Government Memorandum**.

**85.**     The same U.S. Government memorandum acknowledges that Ms. Petrova "does not pose a danger to the community," directly contradicting ICE's March 30, 2025 determination. *Id*.

86.     In its motion to seal the complaint filed on May 12, 2025—while Petitioner remained in ICE custody at the Richwood Correctional Center—the government claimed that that public disclosure of the criminal complaint might jeopardize...the government's ability to arrest the defendant." **Exhibit I**, **Motion to Seal Complaint**.

87.     Upon information and belief, Ms. Petrova is currently detained at the Ouachita Correctional Center in Monroe, Louisiana. On May 15, 2025, the United States District Court for the Western District of Louisiana issued an Order of Commitment to Another District, directing the U.S. Marshals to transport her to Boston, Massachusetts.

88.     On May 18, 2025, Petitioner's counsel contacted counsel for DHS and offered to postpone the bail hearing scheduled for May 28, 2025, if DHS would agree not to re-detain Ms. Petrova following her potential release from criminal custody.

89.     On May 20, 2025, counsel for DHS responded as follows: "DHS advised that it may detain Ms. Petrova as part of her ongoing removal proceedings if she is released from pre-trial criminal custody…"

90.     On information and belief, and consistent with ICE's policy and practice of transferring detained noncitizens to larger immigration facilities in the Southern part of the United States, ICE is likely to transfer Ms. Petrova—upon her release from criminal custody—from Massachusetts back to the Richwood Correctional Center or a similar facility in a "jurisdiction that is more favorable to the Trump administration deportation agenda." **Exhibit J**, **Senators' Letter to DHS**.

91.     If Ms. Petrova is re-detained by ICE, there is a substantial risk that she will be unlawfully removed to Russia, as a result of ICE's documented failures to comply with applicable immigration laws and federal court orders. As the latest example, on May 21, 2025, ABC News

reported that the Department of Homeland Security unlawfully deported eight migrants to South Sudan in violation of a federal court order.[1]

92.     Ms. Petrova's continued detention and her absence from the research group at Harvard is harming the research being conducted and the public interest in the potentially ground-breaking results of that research. "[Ms. Petrova] brings important skills and talents to our country that enrich our labs, spark innovation, and advance research and development." **Exhibit C**.

## CLAIMS FOR RELIEF

## COUNT ONE

## Violation of Administrative Procedure Act 5 U.S.C. § 706

93.     Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

94.     Upon discovering that Ms. Petrova failed to disclose the research samples, CBP was required to follow the process set forth in 19 U.S.C. § 1497, its implementing regulations, and associated guidelines. This process is mandatory.

95.     CBP had no authority to bypass this mandatory process in favor of an entirely different enforcement process.

96.     CBP had no authority to declare Ms. Petrova inadmissible for her alleged customs violation because a customs violation is not a ground of inadmissibility under section 212 of the Immigration and Nationality Act (8 U.S.C. § 1182). In finding Ms. Petrova inadmissible for the alleged customs violation, CBP action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

---

[1]     Quinn Owen, *8 Migrants Deported to South Sudan Despite Court Order, Officials Confirm*, ABC News (May 21, 2025), https://abcnews.go.com/Politics/8-migrants-south-sudan-deportation-flight-officials-confirm/story?id=122033692.

right," and "(D) without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(A)-(D).

97.     CBP had no authority to <u>cancel Ms. Petrova's valid nonimmigrant visa</u>. In so doing, CBP action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "(D) without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(A)-(D).

98.     CBP had no authority to <u>cancel Ms. Petrova's admission stamp and her Form I-94 Record of Admission</u> for her alleged customs violation. In so doing, CBP action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "(D) without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(A)-(D).

99.     Because CBP had no authority to revoke Ms. Petrova's valid nonimmigration visa, find her inadmissible, and cancel her admission stamp and her Form I-94 Record of Admission, this Court must find that CBP acted unlawfully and set aside the unlawful actions pursuant to 5 U.S.C. § 706(2).

## COUNT TWO

### Violation of FOIA, 5 U.S.C. § 552
### Failure to Conduct an Adequate Search for Responsive Records

100.    Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

101.    CBP is obligated under 5 U.S.C. § 552(a)(3) to conduct a reasonable search for records responsive to Petitioner's FOIA request submitted on April 10, 2025.

**102.** Petitioner has a legal right to obtain such records, and no legal basis exists for Respondents' failure to search for them.

**103.** CBP's online portal indicates that the agency has not begun a search of its records.

**104.** CBP's failure to conduct a reasonable search for records responsive to Petitioner's FOIA request violates, at a minimum, 5 U.S.C. § 552(a)(3)(C), as well as the regulations promulgated thereunder.

**COUNT THREE**

**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Disclose Responsive Records**

**105.** Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

**106.** CBP is obligated under 5 U.S.C. § 552(a)(3) to promptly produce records responsive to Petitioner's FOIA request.

**107.** Petitioner has a legal right to obtain such records, and no legal basis exists for Respondents' failure to disclose them.

**108.** CBP's failure to disclose all responsive records violates, at a minimum, 5 U.S.C. § 552(a)(3)(A), as well as the regulations promulgated thereunder.

**COUNT FOUR**

**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Timely Respond**

**109.** Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

**110.** CBP is obligated under 5 U.S.C. § 552(a)(6)(A)(i) to promptly produce records responsive to Petitioner's FOIA request.

**111.** CBP has not made a determination on Petitioner's FOIA request within the statutory time period under FOIA.

**112.**    Petitioner has a legal right to obtain such records, and no legal basis exists for Respondents' failure to disclose them.

**113.**    CBP's failure to disclose all responsive records within the statutory time period violates, at a minimum, 5 U.S.C. §§ 552(a)(3)(A) and (a)(6)(A), as well as the regulations promulgated thereunder.

**COUNT FIVE**

**Violation of Due Process**

**114.**    Petitioner incorporates the allegations in the paragraphs above as though fully set forth here.

**115.**    The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

**116.**    CBP's unlawful actions in revoking Ms. Petrova's valid nonimmigrant visa and canceling her admission stamp and Form I-94 Record of Admission without any basis in law or fact violate Ms. Petrova's right to Fifth Amendment due process.

**117.**    In light of CBP's clearly erroneous actions at Logan Airport on February 16, 2025, the government's decision to continue detaining Ms. Petrova for over three months—despite overwhelming evidence that she poses no danger to the community or risk of flight—violates her right to Fifth Amendment due process.

**118.**    The government's decision to initiate criminal prosecution against Ms. Petrova to obtain leverage in her immigration case is appalling, unbecoming of the U.S. government, and violates Ms. Petrova's right to Fifth Amendment due process.

## PRAYERS FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

(1)     Assume jurisdiction over this matter;

(2)     Declare CBP's finding of inadmissibility against Ms. Petrova unlawful and set it aside;

(3)     Declare CBP's revocation of Ms. Petrova's valid nonimmigrant visa unlawful, set it aside, and order Respondents to reinstate it;

(4)     Declare CBP's cancellation of Ms. Petrova's valid admission stamp unlawful, set it aside, and order CBP to issue a new admission stamp dated February 16, 2025;

(5)     Declare CBP's cancellation of Ms. Petrova's Form I-94 Record of Admission unlawful, set it aside, and order CBP to create a new I-94 record of admission under 8 C.F.R. § 101.2 and in accordance with CBP protocol (*see CBP Inspector's Field Manual* § 15.12(b));

(6)     Declare that after the inadmissibility finding has been set aside, and the revocation of Ms. Petrova's visa has been set aside, and the cancellation of Ms. Petrova's admission stamp has been set aside, and the cancellation of Ms. Petrova's Form I-94 Record of Admission has been set aside, Ms. Petrova is, by law, lawfully admitted to the United States in J-1 visa status;

(7)     Order CBP to conduct a search for any and all records responsive to Petitioner's FOIA request and demonstrate that it employed search methods reasonably likely to lead to the discovery of records responsive to Petitioner's FOIA request;

(8)     Order Defendant to produce, by a date certain, any and all non-exempt records responsive to Petitioner's FOIA request and a *Vaughn* index of any responsive records withheld under claim of exemption;

(9)     Issue an Order to Show Cause ordering Respondents to show cause why Ms. Petrova's habeas petition should not be granted;

(10)     Order Ms. Petrova's immediate release from custody;

(11)     Issue an Order enjoining Respondents from re-detaining Petitioner upon release from

criminal custody;

(12)     In the alternative, issue an order enjoining Respondents from transferring Petitioner

outside of the six New England states of Connecticut, Rhode Island, Massachusetts, Vermont,

New Hampshire, Maine;

(13)     Award Petitioner attorney's fees and other litigation costs reasonably incurred in this

action pursuant to 5 U.S.C. § 552(a)(4)(E); and

(14)     Award Petitioner attorney's fees and costs under the Equal Access to Justice Act, 28

U.S.C. § 2412, and on any other basis justified under law; and

(15)     Grant any further relief this Court deems just and proper.


Dated: May 30, 2025                          Respectfully submitted,

/s/ *Brian Scott Green*                      /s/ *Gregory Romanovsky\**
Brian Scott Green                            Gregory Romanovsky
Law Office of Brian Green                    Romanovsky Law Offices
9609 S University Boulevard #630084          12 Marshall Street
Highlands Ranch, CO 80130                    Boston, MA 02108
(443) 799-4225                               (617) 787-0000
briangreen@greenusimmigration.com            gr@romanovskylaw.com

                                             *Admitted pro hac vice*

*Attorneys for Petitioner*