# UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | |
|---|---|
| **KSENIIA PETROVA**, | ) |
| | ) |
| Petitioner, | )    Case No. 2:25-cv-00240-CR |
| | ) |
| v. | ) |
| | ) |
| **U.S. DEPARTMENT OF HOMELAND** | ) |
| **SECURITY**, *et al*., | ) |
| | ) |
| Respondents. | ) |
| | ) |

## MEMORANDUM IN OPPOSITION TO
## FEDERAL RESPONDENTS' MOTION TO DISMISS AMENDED COMPLAINT

### I.    INTRODUCTION

This case arises from the arbitrary, capricious, and unlawful actions of U.S. Customs and Border Protection (CBP) officers at Logan International Airport on February 16, 2025—conduct that led to Petrova's unwarranted detention and prevented her return to Harvard Medical School, where she was engaged in critical scientific research.

As the facts surrounding this case continue to emerge, the government's efforts to portray Petrova as a fraudster and a criminal—efforts designed to justify CBP's blatant legal violations at Boston Logan Airport on February 16, 2025—have only intensified. Through the recently obtained video of Petrova's primary inspection, we now know that she was not asked whether she was carrying "biological materials" or had anything to declare. *See* **Exhibit A**, Hr'g Tr., 20:25-21:12, 56:4-7, *United States v. Petrova*, No. 1:25-mj-05150 (D. Mass. June 18, 2025).

1

We now know that travelers are no longer required to complete a written customs declaration and are instead expected to divine their obligations from airport signage and the CBP website—where no mention of animal embryos appears. *Id*. at 51:1-22, 64:12-65:1.

We also know that Special Agent Goldsworthy—a longtime customs officer and 18-year veteran of Homeland Security Investigations where he specializes in the importation of goods—does not know what qualifies as 'biological material' under applicable legal standards. *Id*. at 38:24-39:6, 39:19-40:3, 43:5-44:1, 45:17-46:4. We know that the fixed and embedded frog embryo samples Petrova brought with her on February 16 do *not* qualify as biological materials under U.S. law. Dkt. 72-1 at 5-6, ¶8.m. And we know that the criminal investigation initiated by Agent Goldsworthy was not prompted by a CBP referral at Logan, but by review of Petrova's *immigration* file by HSI Headquarters—approximately one week after this Court scheduled the first hearing in Petrova's habeas case. *See* **Exhibit A** at 37:7-22. We also know that she was arrested and transferred from ICE to criminal custody within two hours of the Court scheduling a bail hearing. *United States v. Petrova*, Mot. to Unseal Compl., Dkt. 6, No. 1:25-mj-05150 (D. Mass. May 14, 2025).

And, as if to confirm Petrova's claim that criminal charges were brought solely to gain leverage in her immigration proceedings, upon bringing the charges, the government quickly offered her a deferral of prosecution—on the condition that she abandon her immigration claims and self-deport. *See* **Exhibit B**, Declaration of William W. Fick, Esq., at ¶5.

Although her detention was premised on CBP conduct that has now been shown to be unlawful, the government continues to insist that her detention was lawful—or, alternatively, that this Court lacks jurisdiction to review it, no matter how unlawful the underlying conduct. In this latest motion to dismiss, the government simply recycles arguments this Court has already rejected, hoping to dismiss the case and return Petrova to immigration custody to facilitate her deportation to Russia.

While CBP is vested with broad authority over the admission of noncitizens, that authority must be exercised within the bounds of statutory and regulatory mandates—obligations CBP plainly failed to meet here. As the Fourth Circuit recently reaffirmed: "The Executive possesses enormous powers to prosecute and to deport, but with powers come restraints." *Abrego Garcia v. Noem*, No. 25-1404, slip op. at 5 (4th Cir. April 17, 2025) (denying emergency stay pending appeal).

## II.    ARGUMENT

1. PETROVA'S DETENTION WAS NOT STATUTORILY AUTHORIZED.

### A.    Petrova Was Detained under 8 U.S.C. § 1225(b)(1).

It is indisputable that, had CBP not revoked Petrova's valid J-1 visa, canceled her admission stamp, and voided her Record of Admission, she would not have been detained. It is equally indisputable that her detention was based on the expedited removal statute, 8 U.S.C. § 1225(b)(1).

As the Supreme Court explained, "Section 1225(b)(1) applies to [noncitizens] initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See* §1225(b)(1)(A)(i) (citing §§1182(a)(6)(C), (a)(7))." *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). These noncitizens are normally ordered removed "without further hearing or

review" pursuant to an expedited removal process. § 1225(b)(1)(A)(i). But if a § 1225(b)(1) noncitizen "indicates either an intention to apply for asylum . . . or a fear of persecution," then that alien is referred for an asylum interview. § 1225(b)(1)(A)(ii). If an immigration officer determines after that interview that the alien has a credible fear of persecution, "the alien shall be detained for further consideration of the application for asylum." § 1225(b)(1)(B)(ii).

The government has repeatedly confirmed that Petrova was detained pursuant to § 1225(b)(1). *See, e.g.*, Dkt. 24 at 1, Dkt. 38 at 5. In fact, there was no other plausible legal basis. At the May 14, 2025 hearing, the government for the first time claimed that she was now detained under § 1225(b)(2) "because she's in removal proceedings." Dkt. 64 at 19:9-12.

That argument fails. Petrova was never subject to detention under § 1225(b)(2). As the Supreme Court explained, § 1225(b)(2) "serves as a catchall provision that applies to all applicants for admission *not covered by §1225(b)(1)*… Those [noncitizens] 'shall be detained for a [removal] proceeding' if an immigration officer 'determines that [they are] not clearly and beyond a doubt entitled to be admitted' into the country." *Jennings v. Rodriguez*, 583 U.S. at 287 (emphasis added). But on February 16, 2025, a CBP officer found Petrova inadmissible under 8 U.S.C. §1182(a)(7) and completed Form I-860 "Notice and Order of Expedited Removal," pursuant to 8 U.S.C. § 1225(b)(1). *See* Dkt. 1-4. She was first detained "pending a final determination of credible fear of persecution" under § 1225(b)(1)(B)(iii)(IV), and then "for further consideration of the application for asylum" under § 1225(b)(1)(B)(ii). Because Petrova was clearly processed under § 1225(b)(1), the catch-all detention provision in § 1225(b)(2) simply does apply to her. *See Jennings v. Rodriguez*, 583 U.S. at 287.

4

**B. Petrova's Detention Under § 1225(b)(1) Is Unlawful Because It Rests on an Inadmissibility Finding That Must be Set Aside.**

Detention under § 1225(b)(1) is permissible only when a noncitizen is found inadmissible under 8 U.S.C. § 1182(a)(6) or § 1182(a)(7). This is clear from the statute's plain language, which provides: "If an immigration officer determines that an alien … who is arriving in the United States… is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall…" § 1225(b)(1)(A)(i). The remainder of § 1225(b)(1) sets forth the framework for expedited removal and the credible fear proceedings—but only if this threshold inadmissibility finding is properly made.

Petrova has demonstrated that CBP's inadmissibility finding in her case was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" within the meaning of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). The record—including statements by DHS officials, its attorneys, and the United States Attorney for the District of Massachusetts—confirms what this Court recognized: "It is very clear in this case that Ms. Petrova was detained solely for a customs violation." Dkt. 68 at 60:5; *see also id*. at 56:17-21. CBP's decision to find Petrova inadmissible for her alleged customs violation was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law because the Immigration and Nationality Act does not contain any inadmissibility ground related to a customs violation. *See* U.S.C. § 1182(a)(1)-(10). Accordingly, this Court found that Petrova's habeas petition "raises substantial claims grounded in the facts and the law on which she has shown there is a likelihood she will prevail." Dkt. 68 at 61:10-12.

Because Petrova's detention rests on an inadmissibility finding that had no basis in law and must be set aside, it is not authorized by 8 U.S.C. § 1225(b)(1)—the only statutory provision under which it could even arguably be justified.

## 2. REVOCATION OF PETROVA'S VISA AND HER SUBSEQUENT DETENTION VIOLATED HER DUE PROCESS RIGHTS.

The government concedes that—even treating Petrova as an "arriving alien"—she still had limited, congressionally-prescribed due process protections when she sought re-entry in J-1 status on February 16, 2025. *See* Dkt. 68 at 60:16-18 ("The Court also finds the Court has limited jurisdiction to consider Ms. Petrova's due process claim. As the parties acknowledge, it's congressional due process."); *see also DHS v. Thuraissigiam*, 591 U.S. 103, 138 (2020) ("[T]he decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law.") (cleaned up); *U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)* ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

But Congress did not authorize immigration officers to invent inadmissibility grounds in order to revoke a properly issued visa and deny admission to the United States. Nor did it authorize CBP officers to use immigration penalties for a non-immigration violation where no immigration violation exists. By revoking Petrova's valid J-1 visa, canceling her admission stamp and I-94 Record of Admission, and finding her inadmissible based on an alleged customs infraction, CBP violated governing statutes, regulations, and procedures. And because CBP was not "acting within powers expressly conferred by Congress" (*Thuraissigiam* at 138), the agency also violated Petrova's due process rights—as limited as they were.

3.  THIS COURT HAS JURISDICTION TO REVIEW PETROVA'S APA AND DUE
    PROCESS CHALLENGES (COUNTS 1 AND 5).

**A.  This Court Has Jurisdiction to Review CBP's Unlawful Visa Revocation.**

In sharp contrast to the broad visa revocation authority granted to consular officers and the Secretary of State, the revocation authority delegated to CBP officers at ports of entry is narrow and explicitly limited. *See* 22 C.F.R. § 41.112(e). The record clearly demonstrates that none of the nine regulatory grounds for visa revocation under § 41.112(e) applies to Petrova's circumstances. Unable to identify any specific provision that would even arguably authorize the revocation of Petrova's valid J-1 visa, the government instead pivots to jurisdiction—asserting that this Court lacks authority to review CBP's unwarranted invocation of § 41.112(e)(3), which permits CBP to revoke visas where "the alien requests and is granted permission to withdraw the application for admission."[1]

    i.  <u>8 U.S.C. § 1201(i) Does Not Apply to Visa Revocations by CBP Officers.</u>

To argue that this Court lacks jurisdiction to review the visa revocation, the government relies on 8 U.S.C. § 1201(i), which prohibits judicial review of visas revoked by the Secretary of State. *See* Dkt. 91 at 9, 12. The government argues that the prohibition of judicial review in § 1201(i) also extends to any revocations by an officer or agency to whom the Secretary of State delegates its visa revocation authority. *Id*. The government then argues that the Secretary of State has delegated this authority to CBP through 22 C.F.R. § 41.112(e)(3). *Id*. This is where the government's argument fails.

---

[1] At the May 14, 2025 hearing, the Court explicitly rejected the applicability of § 41.112(e)(3) to Petrova: "I'm confident the government does not claim that she was granted permission to withdraw her application because she wouldn't be here if she was granted permission. She'd be in France." Dkt. 64 at 37:9-14.

CBP's visa revocation in this case was *not* pursuant to a delegation of authority under §
41.112(e)(3) because that delegation only applies where "the alien requests and is granted
permission to withdraw the application for admission." *Id.* While 8 U.S.C. § 1201(i) may
bar judicial review of actions taken pursuant to a lawful delegation of the authority to
revoke visas, nothing prohibits this Court from determining whether, in revoking a visa,
CBP was acting within the scope of a lawful delegation of authority. In this case, CBP
was not acting under a lawful delegation of authority because Petrova had not been
granted permission to withdraw her application for admission. CBP had no power to
revoke Petrova's visa. As the court in *Gill v. Mayorkas*, No. 20-CV-939, 2021 WL
3367246 (W.D. Wash. Aug. 3, 2021), explained:

> The Secretary of State delegated full authority to a consular officer
> to revoke a nonimmigrant visa "at any time, in his or her
> discretion." 22 C.F.R. § 41.122(a)… In contrast, the Secretary
> delegated limited authority to immigration officers to revoke visas
> only for specific reasons, and in an administrative way. The
> provision relevant here provides: "An immigration officer is
> authorized to revoke a valid visa by physically canceling it in
> accordance with the procedure described in paragraph (d) of this
> section if: . . . (3) The alien is notified . . . by an immigration officer
> at a port of entry that the alien appears to be inadmissible to the
> United States, and the alien requests and is granted permission to
> withdraw the application for admission." 22 C.F.R. § 41.122(e)…
> In other words, this regulation authorizes an immigration officer to
> physically write on a visa to cancel it if the officer finds the
> noncitizen inadmissible, under an applicable provision of the INA
> or other law, and the noncitizen requests and is granted permission
> to withdraw their application for admission. These are
> administrative and law-enforcement functions, not signs of
> discretionary authority to which courts must defer.

*Id.*, at *8.

Moreover, the plain language of § 1201(i) makes clear that it applies solely to

revocations by consular officers overseas or by the Secretary of State—not to revocations

by CBP officers at ports of entry. As courts have recognized, there is a "difference between the discretion wielded by consular officers and the authority belonging to CBP officers at ports of entry." *Atanackovic v. Duke*, 399 F. Supp. 3d 79, 87 (W.D.N.Y. 2019).

Oddly, the government claims that "Atanacovkic [sic] never addressed § 1201(i)." Dkt. 91 at 12. It clearly did:

> Looking at the language of the statute, there seems to be a difference between the discretion wielded by consular officers and the authority belonging to CBP officers at ports of entry. In 8 U.S.C. § 1201, which regulates the "Issuance of visas," the statute states that "[u]nder the conditions hereinafter prescribed and subject to the limitations prescribed in this chapter or regulations issues [*sic*] thereunder, a consular officer *may* issue to an immigrant who has made proper application therefor, an immigrant visa ... [and] to a nonimmigrant who has made proper application therefor, a nonimmigrant visa." 8 U.S.C. §1201(a)(1) (emphasis added).... Thus, a consular officer "may" or may not issue a visa to an applicant who has made a proper application. 8 U.S.C. §1201(a)(1). However, for a CBP officer to deny entry to a person seeking admission at the border, they need a valid legal basis. *See* 8 U.S.C. § 1201(h) (". . . found to be inadmissible *under this chapter or any other provision of law*") (emphasis added); 8 C.F.R. § 235.1(f)(1) ("... that the alien is not subject to removal *under the immigration laws, Executive Orders, or Presidential Proclamations*...") (emphasis added). The statute distinguishes between the absolute discretion of consular officers and the legal authority of CBP officers.

*Atanackovic,* 399 F. Supp. at 87-88.

Recognizing that § 1201(i) does not, by its terms, apply to CBP officers, the government tries to link it to CBP by invoking the Secretary of State's general power to delegate authority to "any employee of the United States." 8 U.S.C. § 1104(a). This argument fails. The plain language of § 1201(i) indicates that discretionary visa revocation authority is reserved for Department of State employees. If the Secretary of State could delegate this authority to immigration officers at the border, then the direction to notify the Attorney General of the revocation ("Notice of such revocation shall be communicated to

the Attorney General") would make no sense, given that border officials are acting on behalf of the Attorney General. 8 U.S.C. § 1201(i). Nor would the instruction in the Foreign Affairs Manual when discussing the Department of State's visa revocation authority under § 1201(i): "Under no circumstances should you revoke a visa when the individual is in the United States, or after the individual has commenced an uninterrupted journey to the United States, other than a revocation based on driving under the influence." 9 FAM 403.11-3(B)(b). Thus, any delegation of authority to revoke visas is not a delegation of the discretionary function of deciding which visas to revoke, but merely a delegation of the ministerial act of physically canceling a visa. Even assuming such discretionary authority could be delegated to a CBP employee at the border, § 1104(a) requires "the consent of the head of the department or independent establishment under whose jurisdiction the employee is serving." 8 U.S.C. § 1201(i). The government has presented no evidence of such official delegation or the requisite consent other than 22 C.F.R. § 41.122(e), which is inapplicable for the reasons stated above.

The revocation of Petrova's J-1 visa was arbitrary and capricious, contrary to law, and must be set aside. By revoking Petrova's valid and unexpired J-1 visa, "the agency has relied on factors which Congress has not intended it to consider" (Petrova's customs violation, and justifying revocation under the inapplicable 8 U.S.C. § 1201(i)) and "offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (finding Petrova inadmissible under 8 U.S.C. § 1182(a)(7)). *See Motor Vehicle Mfrs. Ass'n v. State Farm* Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

ii.  <u>Petrova Is Not Required to Exhaust Her APA Claims in Removal Proceedings</u>.

Alternatively, the government argues that Petrova failed to exhaust her visa

revocation claim "before an immigration judge (IJ) or the Board of Immigration Appeals."

Dkt. 91 at 12-13. But as Petrova has shown, her APA claims—including the visa

revocation claim—cannot be adequately addressed by the immigration court or BIA. *See*

*Matter of Hector Ponce De Leon-Ruiz*, 21 I. & N. Dec. 154, 165 (BIA 1996) ("[The BIA

does not] assess[] regulatory compliance with the APA, ... [and should make no]

observations in this area where we lack expertise. We ourselves are exclusively a creature

of the Attorney General's regulations, and we have properly left it to the courts to resolve

questions of APA compliance."). This Court agreed: "If Ms. Petrova's bail is not

considered by this court, there will be no determination by an immigration judge that any

constitutional rights were violated or that she has been subject to a violation of the APA."

Dkt. 68 at 64:5-8.

The government suggests that Petrova could exhaust her visa revocation challenge

in immigration court "as an argument that she is not removable under 8 U.S.C. §

1227(a)(1)(B)." Dkt. 91 at 13. This is another reference to 8 U.S.C. § 1201(i) which

allows noncitizens to challenge their visa revocations in removal proceedings when the

revocation is made by a consular officer or the Secretary of State and "such revocation

provides the sole ground for removal under… [8 U.S.C.] 1227(a)(1)(B)…" But Petrova's

visa was *not* revoked by a consular officer or Secretary of State, and her removal

proceedings were *not* brought under 8 U.S.C. § 1227(a)(1)(B). *See* Dkt. 24 at 18-21.

Therefore, she clearly cannot challenge her visa revocation —or the remainder of CBP's

unlawful actions at Logan—as part of her removal proceedings.

Even if she could raise her APA claims in removal proceedings, Petrova would not be required to do because exhaustion of administrative remedies is not a blanket requirement for all APA claims. Instead, it is contingent on whether a statute or agency rule explicitly mandates exhaustion. The Supreme Court in *Darby v. Cisneros* clarified that, "where neither the statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review," courts cannot impose exhaustion requirements. 509 U.S. 137, 138 (1993). The government argues that 8 U.S.C. §§ 1252(a)(5) and (b)(9) mandate exhaustion in this case. Not only do these provisions lack any language suggesting that Petrova must exhaust her APA claims in removal proceedings, they are also facially inapplicable.

The plain language of 8 U.S.C. § 1252(a)(5) indicates that it only applies when there is an order of removal: "Notwithstanding any other provision of law … a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of *an order of removal* entered or issued under any provision of this chapter." (emphasis added). Because an order of removal has never been issued to Petrova, § 1252(a)(5) does not limit the Court's jurisdiction to review her claims.

The language in § 1252(b)(9), or the "zipper clause" as the Supreme Court dubbed it (*see Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999)), at first glance is less dispositive: "Judicial review of all questions of law and fact… *arising from any action taken or proceeding brought to remove an alien from the United States*…shall be available only in judicial review of a final order under this section." (emphasis added). It follows that in order for § 1252(b)(9) to bar review of Petrova's

claims, they must *arise* from an action or proceeding brought to remove her from the United States.

They do not. Petrova asked this Court to set aside CBP's unlawful actions at Logan Airport—actions that led to her being taken into ICE custody. The legal issues raised here do not arise from her removal proceedings. Rather, they concern CBP's conduct more than two weeks prior to the government issuing a Notice to Appear commencing removal proceedings. Petrova's claims did not arise from her removal proceedings. Although she was eventually placed in removal proceedings, those proceedings were the consequence—not the source—of the violations Petrova challenges under the APA. This Court has already found that it "does not run afoul of the jurisdiction-stripping provisions of the INA" because "[t]he immigration officer took action prior to the initiation of removal proceedings and before a notice of removal was issued… The Second Circuit in both *Ozturk* and *Mahdawi* found that chronology important." Dkt. 68 at 60:9-15.

More fundamentally, the government's argument fails because § 1252(b)(9)'s jurisdictional limitations apply only where there is a final order of removal.  Again, no such order exists in this case.[2]  In *INS v. St. Cyr*, the Supreme Court made clear that § 1252(b)(9) is subject to the general limitations of § 1252(b), and, therefore, "applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'" *INS v. St. Cyr*, 533 U.S. 289, 313 (2001) (internal quotation omitted).  As the Third Circuit Court of Appeals explained, "Section 1252(b)(9), therefore, requires only that, when there is an

---

[2]    This distinguishes the present case from *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011), where the court found that the petitioner was indirectly challenging an existing removal order.

order of removal under subsection (a)(1), review of any issues related to that order must be consolidated into a single petition for review and cannot be brought piecemeal. One may not, for instance, follow a petition for review with a habeas petition or a petition for a writ of mandamus." *Chehazeh v. Attorney General of United States*, 666 F. 3d 118, 131 (3rd Cir. 2012); *see also Khalil v. Joyce*, No. 25-cv-01963, U.S. Dist. LEXIS 81083, slip op. at 10 (D.N.J. April 29, 2025) ("Section 1252(b)(9) applies only after a final order of removal has been entered by the immigration courts. The words of the statute say so.")

### B.  This Court Has Jurisdiction to Set Aside CBP's Baseless Inadmissibility Determination.

Even though it is undisputed that there has never been an order of removal against Petrova—and the complaint has been amended to reflect she no longer seeks relief under 8 U.S.C. § 1252(e)—the government still contends that her placement in removal proceedings "provided her with the only relief within this Court's jurisdiction to provide: 'a hearing in accordance with section 1229a[.]'" Dkt. 91 at 14. Inexplicably, despite the record plainly refuting the claim, the government insists that "Petrova seeks an advisory opinion about the legality of a moot determination with no bearing on her ultimate removability or susceptibility to immigration detention." *Id*. Because this Court has already found that, by reviewing Petrova's claims, it "does not run afoul of the jurisdiction-stripping provisions of the INA" (Dkt. 68 at 60), the judgment she seeks is not "advisory"; it will have a concrete legal effect on both her removability and her vulnerability to renewed immigration detention.

The government then recycles its § 1252(e)(5) argument, again asserting that this Court lacks authority to review CBP's inadmissibility determination—regardless of how

unfounded it may have been. Once again, the government invokes a jurisdiction-stripping provision under 8 U.S.C. § 1252—the section that applies only to review of removal orders and is therefore inapplicable here. The Court is not "determining whether [Petrova] has been ordered removed under section 1225(b)(1)," as the government has conceded that no such order has ever been issued against Petrova. *See* Dkt. 63 at 3. Nor is this Court reviewing Petrova's ongoing removal proceedings, which did not even begin until well after the events of February 16. Instead, Petrova asked this Court to review the unlawful conduct by CBP officers at Logan who revoked Petrova's valid visa, found her inadmissible, and cancelled her admission stamp and I-94 record—all without statutory or regulatory authority. *See generally* Dkt. 72.

The government next claims that Petrova failed to exhaust "her challenge to any inadmissibility finding before an immigration judge and the Board of Immigration Appeals as required by 8 U.S.C. § 1252(d)(1)." Dkt. 91 at 15. But the government runs into the same problem: just like the rest of § 1252, § 1252(d)(1) deals with review of removal orders: "A court may review *a final order of removal* only if… the alien has exhausted all administrative remedies…" 8 U.S.C. § 1252(d)(1) (emphasis added). Because Petrova is not seeking review of any final removal order, § 1252(d)(1)'s exhaustion requirement simply does not apply.

Finally, the government again attempts to reframe Petrova's APA challenge as "an implicit claim" that CBP erroneously commenced removal proceedings and invokes the jurisdiction-stripping provision in 8 U.S.C. § 1252(g). *See* Dkt. 91 at 15. The government's continued reliance on § 1252(g) is misplaced. The Second Circuit has repeatedly rejected attempts to extend § 1252(g)'s jurisdictional limitation beyond

discretionary decisions to commence proceedings, adjudicate cases, or execute removal

orders. Most recently, in *Mahdawi v. Trump*, the court reaffirmed the narrow scope of §

1252(g):

> The Supreme Court and our Court have explained that § 1252(g)'s bar on
> jurisdiction is "narrow[]," and "applies only to three discrete actions": a
> decision "to 'commence proceedings, adjudicate cases, or execute removal
> orders.'" *Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525
> U.S. 471, 482 (1999) (quoting 8 U.S.C. § 1252(g) (emphases adopted));
> *see also Oztürk*, 2025 WL 1318154, at \*8. Section 1252(g) is thus
> "directed against a particular evil: attempts to impose judicial constraints
> upon prosecutorial discretion." *AADC*, 525 U.S. at 485 n.9.

*Mahdawi v. Trump*, No. 25-1113, 2025 U.S. App. LEXIS 11240, at \*10 (2d Cir. May 9,

2025).

Similarly, the court in *Khalil v. Joyce* explained that "Section 1252(g)'s aim was to

give the Secretary of Homeland Security the space she needs to make the choices she must –

about enforcement priorities, for example, or allocation of finite resources. These are classic

questions of prosecutorial discretion, and they are generally for prosecutors to work through

for themselves." *Khalil v. Joyce*, No. 25-cv-01963, slip op. at 102 (D.N.J. April 29, 2025).

The Second Circuit has recently reaffirmed the narrow scope of § 1252(g): "There are 'many

other decisions or actions that may be part of the deportation process' but that do not fall

within the three discrete exercises of 'prosecutorial discretion' covered by § 1252(g). *Ozturk*

*v. Hyde*, No. 25-1019, slip op. at 26-27 (2d Cir. May 7, 2025) (order denying stay of transfer

order) (internal quotation omitted).

Petrova is not challenging any discretionary decision "to commence proceedings,

adjudicate cases, or execute removal orders." While DHS eventually initiated removal

proceedings against her (*see* Dkt. 32-1), those proceedings did not begin until March 7,

2025—well after her habeas petition was filed. *See* Dkt. 1. Rather, she is challenging the

legality of CBP's actions at the airport—specifically, the agency's unsupported inadmissibility determination, which is a ministerial, administrative action governed by 22 C.F.R. § 41.122(e), and not a discretionary prosecutorial decision shielded by § 1252(g). *See Atanackovic v. Duke*, 399 F. Supp. 3d at 87-88, *Gill v. Mayorkas*, No. 20-CV-939, 2021 WL 3367246 *8 (W.D. Wash. Aug. 3, 2021).

The inadmissibility determination, which preceded the initiation of removal proceedings, clearly falls outside the narrow jurisdictional bar imposed by 8 U.S.C. § 1252(g).

### C. This Court Has Jurisdiction to Set Aside CBP's Erroneous Cancellation of Petrova's Admission Records.

Here, the government finally gets it right: Petrova's challenge to the cancellation of her admission stamp and Form I-94 is, in fact, "entirely contingent on this Court's jurisdiction to review her actual admissibility or inadmissibility to the United States." Dkt. 91 at 16. Because this Court has jurisdiction to set aside CBP's baseless inadmissibility determination, *see supra* Argument § 2.B, it follows that the Court also has jurisdiction to order CBP to reinstate Petrova's admission stamp and Form I-94, which were issued when Petrova cleared Primary Inspection. Dkt. 72 at ¶53. While Congress has delegated significant authority to border officials, CBP may not disregard the channels of authority fixed by statute, regulation, and its own procedures.

### D. This Court Has Jurisdiction to Review CBP's Violation of 19 U.S.C. § 1497.

The government does not dispute that CBP agents failed to follow mandatory *customs* procedures when they took possession of the frog embryo samples from Petrova on February 16, 2025. The record shows that she was never issued a penalty under 19

U.S.C. § 1497 or 19 C.F.R. § 148.18(a) ("Any article in the baggage of a passenger arriving from a foreign country which is not declared" and "the personal penalty prescribed by section 497, Tariff Act of 1930 (19 U.S.C. 1497), *shall* be demanded from the passenger.") (emphasis added). Nor was Petrova served with any *customs*-related documentation, including the mandatory Notice of Seizure. *See* Dkt. 72-1 at 3 ¶8.d ("If there is a seizure of the undeclared merchandise, the CBP officer would refer the matter to the nearest CBP Fines, Penalties, and Forfeitures Office, which would issue a formal Notice of Seizure."). Instead of initiating that required process, CBP officers unlawfully revoked Petrova's visa and detained her—despite lacking any legal basis to do so.

To defend CBP's improper use of immigration enforcement to address what was, at most, a customs infraction, the government makes two arguments—neither persuasive. First, it argues that the Immigration and Nationality Act does not "require DHS to impose a monetary fine on a noncitizen for customs violations under 19 U.S.C. § 1497… And a customs violation is not a prerequisite for DHS to exercise its detention authority." Dkt. 91 at 19. But this misses the point. Petrova never argued that CBP was required to impose a fine before detaining her. She argued that CBP had no authority to bypass the mandatory *customs* enforcement process altogether in favor of an *immigration* enforcement process for which it lacked legal basis. *See* Dkt. 72 at 20, ¶95. She also argued that CBP's complete failure to follow customs protocols on February 16, 2025, renders the government's later decision to initiate a criminal investigation for an alleged customs violation even more suspect. *Id*. at 23, ¶¶117, 118.

Second, the government claims that CBP had "discretion to enforce 19 U.S.C. § 1497." *See* Dkt. 91 at 20. But the case it relies on—*United States v. Von Neumann*, 474

U.S. 242 (1986)—does not support that proposition. That case involved the government's discretion to remit or mitigate penalties under § 1497 *after* a violation has been processed through the proper administrative channels—not discretion to disregard enforcement entirely. *See* 19 C.F.R. § 148.18(b); *see also* Guidelines for Disposition of Violations of 19 U.S.C. 1497[3]; Appendix A to Part 171—Guidelines for Disposition of Violations of 19 U.S.C. 1497.[4] *Von Neumann* holds only that the government has discretion not to pursue full forfeiture when a violator seeks remission; it does not suggest that CBP may altogether disregard statutory enforcement mechanisms in favor of an entirely different and unrelated enforcement process. *See United States v. Von Neumann*, 474 U.S. at 249-51.

### E.  Petrova Does Not Seek Review of her Criminal Prosecution.

Contrary to the government's assertion, Petrova is not asking this Court to review her criminal prosecution, nor is she collaterally attacking that proceeding through her immigration case. *See* Dkt. 91 at 21. Instead, it is the government that has used the criminal case to gain leverage in the immigration proceedings after failing to achieve its objectives through lawful channels.

Nearly three months after Petrova's arrival—which did not result in any customs-related enforcement action—HSI Headquarters ordered Special Agent Goldsworthy (who was not present at Logan and has no personal knowledge of the events) to open a criminal

---

[3] Available at https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/Mitigation-Guidelines-Seizures-Penalties-Passenger-Failure-to-Declare.pdf (last visited on July 10, 2025).

[4] Available at  https://www.ecfr.gov/current/title-19/chapter-I/part-171/appendix-Appendix%20A%20to%20Part%20171 (last visited on July 10, 2025).

investigation. That order came just one week after this Court scheduled a hearing in

Petrova's habeas case. *See* **Exhibit A** at 37:7-22.

On May 12, 2024—two days before the hearing—the government filed a sealed

criminal complaint, asserting that "public disclosure of the criminal complaint might

jeopardize...the government's ability to arrest the defendant," even though Petrova was

then confined to an ICE detention facility in Louisiana. Dkt. 79-1. Within two hours of the

May 14 hearing—after it became clear that this Court was considering her release—the

government unsealed the complaint, arrested Petrova, and transferred her from

immigration to criminal custody. *United States v. Petrova*, Mot. to Unseal Compl., Dkt. 6,

No. 1:25-mj-05150 (D. Mass. May 14, 2025). Shortly thereafter, the government offered

to defer prosecution—if Petrova abandoned her immigration claims and agreed to self-

deport. *See* **Exhibit B** at ¶5.

This sequence suggests that the criminal charges were brought not to serve any

legitimate enforcement interest, but rather to pressure Petrova into surrendering her rights

in the immigration case. That raises serious due process concerns. *See Blackledge v.

Perry*, 417 U.S. 21, 27 (1974) (prosecution brought to penalize exercise of legal rights

violates due process); *United States v. Goodwin*, 457 U.S. 368, 372 (1982) ("To punish a

person because he has done what the law plainly allows him to do is a due process

violation of the most basic sort.") (internal quotations omitted). This Court need not

resolve the merits of Petrova's criminal case to recognize that Petrova's immigration

proceedings have been distorted by retaliatory and coercive government conduct in

violation of due process.

4.  PETROVA'S APA AND FOIA CLAIMS ARE PROPERLY VENUED.

In its March 24, 2025 Order, this Court confirmed that, despite Petrova's transfer

to the Richwood Correctional Center in Louisiana, it retains jurisdiction over the habeas

claim pursuant to *Ex parte Endo*, 323 U.S. 283, 306 (1944). *See* Dkt. 26. At the May 28,

2025 hearing, the Court reiterated:

> Ms. Petrova filed her habeas petition while incarcerated in the District of
> Vermont. Accordingly, the Court's jurisdiction, if any, was vested at that
> time and was not devested by the Court's -- or the government's
> determination to transfer her to Louisiana or its decision to charge and
> arrest her for smuggling goods into the United States in the District of
> Massachusetts.

Dkt. 68 at 58:14-20.

The government argues that Petrova's APA claims should be dismissed for

improper venue (*see* Dkt. 91 at 21-22) and that her FOIA claims should be dismissed for

improper venue (*id*. at 23-24) and because they are outside the scope of habeas (Dkt. 91

at 23-24). Due to the close factual relationship among the habeas, APA, and FOIA

claims, however, venue is proper and the nexus is so strong that all of Petrova's claims

should proceed in a single action.

It is settled law that in a case involving multiple claims, dismissal of an

improperly venued claim is not warranted if "it is factually related to a properly venued

claim." *Mikhaylov v. United States*, 29 F. Supp. 2d 260, 273-74 (E.D.N.Y. 2014) (quoting

*United States Envtl. Prot. Agency ex rel. McKeown v. Port Auth. of N.Y. & N.J.*, 162 F.

Supp. 2d 173, 183 (S.D.N.Y.2001), aff'd sub nom. *McKeown v. Del. Bridge Auth.*, 23 F.

App'x 81 (2d Cir. 2001)).

Petrova's APA challenge is not just "factually related," it is intrinsically

intertwined with her habeas claim, as her detention stems from CBP's unlawful actions at

Logan Airport, and her APA claims seek to set these actions aside. The APA authorizes this Court to set aside CBP's revocation of Petrova's valid J-1 visa, the cancellation of her admission stamp and I-94 record, and the finding of inadmissibility. Once those actions are set aside, the unlawfulness of Petrova's detention becomes manifest, establishing the basis for habeas relief. Since the APA claims arise from the same core set of facts as the habeas claim, and judicial economy favors joint resolution, venue is proper here.

The government's venue challenge to the FOIA claims, though grounded in the FOIA-specific venue provision (5 U.S.C. § 552(a)(4)(B)), also fails. While Petrova does not reside in Vermont and the records are presumably located elsewhere, courts have recognized that proper venue for the principal claim can support venue for related claims without requiring independent satisfaction of venue requirements. The D.C. Circuit explained:

> The general rule is that venue must be established as to each separate cause of action. However, as one commentator has explained, the focus is on the word separate. Professor Moore notes that, whether the case involves a federal and nonfederal claim, or two federal claims, if they amount to only one cause of action with two grounds for relief, proper venue as to one federal ground will support adjudication of both grounds.

*Beattie v. United States*, 756 F.2d 91, 100 (D.C. Cir. 1984). *See also Sadighi v. Daghighfekr*, 36 F. Supp. 2d 267, 277 (D.S.C. 1999) ("Although courts have traditionally held that venue must be appropriate for each claim, a court may, in its discretion, hear claims as to which venue is lacking if those claims arise out of the same common nucleus of operative facts as other claims to which venue is proper… The touchstones of the doctrine of 'pendent venue' are judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants.") (internal quotations omitted).

22

Here, Petrova's FOIA request—submitted on April 10, 2025—sought "any and all records regarding [her] entry/admission at Boston Logan Airport… on February 16, 2025" and "any and all records related to an alleged customs violation on or around February 16, 2025." *See* Dkt. 72-6. CBP failed to respond within the 20-day statutory deadline. *See* 5 U.S.C. § 552(a)(6)(A)(i); *see also* 6 C.F.R. § 5.6(c). The records withheld go to the heart of Petrova's habeas and APA claims. As this Court acknowledged, "[s]he is in the process, under a Freedom of Information Act claim, to try to find out if there is a retaliatory purpose behind what has happened to her." Dkt. 68 at 64:1-4. The records CBP is withholding include a recording of Petrova's secondary inspection:

> Q. The interaction at Secondary Inspection, is that audio or video recorded to your knowledge?
> A. I believe so, but depends on the location.
> Q. Do you know whether there's an audio or video recording in this case?
> A. Likely.

**Exhibit A** at 53:9-14

Because the FOIA, APA, and habeas claims all arise from the same underlying events—the conduct of CBP at Logan Airport on February 16, 2025—they form part of the same common nucleus of operative facts. The interests of judicial economy, convenience, and fairness support resolving all claims in this Court.

### III.     CONCLUSION

Despite the significant powers granted to border agents, there are limits to their authority—limits that are not aspirational but obligatory. When CBP exercises its immense immigration powers without legal basis, using them to punish noncitizens for actions that should carry no immigration consequences, it constitutes a clear abuse of government authority. In the face of such overreach, we are reminded of the judiciary's

essential role in protecting individuals from the unlawful exercise of executive authority. "We yet cling to the hope that it is not naïve to believe our good brethren in the Executive Branch perceive the rule of law as vital to the American ethos. This case presents their unique chance to vindicate that value and to summon the best that is within us while there is still time." *Kilmar Abrego Garcia v. Kristi Noem*, 2025 U.S. App. LEXIS 9237, *6 (4th Cir. 2025).

Respectfully submitted,

Dated: July 11, 2025                          Respectfully submitted,

/s/ *Brian Scott Green*                       /s/ *Gregory Romanovsky**
Brian Scott Green                             Gregory Romanovsky
Law Office of Brian Green                     Romanovsky Law Offices
9609 S University Boulevard #630084           12 Marshall Street
Highlands Ranch, CO 80130                     Boston, MA 02108
(443) 799-4225                                (617) 787-0000
briangreen@greenusimmigration.com             gr@romanovskylaw.com

                                              **Admitted pro hac vice*

*Attorneys for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Opposition to Motion to Dismiss filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

Dated: July 11, 2025                By:        / s /  Gregory Romanovsky
                                               Gregory Romanovsky