```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   UNITED STATES OF AMERICA,       )
                                     )
 4            Plaintiff,             )
                                     )   No. 1:25-cr-10272-LTS
 5   v.                              )
                                     )
 6   KSENIIA PETROVA,                )
                                     )
 7            Defendant.             )

 8

 9            BEFORE THE HONORABLE JUDITH G. DEIN
                 UNITED STATES MAGISTRATE JUDGE
10

11                      Motion hearing
                      (Digital recording)
12

13                    February 10, 2026
                   10:03 a.m. - 11:30 a.m.
14

15

16       John Joseph Moakley United States Courthouse
                      1 Courthouse Way
17                Boston, Massachusetts 02210

18

19

20

21

22

23

24   Proceedings recorded by sound recording and produced by
     computer-aided stenography.
25
```

```
 1                        APPEARANCES

 2    ON BEHALF OF THE PLAINTIFF:
         DAVID M. HOLCOMB, ESQ.
 3       United States Attorney's Office
         1 Courthouse Way
 4       Suite 9200
         Boston, Massachusetts 02210
 5       (617)748-3354
         David.holcomb@usdoj.gov
 6

 7    ON BEHALF OF THE DEFENDANT:
         WILLIAM W. FICK
 8       Fick & Marx LLP
         24 Federal Street
 9       4th Floor
         Boston, Massachusetts 02110
10       (857)321-8360
         Wfick@fickmarx.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24    Proceedings recorded by sound recording and produced by
      computer-aided stenography.
25
```

1                    P R O C E E D I N G S

2

3          (Recording begins 10:03:06 a.m.)

4          THE CLERK:  The United States District Court for the

5    District of Massachusetts is now in session on February 10th,

6    the year 2026, in the matter of the United States of America

7    versus Kseniia Petrova, Criminal Case Number 202510272.

8          Could counsel please identify themselves for the

9    record?

10          MR. HOLCOMB:  Good morning, Your Honor.  David Holcomb

11    for the United States.

12          MR. FICK:  Good morning, Your Honor.  William Fick for

13    Ms. Petrova who is here with me.

14          THE COURT:  Good morning.

15          We're here on the defendant's motion to compel.

16          MR. FICK:  That's right, Your Honor.

17          THE COURT:  Have you made any changes since the papers

18    were filed?

19          MR. FICK:  Well, I mean, as the papers reflect, after

20    the motion was filed, the government did produce some

21    materials, and so some of the requests -- and I can talk about

22    which ones -- the government has represented that they produced

23    everything they're aware of, you know.

24          I -- my only concern with that language is I would

25    expect that awareness involved some level of inquiry to find

1    out, right, whether something exists, sort of, outside the four

2    corners of this U.S. Attorney's Office, and, you know, if

3    that's the case, then those requests, where the government has

4    produced things and said it's unaware of anything else, are

5    probably satisfied, but it leaves other categories that are

6    still in dispute.

7          THE COURT:  We'll go over all of it, but, obviously,

8    you could have called.

9          MR. FICK:  I'm sorry?

10         THE COURT:  You could have called them to find out

11   how -- if you have an issue as to --

12         MR. FICK:  Well --

13         THE COURT:  -- the words that he's using, but we'll --

14         MR. FICK:  Well --

15         THE COURT:  -- we'll go over it.

16         MR. FICK:  Okay.  I mean, that was really -- a

17   reflection really.  I mean, I read the papers again this

18   morning, and that sort of jumped out at me that that was the

19   language.

20         But, in any event, yes, that's something that we can

21   clear up, and those -- the categories where they produced

22   things and said we're unaware of anything else are probably not

23   controversial.

24         THE COURT:  Okay.

25         MR. FICK:  But it does leave some area of substantial

1    controversy.

2           And I guess I'll start with the biggest one, and that

3    is the question about the showing required to get discovery on

4    issues of either vindictive prosecution or selective

5    prosecution.

6           And I don't think there's any disagreement about the

7    legal standard here, right.  The standard is if the defense

8    produces some objective evidence of vindictiveness, that

9    warrants discovery, you know.

10          The government cites the *Bucci* case out of the First

11   Circuit, which, you know, sets off that standard.  It comes

12   from Armstrong, a Supreme Court case, and the cases that we

13   cite in our brief, which are more recent and a little bit of a

14   different context, also all come from *Armstrong*, so we're not

15   really disputing the standard.

16          I'd suggest *Bucci* is not really a very good touchstone

17   of comparison for a couple of reasons.  It's a case from a very

18   different time about a very, very different kind of criminal

19   investigation, right.

20          The *Bucci* case that the government relies on was a big

21   drug investigation, serious drug charges get filed against

22   Mr. Bucci.  He creates this Whosarat.com website, which is

23   controversial.

24          Six months later the government supersedes with some

25   more serious charges, and a year later they supersede again

1    with yet more serious charges.  And that -- you know, the

2    defense argued there that, well, the government's just

3    retaliating against him because of rat.com.

4            But the temporal proximity there is -- it's along a

5    much greater horizon, right.  We're talking about six months

6    and a year after that.  And it also just looks much more like

7    what always happens or what often happens in an ordinary drug

8    investigation; initial charges are brought; investigation

9    continues; the charges get enhanced.  That doesn't look, on its

10   face, terribly unusual.

11           And so, you know, the First Circuit said, well, you

12   know, suspicious timing isn't enough, which I don't disagree

13   with that, but I would suggest the timing in *Bucci* was not very

14   suspicious to begin with, and, of course, it doesn't mean that

15   timing is not a factor.

16           I mean, all the Courts that have looked at this where

17   there is an issue of suspicious timing and say it is a factor

18   to be considered.  So I don't think *Bucci*, on its facts, really

19   helps us or even teaches us much about the law, you know.

20           The Court -- there are lots of cases we cite in our

21   papers.  I think the most interesting one that comes out of,

22   sort of, our time and circumstances is the *Abrego Garcia* case

23   out of the Middle District of Tennessee where you had, you

24   know, a similar situation about disputed conduct by homeland

25   security, judicial intervention or judicial action that seemed

1    to result in, sort of, traction for the claimant, the defendant

2    in that case, and then the sudden institution of criminal

3    charges that appear both in timing and in, sort of, structure

4    to be intended to thwart that effort, right.

5         And the Court found there that there was grounds for

6    additional discovery, and the case is cited in the papers.  It

7    is -- it's a Lexis cite, but the Court will find it in the

8    papers.

9         And so, you know, that comes from the current world

10   we're living in where the -- sort of, the interactions between

11   the White House, the Department of Justice, the Department of

12   Homeland Security, and local prosecutors are being conducted in

13   a different way on different bases.

14        And so -- and so, you know, the record that I suggest

15   we present here in Ms. Petrova's case echoes that chronology

16   and, sort of, you know, background in many ways.

17        And, sort of, one of the most unusual things we have

18   here is we have a federal judge in the habeas case in

19   Ms. Petrova's case who makes essentially a preliminary finding

20   on -- in denying a motion to dismiss and says, Ms. Petrova

21   argues she has been criminally prosecuted to divest this Court

22   of habeas jurisdiction and/or to gain an advantage in a civil

23   proceeding by prosecuting her criminally.  The Court finds her

24   petition raises substantial claims grounded in the facts and

25   law on which she has shown there is a likelihood she will

1    prevail.

2           Now, that's a judicial finding, I would suggest, or

3    finding order, preliminary or not, that maybe doesn't use the

4    words "some evidence," but, I mean, it's essentially saying we

5    have facts and we have law and I think there's a likelihood she

6    will prevail.  I mean, if that's not -- if that's not, sort of,

7    some evidence in other words or even more than that, it's hard

8    to know what is.

9           And, sort of, where does that come from?  Well, the --

10   the litigation in that case, right, that, sort of, led to or

11   was the preamble to the criminal charges, the Court found, as a

12   preliminary matter, right, that there was a showing that the

13   failure to declare something in customs does not provide a

14   basis legally to cancel a visa; it's not a ground in

15   inadmissibility; CBP failed to follow its own procedures; and

16   CBP is not authorized to revoke a visa.  So that's, sort of,

17   part of the preliminary legal argument in the habeas court, so,

18   you know, CBP has done something strange, apparently.

19          Then what happens?  On the 22nd of April, the habeas

20   Court sets a hearing for May 14th where, you know, she's

21   already made findings that there's something fishy going on

22   here; we're going to have a hearing on May 14th where I may

23   well order Ms. Petrova released on bail.  Then what happens?

24          So the 22nd of April, that happens.  The 2nd of May,

25   we know from the testimony and the probable cause hearing here,

1    HSI makes a referral from headquarters in D.C. to open a

2    criminal investigation, right, from headquarters in D.C., not

3    something local, not something out of Logan Airport.

4         Now, you know, the timing there is peculiar.  One of

5    the things we're seeking in discovery are the communications

6    inside HSI and among HSI, DOJ, the White House, and whoever

7    else about why that decision was made literally, like, a week

8    or so after the habeas Court says, we're going to consider --

9    you know, I think something fishy is going on here, and I'm

10   going to consider releasing Ms. Petrova.  So that happens on

11   the 2nd of May.

12        The 12th of May, the Court obtains -- or the

13   government obtains the complaint here.  Also, on the 12th of

14   May, there's -- Massachusetts files an amicus brief on the

15   habeas making allegations about how this is part and parcel of

16   the government singling out international students especially

17   from Massachusetts and from Harvard.

18        It's the day before Ms. Petrova herself publishes an

19   op-ed in the *New York Times*, and it's two days before the

20   scheduled habeas hearing, so the criminal complaint gets issued

21   then.  It gets unsealed on the very day of the habeas hearing.

22   And then within about a week, the U.S. attorney is arguing to

23   the habeas Court that, well, now there's this criminal

24   complaint; you no longer have jurisdiction.

25        So, you know, it certainly suggests that a purpose of

1    doing this in this way in this time frame was to try and thwart

2    the habeas process.  The judge in Vermont disagreed that that

3    would be effective, but, you know, the timing is, I would

4    suggest, extremely telling.

5         And so that's, sort of -- it suggests, I would argue,

6    that, you know, the criminal charges, either in whole or in

7    part, are designed to thwart the habeas process and try to,

8    sort of, prevent the Court in Vermont from further digging into

9    what CBP did at Logan Airport and whether it was proper or not.

10        So that's -- that's one piece of some evidence, where

11   a Court has actually said, yeah, you know, I think this is a

12   substantial showing.

13        The other piece of some evidence is a suggestion of

14   First Amendment retaliation.  Now, the government says, well,

15   you know, the *New York Times* op-ed actually comes a day after

16   we got the criminal complaint so that's not what caused this.

17        But that's not our point, right.  What we know is even

18   before May 13th, Ms. Petrova's situation is getting extensive

19   coverage in lots of media including the *New York Times*.  She's

20   interviewed.  She's made statements.  She's out there.  There's

21   a report from HSI that we cite in the paper saying HSI is

22   tracking all of this stuff very carefully, right, so that in

23   itself seems unusual.

24        Then we have May 12th, the government gets its

25   complaint that's under seal; May 13th, the *New York Times* op-ed

1    offered by Ms. Petrova is published; then on the 14th, the

2    complaint is unsealed and the U.S. attorney makes a statement

3    which doesn't just announce the charges; it actually contains,

4    essentially, an attack on the *New York Times* saying, you know,

5    don't let facts get in the way of -- you know, this is -- now

6    we've filed criminal charges; you shouldn't let facts get in

7    the way of a good story.

8            Now, that, in a way, right, it's -- it's -- is it

9    responsive just to the editorial -- from the op-ed from the day

10   before?  It's not clear.

11           I would suggest what it reflects is a kind of real

12   animus on the part of the government against Ms. Petrova's

13   exercise of her First Amendment rights and the coverage of her

14   situation suggesting that, you know, the government has gone

15   way, way overboard here.

16           It's extraordinarily unusual for, you know, the -- the

17   government makes press releases and press statements all the

18   time when charges are filed, right.  There's a local rule that,

19   sort of, cabins what can and can't be said.

20           This statement, which is quoted in -- verbatim in the

21   papers, I would suggest, goes well beyond what we usually see,

22   and it, sort of, suggests the tail end of the dog or -- that's

23   been, sort of, wagging its tail since -- that's probably not

24   the right analogy -- but the tail end of a process that has

25   been going on for -- much earlier, you know, DHS very carefully

1    tracking all of the -- all of the statements and coverage

2    that's happened here, so, sort of, on two different levels,

3    sort of, two different categories of potential retaliation or

4    vindictiveness; we would suggest there is more than enough of a

5    showing that there is some evidence enough to warrant discovery

6    going forward.  That's vindictiveness.

7         The other part is selective prosecution.  For that to

8    get discovery -- again, there's no dispute, and this all,

9    again, comes out of the Supreme Court jurisprudence -- there

10   has to be a showing -- a preliminary showing of discriminatory

11   effect and discriminatory intent.

12        And, you know, the, sort of, best encapsulation of

13   that is the amicus brief the attorney general of the

14   Commonwealth of Massachusetts files in the habeas case which

15   essentially says what we are seeing in Massachusetts is

16   discriminatory -- both effects and intention, both -- you know,

17   intention just in the words the administration is saying;

18   effect in what we are seeing in our students -- our

19   international students and the way they're being treated, that

20   they are in violation of, sort of, due process rights and, sort

21   of, any sort of reasonable basis in the law being singled out

22   for poor treatment.

23        And Ms. Petrova is one of the most, sort of, notable

24   examples of that because her treatment, sort of, went way

25   beyond what we've seen in just about any other case except

1   perhaps the *Ozturk* situation and that arrest.

2          So, extraordinary, right, you have the chief law

3   enforcement officer of the Commonwealth of Massachusetts saying

4   the government is selectively going after a class of people of

5   which Ms. Petrova is one in a way that is completely unlawful,

6   again, unprecedented circumstances and hard to imagine that

7   that's not some evidence of discriminatory effect and

8   discriminatory intent that would warrant, at a minimum,

9   discovery on these issues.

10         And so those -- that, we would suggest, is the basis,

11  the principal basis, for discovery requests 16 to 21 in the

12  initial letter, you know.  If we got deeper into the weeds, we

13  could talk about each individual one and whether it's

14  appropriate now or appropriate later.

15         The other thing I would say is, you know, there's

16  almost a bit of a conundrum with this issue.  Do we seek

17  discovery about it at the beginning, during the regular

18  discovery process, or do we wait until we file an actual motion

19  to dismiss and seek it then?

20         In the circumstances here where the facts and

21  background that we already have, I conclude, are so compelling,

22  I thought it makes sense to do it at the preliminary discovery

23  stage.

24         But what I would ask the Court is, you know, if -- and

25  I hope the Court doesn't disagree with me, but if the Court

1    were to disagree that there's been a showing -- a sufficient

2    showing now, at least the denial be without prejudice because I

3    expect we will actually file an actual substantive motion to

4    dismiss at which point, if the Court has not already found a

5    sufficient basis, we would renew the request for discovery.

6            THE COURT:  Let me just ask you on your selectiveness

7    argument, you rely -- you're emphasizing the Mass. AG right

8    now.  It seems to me there was evidence, though, that in the

9    treatment at Logan, the fact that this was referred for

10   criminal prosecution at all given that it was a --

11           (Crosstalk.)

12           MR. FICK:  Yes.  I'm certainly --

13           THE COURT:  -- is that part of your selectiveness, or

14   does it have --

15           (Crosstalk.)

16           MR. FICK:  It is part of it, but I think that -- I --

17   that's, sort of -- that's, sort of, part of the District of

18   Vermont's -- the Courts there are finding also.  I didn't mean

19   by any means to, like, forget about that or diminish that.  I

20   think that's right.

21           And it's interesting, right, the government's response

22   to this is, well, it's not that unusual; there are a couple of

23   cases in Michigan where Chinese nationals were prosecuted for

24   bringing, like, roundworms into the country.

25           Those events are a different situation, right,

1    because, as I understand the charges there, we're talking about

2    live, biological stuff, absolutely not the kind of material

3    Ms. Petrova was bringing in.

4         The record -- I don't know that there's any basis to

5    dispute it, this stuff was formalin-fixed, not living,

6    nontoxic, nonreactive, right, very different from bringing --

7    the cases in Michigan that the government even cites.

8         And there's certainly -- again, the -- the

9    declaration, the testimony in Vermont, and the judge's

10   conclusions from that do provide another basis for a finding of

11   selectivity.

12        But I guess what I was focusing on with the Mass. AG

13   is you have to have selectivity based on some unlawful

14   criteria, right, or, like, a protected class.

15        And I would suggest the protected class here are

16   international -- international students in Massachusetts who

17   are being singled out in a way that's inappropriate, but the

18   factual underpinning for showing selectiveness is broader, the

19   Court's exactly right about that, and I was remiss to forget

20   about mentioning it, so that's -- that's sort of that piece.

21        I can go on to some of the other categories of

22   information if the Court wants --

23        THE COURT:  Let's divide it.

24        MR. FICK:  -- or we can do it in pieces.

25        THE COURT:  Let's divide it.  Let's focus on this, and

1     then we'll -- then we'll deal with the specifics.  So in the

2     specifics, I do want to deal with the jury instructions --

3              MR. FICK:  The grand jury.

4              THE COURT:  -- as a separate category as well, but let

5     me hear from the government on this.

6              MR. FICK:  Thank you.

7              MR. HOLCOMB:  Thank you, Your Honor.

8              And just to preview, in the government's view, I think

9     based on the government's response, the main two categories of

10    discovery that are at issue today are the selective and

11    vindictive prosecution discovery requests and the grand jury

12    legal instruction requests because I do think that everything

13    is -- else has been responded to at this point.

14             I will start by just disagreeing with Mr. Fick that we

15    agree on the legal standards because I think the defense's

16    motion is clear that we don't because they didn't cite the

17    controlling First Circuit standards for either vindictive or

18    selective prosecution.

19             With respect to -- I'll take each in turn, but with

20    respect to *Bucci*, the vindictive prosecution case, the question

21    isn't whether the facts are similar to *Bucci*.  The question's

22    whether *Bucci* sets out the controlling standard in the First

23    Circuit, which is some objective evidence, which it does, and

24    that's a different standard than what the defense applied in

25    its motion; and same thing with the *Lewis* case with respect to

1    selective prosecution, this morning is the first time that the

2    defense has elaborated on how the evidence somehow satisfies

3    the *Lewis* requirements of both discriminatory effect and

4    discriminatory intent.  The motion --

5           THE COURT:  But as we stand here today, I had actually

6    written that the parties agree on the standards, so are we

7    working off of the same standard now, the *Bucci* standard, for

8    some objective evidence, and then the discriminatory effect and

9    intent for the selectiveness?

10          MR. HOLCOMB:  Your Honor, I just highlight that to

11   point out that I think we are today.

12          THE COURT:  Today.

13          MR. HOLCOMB:  I think we are today.

14          THE COURT:  All right.

15          MR. HOLCOMB:  But --

16          THE COURT:  Whether I read the briefs differently or

17   not, I just want to make sure we're on the same page right now.

18          MR. HOLCOMB:  Yes, Your Honor.

19          And so let me address selective prosecution first,

20   and, again, this morning is the first that the defense has

21   articulated any theory of discriminatory effect or

22   discriminatory intent.

23          One of the requirements is that -- identifying a

24   protected characteristic; the motion does not do that at all.

25   As I hear it this morning, the protected characteristic is

1    allegedly a class of international students that have been,

2    according to the Massachusetts AG's office, allegedly targeted.

3        But that doesn't do what the *Lewis* standard requires.

4    Under the *Lewis* standard, to prove discriminatory effect, the

5    defense bears the burden of showing that there's a class of

6    individuals who don't share the protected characteristic that

7    have not been prosecuted for doing the same thing, and the

8    *Lewis* case walks through that when it discusses the defining of

9    the pool of similarly situated defendants.

10    THE COURT:  But wouldn't one of the pools here be

11    persons who have things confiscated at the airport are not

12    prosecuted at that point by customs and border patrol but have

13    criminal proceedings brought against them?  I mean, isn't that

14    sufficient?

15    MR. HOLCOMB:  No, Your Honor.  And *Lewis* says it is

16    not, because what the -- the First Circuit in the *Lewis* opinion

17    explained is that in defining the pool of similarly situated

18    offenders, it must be done in relation to what the First

19    Circuit called material prosecutorial factors.

20        It's not just everybody else who, as a routine matter,

21    may have failed to declare something but rather looking at who

22    is -- who can be said to be similarly situated has to be done

23    considering the facts that would fairly be material to

24    prosecutors, and the *Lewis* Court identifies those to include

25    the manner in which the offense was committed, the efficacy of

1    deterrence of bringing a case, and the nature of the evidence.

2           And so there are these material factors that the

3    government -- that *Lewis* acknowledges that the government can

4    consider in deciding whether to prosecute one person for

5    committing an offense and not another person.

6           THE COURT:  So who would be similarly situated here?

7           MR. HOLCOMB:  I think it -- it would have -- so I

8    don't know that we're at that point in defining a pool of

9    similarly situated people.

10          But here, I would say, at a minimum, it would have to

11   take into account the level of planning or indications of

12   forethought that went into concealing the items and not

13   declaring them and the -- the nature in which it was done, the

14   false statements to the officers.

15          The *Lewis* test and the material prosecutorial factors

16   does not -- does not lump everybody who happens to have walked

17   into the country together -- and not declared something

18   together.

19          I think in the *Lewis* case, the question was in the --

20   the -- I think it was a counterterrorism example, and it

21   included, you know, the -- if I may, Your Honor, I just want to

22   pull the case out -- so the First Circuit in *Lewis* said in

23   configuring the pool of similarly situated offenders, no fact

24   should be omitted to make it out completely; material

25   prosecutorial factors are those that are relevant, that is,

```
1    that have some meaningful relationship either to the charges at

2    issue or to the accused and that might be considered by a

3    reasonable prosecutor.

4            THE COURT:  So would the class be -- would the

5    similarly situated be persons entering the country on

6    international visas who fail to declare and how they were

7    treated at the airport?  Do we divide that --

8            MR. HOLCOMB:  I would say, Your Honor --

9            THE COURT:  -- before the changes in policy and after?

10           MR. HOLCOMB:  I would say, Your Honor, that it's even

11   more specific, that it would include individuals who have

12   demonstrated some premediation or planning in the smuggling of

13   items into the U.S.

14           THE COURT:  But how do you get that without discovery?

15   I mean, I understand that as an argument to differentiate any

16   claim that is actually pursued, but we're dealing here right

17   now with discovery.

18           So he's put forth -- the defendant has put forth

19   evidence that goes unchallenged at this point but, obviously,

20   will be challenged, that there has been virtually no similar

21   prosecutions of persons entering on foreign visas who have --

22   who have failed to declare things then being criminally

23   prosecuted for it without the border patrol proceedings being

24   completed.  I mean, that's the evidence that I have, that she

25   was treated differently than anyone else.
```

1          So the question that I have is whether that's enough

2    just to get discovery, whether it ends up ultimately being able

3    to be differentiated on the grounds of individuals.

4          If nobody else was prosecuted, as he asserts, then I

5    guess you're going to say nobody else planned it to the degree

6    that she did.  I don't know.

7          MR. HOLCOMB:  Well, I think that's correct, Your

8    Honor.  And let me just say that the *Lewis* case is about

9    entitlement to discovery not ultimately making out a selective

10   prosecution claim.

11         THE COURT:  Right.

12         MR. HOLCOMB:  And so this is the, kind of, threshold

13   issue of the showing required to get discovery, and so what

14   the -- what the circuit says is that in determining whether a

15   sufficient enough showing has been made, the Court has to

16   consider these other factors that may have legitimately

17   influenced the government's decision to prosecute one

18   individual but not another, and the Court says these may

19   include, among others, the comparability of the crimes, the

20   similarities and the manner in which the crimes were committed,

21   the relative efficacy of each prosecution as a deterrent, and

22   the equivalency of the evidence against each prospective

23   defendant.

24         And so I do understand the concern about -- or the

25   general claim that, well, this seems to be a selective instance

1    of prosecuting somebody for failing to declare, which is

2    something that we may, just as a general matter, assume that

3    plenty of people do.  The example that Mr. Fick has made on

4    several occasions is if I bring in an Eiffel Tower magnet and

5    fail to declare that --

6              THE COURT:  I think it was something from Mexico,

7    wasn't it?

8              MR. HOLCOMB:  That's the scorpion encased in plastic,

9    I believe that was the favored example of the habeas Court.

10             But, in any event, Mr. Fick's example, I come in and I

11   fail to declare an Eiffel Tower magnet.  That person may not be

12   in the same class as Ms. Petrova for a simple failure to

13   declare a little souvenir.

14             The prosecutorial factors that the First Circuit just

15   enumerated all go to what it was that Ms. Petrova is alleged to

16   have done, the comparability of the crimes.  That's not a

17   comparable situation if somebody brings back a souvenir from

18   another country and just says, I'm not going to declare it and

19   walks through.

20             That's different than texting with your coworkers in

21   advance and concealing frog embryos, research samples in two

22   different bags, and not declaring them and then when first

23   being confronted by a CBP agricultural specialist about whether

24   you have biological materials saying no and then only then

25   presenting the research samples that you are carrying through

1    the border.  Those are two separate manners of an offense or a

2    violation, I should say, because it's --

3         THE COURT:  But the evidence that I have in front of

4    me on this, obviously, very abbreviated record, is that

5    regardless of whether somebody was bringing in the magnet or

6    bringing in biological samples or whether we define biological

7    the same way or not, nobody's prosecuted, that the -- that the

8    samples are taken away, that they're sent home, that they're

9    investigated, and then there's a time that lapses before

10   something's done, and that there are not comparable

11   circumstances where somebody is found ineligible to come into

12   the country, that their documents are invalidated at that

13   point, and that they're subsequently prosecuted.

14        And I think the argument is that the subsequent

15   prosecution is to prevent the investigation as to what went on

16   at Logan; right?

17        MR. FICK:  In part.

18        THE COURT:  In part.  So I understand that there could

19   be a lot of basis -- you know, we spend our lives separating

20   and merging facts to our -- he'll take a broader class; you'll

21   take a more narrow class, but right now, I have no -- nothing.

22   Like, I have that she was just treated differently than anybody

23   else who has come through here, whether they thought about it,

24   whether they had a text on them or not, whether they

25   communicated with coworkers, the evidence in this record that

1   was presented to the habeas judge was it's never happened

2   before.

3        MR. HOLCOMB:  Well, Your Honor, I think the point is

4   that *Lewis* says that that's not enough.  To, sort of, look in

5   general and say, I don't have another example of this is not

6   the -- the --

7        THE COURT:  It's not the end.

8        MR. HOLCOMB:  -- showing.  It's not the showing that

9   the defendant has to make.  What the defendant has to show --

10  and this is what *Lewis* says -- is that somebody similarly

11  situated committed this offense but was not prosecuted for it.

12       And so the question is not, you know, is there an

13  absence of examples?  The question is:  Are there specific

14  examples where somebody was not prosecuted and did not share

15  the same characteristic that the defendant -- the defense is

16  pointing to that Ms. Petrova was supposedly discriminated

17  against for?

18       And so *Lewis* is clear on that, is that the first --

19  one of the steps, an earlier step, is defining the pool of

20  who's similarly situated, but after that, the defense has the

21  burden of showing that there are examples of people who are

22  similarly situated and were not -- and did not share the trait

23  and were not prosecuted.

24       And so I -- I think the Courts recognize that it's a

25  rigorous standard, and it might not be one that is easily made

1    prior to discovery, but that said, this is the requirement for

2    being entitled to discovery into selective prosecution.

3        If -- Your Honor, I think unless you have any more

4    questions about the selective prosecution arguments, I'll just

5    move on to vindictive prosecution.

6        THE COURT:  That's fine.

7        MR. HOLCOMB:  So here just to, you know, quickly

8    rehash the applicable standard from *Bucci* or the guidance from

9    *Bucci*, it's some objective evidence tending to show the

10   existence of prosecutorial vindictiveness.

11       The defendant has to do more than suggest a potential

12   motive for prosecutorial animus.  The defendant must connect

13   any alleged prosecutorial vindictiveness to those making the

14   charging decision, and the defendant cannot rely on allegedly

15   suspicious timing alone.

16       And I do want to just point out that I think the

17   argument is a bit of a moving target because the motion goes --

18   the entire first half of the motion addressing these arguments

19   without pointing out that the real first date of charges was

20   May 12th, the day prior to the *New York Times* op-ed and two

21   days prior --

22       THE COURT:  You know, you relied a lot on that

23   argument, and I have to say I found it frustrating, because the

24   issue of the validity of the conduct was at issue from the day

25   after, from February 23rd, when the habeas petition's filed,

1    right, and then she's transferred to Louisiana the next day.

2         It's not -- she's in limbo.  There's no hearings.

3    There's no prosecution.  There's no move to charge her with

4    anything.  There's nothing happening.

5         It seems to me that April 22nd is your key date,

6    right; that's the date that the Court says, I'm uncomfortable

7    maybe with what happened, but at least I'm giving you a

8    hearing, and I'm giving you a hearing on May 14th.

9         And that's when the investigation allegedly starts and

10   the charges are brought.  I mean, I think you have a -- to

11   argue that I should focus on the fact that the complaint was

12   put forth on May 12th ignores the fact that the issue has been

13   percolating and briefed and made public well before then.

14        MR. HOLCOMB:  And, Your Honor, I apologize if the

15   government, kind of, hit that point too hard, but I think the

16   reason we hit that point hard in our opposition is because the

17   defense highlighted it in its motion.

18        It said that the *New York Times* op-ed -- its actual

19   argument with respect to the *New York Times* op-ed and the U.S.

20   attorney's statement is that the U.S. times -- or the *New York*

21   *Times* op-ed provoked the charging decision, and so the point of

22   hitting it hard in opposition is because it's a factual

23   impossibility because she was charged at that point.

24        And the same thing with respect to the May 14th

25   hearing that the defense's motion painted as this big victory

1    for her and that hours later we rushed to unseal charges as if

2    there's some significance there, when, in fact, she was already

3    charged two days prior, and so -- but I think if I may

4    address --

5              THE COURT:  Yeah.  Let me just --

6              MR. HOLCOMB:  -- your larger concern.

7              THE COURT:  I think everybody's arguments have

8    evolved, but the facts -- let's just deal with the facts, all

9    right, and I think the facts, as chronology is undisputed, in

10   that we have no hearing until April 22nd; at which point, I

11   don't know if there was a hearing or not, but on April 22nd,

12   there's a hearing scheduled for May 14th.  I think that's clear

13   on the record.

14             I think the testimony at the probable cause hearing

15   was -- on May 2nd, was when the referral came in to start

16   the -- to open the criminal investigation.  May 12th was when

17   the complaint was presented.  May 14th is when the habeas

18   hearing took place, and then shortly thereafter on May 25th,

19   the government argues to the habeas Court that the institution

20   of criminal charges mooted the habeas petition, so there's

21   clearly a connection between the proceedings in the habeas

22   court and the proceedings in this court.

23             MR. HOLCOMB:  I disagree with --

24             THE COURT:  Okay.

25             MR. HOLCOMB:  -- connection, Your Honor.  I agree that

1    there's an interplay.  And just to correct one point Mr. Fick

2    made, he said the U.S. Attorney's Office then went to the

3    District of Vermont and argued in the habeas proceeding that

4    the Court didn't -- no longer had jurisdiction over those

5    claims.

6         The U.S. Attorney's Office had no part in the habeas

7    proceedings.  We haven't intervened at all.  The government --

8    the part of the government responding to that -- or involved in

9    that case, party to that case, may have made that argument, but

10   the U.S. attorneys -- it's incorrect to say that the U.S.

11   Attorney's Office said, District of Vermont you no longer have

12   jurisdiction over her habeas claims.

13        THE COURT:  So what's this May 25th reference in the

14   papers?  It says DHS argues to the habeas Court that the

15   institution of criminal charges mooted the habeas petition.

16   Are you aware of that?

17        MR. HOLCOMB:  As I understand -- well, I accept it

18   as -- you know, I accept the representation that that's what

19   happened in the habeas proceeding.  I don't have intimate

20   knowledge of the habeas proceedings, but if that's -- that's

21   what DHS, apparently, argued.

22        But it is not what the U.S. Attorney's Office, which

23   has charged this criminal case, took as a position, because the

24   U.S. Attorney's Office has taken no positions in the habeas

25   proceedings.  It has not intervened in the habeas proceedings

1    at all, and so that's why I disagree with the characterization

2    of a connection.

3            And I think this is the problem with relying too much

4    on a chronology and dates because it often invites inferences

5    that just as easily could be made at any point along the

6    chronology.

7            If she had been charged immediately after or a week

8    after claiming asylum and first filing her habeas petition,

9    it's a very common argument in these types of cases alleging

10   vindictive prosecution that the closer in time to the exercise

11   of the right is more indicative of retaliation.

12           And so here, the argument is that the further in time

13   is more indicative of retaliation, and there's no objective

14   evidence to base either conclusion on.

15           The defense asks the Court to draw an inference, but

16   it's not a particularly supported one when you have a

17   chronology that relies on one thing happening in the habeas

18   case on April 22nd, as Your Honor has just noted, and then a

19   referral being made on May 2nd and assuming, just because the

20   May 2nd referral happened after the April 22nd hearing, that

21   one somehow caused the other.

22           I think that this -- it shows the issue with relying

23   on inferences from a chronology as objective evidence because

24   there's no other objective evidence pointing to any

25   relationship between those two things.

1          And so the chronology --

2          THE COURT:  I'm a little confused on your argument

3     that DOJ wasn't involved in the habeas petition, so that -- I'm

4     supposed to assume you knew nothing about it.

5          I mean, DHS argues to the habeas Court and DHS is in

6     front of the habeas Court and it's saying that the criminal

7     prosecution moots the habeas petition, which their argument

8     being, I assume at that point, that don't look -- if it had

9     succeeded in that argument, the events at Logan would no longer

10    be -- the jurisdiction of the customs officers would no longer

11    have been the primary issue, right.  You would have been

12    focused on the criminal charges.

13         But DHS is clearly in -- aware of and informed about

14    the criminal case.  I mean, the government -- are you making

15    some kind of wall between justice and what went on at the

16    habeas court?

17         MR. HOLCOMB:  Only in the sense, Your Honor, that it's

18    the U.S. Attorney's Office that made the decision to charge

19    this case and the -- the inquiry here as to vindictive

20    prosecution is whether there was any retaliation on the part of

21    those who made the charging decision.

22         And so I'm not making an argument about some greater

23    wall or denying any sort of awareness that DHS, as a party in

24    the habeas suit, had about the criminal case.

25         But this is where I go back to the point that, you

1     know, what this shows is interplay between the cases, not

2     causality or connection and certainly not any objective proof

3     that the U.S. Attorney's Office only took up this case or in

4     large part took up this case in order to thwart the habeas

5     proceedings as the defense suggests.

6          And I think that when Your Honor considers the

7     record --

8          THE COURT:  I'm just trying to figure out if you're --

9     listen.  I was presented with the complaint.  It had nothing in

10    it about all of these other events, you know, but the

11    affidavit, that went with the criminal complaint here, so do I

12    look at the actions of the government in -- as a broader

13    entity, or do I need to -- I don't know the answer to this --

14    do I need to focus just on the U.S. Attorney's Office in Boston

15    on why they brought the prosecution?

16         MR. HOLCOMB:  *Bucci* says that the Court needs to focus

17    on those who made the charging decision, and I acknowledge that

18    there is case law in which that is -- that question is resolved

19    to encompass, you know, situations where there may have been

20    pressure from another government body, but that's -- that's

21    where there's been evidence of that, objective evidence of

22    that.

23         THE COURT:  And that's what he's seeking.  He's

24    seeking, right, the communications between the entities that

25    led to the -- the decision to request a criminal prosecution.

1          MR. HOLCOMB:  He's seeking that, but *Bucci* also

2     requires him, first, to show some objective evidence that that

3     occurred, and besides inferences from a timeline that the

4     defense asks the Court to draw, there is no objective evidence

5     that that's what occurred here, and so under, you know, the

6     guidance from *Bucci*, the Court should look to those who made

7     the charging decisions.  In this case, that was the U.S.

8     Attorney's Office.

9          And I want to go back, Your Honor, to what is the

10    record that the Court considers, and just -- you know, that

11    includes what the allegations are, and I just want to address

12    how those tie in to those material prosecutorial factors that

13    the First Circuit said are entirely permissible prosecutorial

14    considerations.

15         They are in the selective prosecution context, but as

16    we know, selective and vindictive prosecution analysis is

17    fairly similar.

18         So what the record, you know, also contains is that

19    what Ms. Petrova is alleged to have done.  She's alleged to

20    have carried unidentified research samples into the country in

21    vials and on slides; some of them were on ice, and she told her

22    principal investigator in advance that she was doing that.

23         The CBP agricultural specialist whose job it is, in

24    part, to assess potential bio threats discovered some of the

25    samples in Ms. Petrova's bag.  At this time, he does not know

 1    what these things are.  She has not declared them, and he

 2    cannot know in that moment what they are just by looking at

 3    them.

 4         And so I just want to reiterate the government's

 5    position that the question isn't -- the question of deterrence

 6    isn't over just when Mr. Fick or the defense says that these

 7    things were nonliving and nonthreatening and nonharmful.  This

 8    is not an all's-well-that-ends-well situation.

 9         At this time, the CBP agricultural specialist does not

10    know what these are, and that's, in part, because Ms. Petrova

11    has acted to impede his ability to do his job.

12         He asked Ms. Petrova whether she was carrying

13    biological materials.  She at first denies it, then she herself

14    identifies the other research samples that she was carrying,

15    those that she had on her person that -- in addition to the

16    ones that the CBP agricultural specialist had already

17    discovered in the bags, and then a review of her phone shows

18    that she had been texting in advance of arriving to the U.S.

19    about getting research samples past customs.

20         And these messages demonstrate that she knew CBP

21    likely would not -- or they at least suggest that she knew CBP

22    would likely not let her in -- come in with the samples,

23    whether they were harmful or not, so she intentionally impeded

24    its ability to do its job.  She made the decision for herself

25    that I'm going to not show -- not let CBP see that I have

1  these.

2           And so the reason I hit these points again is to

3  emphasize this is not the aberration of a case that the defense

4  keeps making it out to be.  The --

5           THE COURT:  The concern is -- as I understand it, is

6  that somehow, then, CBP invalidates her visa and is prepared to

7  send her back to Russia, and there's a question as to whether

8  they have the authority to do that at the airport given this

9  fact -- facts as you've put them forward, right.  You can't

10  ignore those facts in their claim that she's treated

11  differently.

12           MR. HOLCOMB:  Well, the question here is whether she's

13  treated differently in being criminally prosecuted and --

14           THE COURT:  Well, the criminal prosecution claim is

15  that you had a problem with the way things went at Logan and

16  that to avoid an analysis, an in-depth study, of what went on

17  at Logan, the criminal charges were brought to thwart the

18  habeas Court from dealing with the cancelation of her visa and

19  subsequent treatment.

20           MR. HOLCOMB:  Your Honor, I agree that's an allegation

21  here, but it's an assumption.  It's an inference that's drawn,

22  and what I'm pointing out --

23           THE COURT:  Well, then they say that the government in

24  this case offered to defer prosecution if she would

25  self-deport, so I don't know -- I have no idea if any of this

1    is true.  I mean, let's make that clear.  I have no idea what

2    is true here, but there's clearly a connection with what's

3    going on and her status in the United States.

4            MR. HOLCOMB:  I disagree, Your Honor.

5            And what I'm trying to emphasize is that the U.S.

6    Attorney's Office, as a prosecutorial office, has its own

7    separate interests in prosecuting this type of offense as it

8    was committed by Ms. Petrova.

9            And so just because there is also this habeas

10   proceeding happening at the same time does not mean that the

11   U.S. Attorney's Office's prosecutorial decisions are per se

12   related to what is happening in those cases.

13           And the facts -- the allegations, as I've laid them

14   out, explain why the prosecution has a clear interest in

15   prosecuting a case like this that involved this level of

16   forethought and caused this type of confusion to -- among the

17   people at the airport who are required to be monitoring for

18   biological items.

19           And the facts that there are also civil proceedings, I

20   don't mean to just sweep them under the rug, but what I do mean

21   here is that those don't negate any interest that the U.S.

22   Attorney's Office has in prosecuting a case like this.

23           And so it's easy to see that these two things are

24   happening at the same time and conclude that there's a

25   connection, but what the defense is required to show is some

1   objective evidence that there is a connection, that those who

2   made the charging decision were motivated by animus or

3   retaliation for what she was doing in the civil case.

4          And the mere fact that they were happening at the same

5   time and that there is some interplay there is not enough in

6   terms of amounting to objective evidence for being entitled to

7   further discovery into that allegation.

8          THE COURT:  Thank you.

9          MR. FICK:  Just a few responsive points, Your Honor.

10  First, on the issue -- Your Honor's right that there was an

11  offer to self-deport if she would -- defer prosecution in

12  exchange for self-deportation.  If the Court wants sworn

13  information or documents on it, we can provide it.

14         THE COURT:  It's in the papers.

15         MR. FICK:  It's in the papers.

16         So the issue here -- I mean, I think what the

17  government is trying to do is to say, okay, the conduct was

18  really bad here, and if you look at what the U.S. Attorney's

19  Office did in isolation, there was a basis to bring the charges

20  and you should look no further.

21         And I think that is a kind of artificial isolation of

22  the factual record here that just doesn't withstand scrutiny.

23  It's a kind of -- like, it's a kind of almost laundering of the

24  prosecution decision, right.

25         I mean, I think what the record suggests, what the

*Abrego Garcia* case suggests, is that what is happening here is
that the White House, DOJ, DHS are, sort of, using U.S.
Attorney's Offices -- local U.S. Attorney's Offices as chess
pieces to, like, make a move in some overall scheme or effort
to promote their own interests, right.

And so to suggest that as long as what Ms. Petrova did
is allegedly really bad and, like, you know, distinguishable
and worse than what other people did -- and, by the way, those
are all disputed facts; I mean, among other things, the
discovery we have gotten, for example, of the audio and video
of the airport contradicts what a lot of the reports say about
what she supposedly said and what was said to her, so put that
aside; I mean, those are factual things for another day -- even
if she committed a really bad version of this crime, it is
still unconstitutional to prosecute her for a vindictive reason
or on a selective basis, right.

The point isn't what she did.  It's why the
prosecution is being brought and whether it is vindictive or
selective.

And the connective tissue we have here is that, you
know, we know this was not just like a sui generis decision of
the Boston U.S. Attorney's Office to prosecute the case.

We know from Agent Goldsworthy's testimony at the
probable cause hearing that this all began with a referral from
DHS headquarters to a special agent of HSI on May 2nd.  That is

1    what set the ball rolling and became a prosecution in this

2    district.

3            So you can't sort of, you know, hermetically seal the

4    prosecution of this district and say, well, everyone here is

5    well-intentioned and they had a basis to do it, when, in fact,

6    like, you're sort of leaving out the but-for cause of all that

7    is happening, and that came out of DHS headquarters in D.C.,

8    you know, and based on what we, kind of, want to understand,

9    right, who is -- who is -- who is the driving force moving

10   these chess pieces, right?  Is it the White House?  Is it DOJ?

11   Is it Kristi Noem?  Is it somebody else at DHS or CBP that

12   doesn't want scrutiny of what happened here?  That's where this

13   began, with an HSI headquarters referral on May 2nd.

14           Now, you know, if I said that -- you know, if I said

15   in my -- in my presentation here that the U.S. attorney in

16   Boston made an argument in Vermont, no, I didn't mean to say

17   that.

18           But the United States Government, DHS in Vermont made

19   an argument that there is no jurisdiction because there's this

20   criminal case going on here in Boston.

21           The issue isn't who said it.  It's what that tells you

22   about the motivation for why this all happened in the first

23   place.

24           I mean, habeas Court starts to do stuff to

25   Ms. Petrova's benefit.  It's going to be looking into this,

1    sets a hearing.  Within, like, a week there's an investigation

2    initiated by DHS headquarters, then there's a criminal charge

3    made just before the hearing announced on the day of the

4    hearing, and then within a week of -- week or so, 10 days of

5    the hearing the government's in there arguing -- the

6    government, somebody from the government, that, oh, yeah,

7    there's a criminal case now so, you know, we're all done here;

8    this is all moot, right.

9            That's the story, and you can't, sort of, hermetically

10   seal or look at one piece in isolation and say, oh, well, that

11   piece looks okay so we're all -- we can all just go home.

12           And I think the same kind of argument is what the

13   government winds up using on the selectiveness issue also.  I

14   would argue selectiveness is a bit of a trickier, maybe a

15   harder showing than vindictiveness is, and they are separate.

16           On selectiveness, the government says, well, you know,

17   there are all these things about Ms. Petrova's case that make

18   it different and so that's why she was prosecuted.

19           And I think Your Honor is exactly right, I mean, even

20   if maybe, you know, that makes it distinguishable, it still

21   raises the question that is commenced by the expert testimony

22   in the Vermont case, that, like, even if what she did was,

23   like, different or maybe a little bit worse in some way, which

24   is disputable, nobody gets prosecuted for this stuff, certainly

25   not in the way she was, so that's at least some evidence on the

1    selectiveness points that I think gets us over the hump of at

2    least some discovery.

3            So -- and, you know -- and, you know, the Eiffel Tower

4    example, I don't think that's -- that's not, I think, the class

5    you would compare her to, right.

6            And the other problem we have is that what goes on in

7    CBP at Logan Airport is a black box.  There is no, like,

8    information that's otherwise accessible to us at this

9    preliminary stage to even make the comparison, so really the

10   best we can do is the expert testimony to say, this is weird;

11   this is sui generis; this never happens, right.

12           It's not, like, say, a case -- if there were a federal

13   prosecution, say, of a trade secret criminal violation and we

14   want to say that our client is being ethnically profiled; he's

15   Asian American and only Asian Americans are getting prosecuted

16   for trade secret thefts, we don't know what else, there we

17   would have data.  We could look at all the civil trade secret

18   cases that are brought and see what the surnames are of the

19   people in those cases and then compare those statistics to who

20   gets prosecuted for those, right.  There's actually a way, at

21   least, for the defense to make a somewhat prior showing.

22           But what happens at Logan Airport it's a black box,

23   but I think we can certainly infer just from personal

24   experience that, you know, putting aside Eiffel Towers, people

25   come in with stuff, meat, animals, fruit.  They don't

1    necessarily get prosecuted for that even though, I think the

2    evidence would show, that, like, an animal or a piece of meat

3    is probably much, much, much more dangerous than the fixed --

4    the fixed, inert model unliving samples that Ms. Petrova

5    brought in.

6          So, you know, the debate about what's the group and

7    how you compare and is this really worse or not, that's, sort

8    of, a debate for another day, but I think the initial showing

9    at least we may need it for discovery, I think we've cleared

10   that hurdle pretty clearly.

11         MR. HOLCOMB:  May I just respond to a couple points,

12   Your Honor?

13         First, just on the similarly situated group question,

14   I'm sorry, I did not have this readily handy earlier, but the

15   *Lewis* case, its specific example the defense claimed that

16   the -- that he was -- the defendant claimed that he was

17   prosecuted based on his race and religion, that he was

18   African-American Muslim, and that that was, therefore, the

19   similarly -- that was the class of similarly situated offenders

20   that he was to be compared against.

21         And the Court disagreed with that and denied his

22   discovery motion and applied a -- determined that the pool of

23   offenders situated similarly to the defendant consisted of

24   non-African Americans and/or non-Muslims who had committed

25   multiple misrepresentation offenses in connection with

1   firearms, paperworks, who posed a danger of violence, and who

2   may have had links to terrorism which were three

3   characteristics that applied to the defendant in *Lewis*.

4        And so I point that out just to show the level of

5   specificity that goes into the analysis of who's actually

6   similarly situated in deciding whether somebody's been

7   selectively prosecuted.

8        Going to Mr. Fick's point about it's hard to obtain

9   evidence in support of these claims, that may be the case that

10  in some cases it is hard to obtain evidence to meet the

11  standard for discovery.

12       But that doesn't change what the standard for

13  discovery is for either selective or vindictive prosecution,

14  and it doesn't enable the Court to draw inferences or accept

15  inferences in place of the objective evidence that's required.

16       And so Mr. Fick suggests that -- I would say

17  speculates that there was all these things going on at the

18  higher levels of government that caused our office to prosecute

19  this case and that must have been the case because he alleges

20  we see it elsewhere and so -- so that's evidence of

21  vindictiveness.  None of that is objective evidence that

22  entitles the defense to further discovery into that claim.

23       THE COURT:  I'm going to assume that you're going to

24  want a written decision on this.

25       MR. FICK:  I think -- I don't mean to create more work

1    for the Court, but I think, as Your Honor has heard and I think

2    Your Honor has even indicated, there's some complex and

3    interesting things going on here, so yes.

4         THE COURT:  Yes.  So it will take me a little while,

5    but I will tell you I am going to allow some discovery.  I do

6    think that this is an exceptional case.

7         Everybody's quoting cases that have more traditional

8    crimes and more traditional chronologies.  I think there is a

9    clear, strong implication of the interrelatedness between the

10   habeas proceedings and the criminal proceedings here.

11        I think there's been a strong enough showing that the

12   government brought criminal charges to thwart or retaliate

13   against Ms. Petrova's exercise of her rights to challenge her

14   immigration -- her treatment as it -- as someone in the United

15   States with a visa.

16        I find it as objective evidence the habeas Court found

17   that she had put forth sufficient evidence that the immigration

18   proceedings were initiated for an improper purpose and the

19   failure to declare items is not grounds for canceling a visa or

20   inadmissibility, and that without even processing her for

21   failure to declare a violation initiated criminal proceedings

22   and that the CBP had exceeded its authority.

23        There seems to be -- the Court was presented with

24   hearings and affidavits and evidence, and I find that, for

25   discovery purposes, that finding by the other Court is

1    persuasive.

2            I think what the government is arguing here, as

3    Mr. Fick actually put it so well, it's an artificial isolation

4    of facts.  I think the chronology has to go back to the fact

5    that this prosecution at the -- this treatment at Logan was

6    questionable from the beginning.

7            I find that while chronologies are not the end all and

8    be all, there is evidence that I can consider, and the fact

9    that the criminal prosecution was not initiated until a hearing

10   date had been set and that the criminal complaint was brought,

11   I believe, late on a Friday afternoon before the Monday hearing

12   or Tuesday hearing; I think the 12th was a Friday, maybe not; I

13   may be off a day, but it was late in the day that the criminal

14   proceeding was brought on the eve of the habeas hearing is

15   significant.

16           I think that there's a strong correlation -- I draw no

17   inferences for or against the actions of this U.S. Attorney's

18   Office of the individual assistant U.S. attorneys.  This

19   appeared on the paper to be a straightforward case of

20   environmental concern, let me put it that way, but there were

21   clearly a lot more facts going on and that I think the sequence

22   is important.

23           And I think the fact that DHS argued that -- I think

24   there are -- I'm sorry -- this is not very articulate, but at

25   the beginning even at Logan, she was offered the right to

1  self-deport.  DHS then argues that the hab should stop because

2  of the criminal proceedings.

3         While these proceedings are going on, the defendant

4  is, again, offered the opportunity to self-deport.  It's hard

5  to ignore the fact that there's a connection between the

6  criminal proceedings and her status in the United States.

7         I think I've already mentioned the May 12th date to me

8  just is a red flag that it is connected to the May 14th

9  hearing.

10         I will make this all clearer, and I do think that

11  we're all on the same page on the standards to be applied.  I

12  appreciate the briefing, and I appreciate the arguments.  I

13  will try to make it articulate.  It will take me a little while

14  to get the decision out, but there will be some discovery here.

15         And with that in mind, I'm going to ask counsel to

16  take the time while I'm doing my homework to do some more

17  talking among yourselves as to whether the scope of discovery

18  needs to -- can be agreed upon or whether we need further

19  hearing on that.  I don't want to go into that right now.

20  Okay.  All right.

21         MR. FICK:  Your Honor had mentioned a couple of other

22  topics.  I know we've been at this a long time.

23         THE COURT:  Go ahead.

24         MR. FICK:  So the two, I guess, that are -- sort of,

25  the chief ones hanging out there still are the grand jury legal

1    instruction request, which is number 24, and the policies

2    request, which is 27 to 29.

3            And if I'm not mistaken, I don't think the government

4    really addressed the policies request in its papers.  I mean,

5    those are -- I mean, they also actually, I think, go to

6    potential vindictive and selective prosecution issues, but

7    those aren't the real reasons I was asking for those.

8            It was more to be able to, you know, impeach trial

9    witnesses and perhaps also address the constitutional vagueness

10   questions about, you know, what is and isn't a potential

11   subject for -- or, you know, what is or isn't declarable at the

12   border and what actions CBP is going to take on these bases, so

13   those were 27 to 29.

14           The more interesting, I guess, issue that is -- was

15   disputed or joined in the papers was the grand jury instruction

16   issue.

17           THE COURT:  Let me just say the 27 to 29, they

18   included in the vindictive or selective prosecution category.

19           MR. FICK:  Okay.

20           THE COURT:  So I --

21           MR. FICK:  I mean, I think those are more broadly

22   relevant.  I mean, I think those are the kinds of things we

23   look for in many criminal cases where, you know, the conduct

24   and credibility of the people who are interacting with

25   Ms. Petrova at the airport is, you know, an important way to,

1    sort of, assess and impeach, where appropriate, that conduct as

2    to see what are the policies and procedures, what are they

3    supposed to do, what -- you know, and how is their discretion

4    guided.

5        And it has a separate additional relevance here

6    because I expect we'll be making a dispositive motion regarding

7    the substantive charges, especially the smuggling charge, on,

8    sort of, a due process notice argument that how is -- you know,

9    what are the contours of what one is required to declare or not

10   declare and what notice is given about that and what criteria

11   do government agents act on when deciding how to address that,

12   so I think there were, sort of, different reasons for relevance

13   in addition to vindictive prosecution for those three requests.

14       Although, I mean, maybe if it's part of the

15   vindictive -- you know, if we're going to get discovery on this

16   anyway for vindictive prosecution, maybe it comes up as a wash.

17       THE COURT:  Well, I'll let the government respond in a

18   minute.  It did seem to me that they were producing copies of

19   all signage --

20       (Crosstalk.)

21       MR. FICK:  Yeah --

22       THE COURT:  -- and --

23       (Crosstalk.)

24       MR. FICK:  -- the wall signage, yes, we've gotten

25   those, and I think there's still a video that we're expecting

1    or something.  That one, I think, is sort uncontroversial now,

2    but I think the 27 to 29 were more the policies, if I'm not

3    mistaken, right, the -- 27 to 29 are all written policies or

4    procedures concerning, you know, border inspection, guidance to

5    CBP about how to refer things for criminal prosecution and then

6    policies and procedures about the K9.

7         So, you know, I think those have broader relevance to

8    the case if it goes to trial in terms of the cross-examination

9    of the government's witnesses and potentially a due process

10   notice argument at least as to some of them.

11        THE COURT:  Then I'm going to ask the government to

12   look at those separately even if you're still challenging --

13   I'm assuming you're going to challenge the production of

14   documents on the vindictiveness and selective prosecution,

15   those we'll deal with as 16 to 21.

16        MR. HOLCOMB:  Yes, Your Honor.  Just so you know, I

17   think, you know, the government would just ask for an

18   opportunity to assess, in light of the Court's order, how

19   narrowly or broadly the Court intends to allow discovery.

20        I don't know if the Court anticipates looking request

21   by request and saying this falls under the category of a narrow

22   vindictive discovery -- or vindictive prosecution discovery

23   that the Court will allow or what, but I think at this point,

24   that's still to be seen, and so the government would request an

25   opportunity to respond.

1          THE COURT:  So I guess what I'm asking you to do is

2     look at 27 to 29 as a non -- as separate categories exclusive

3     of the Court's ruling on selective and vindictive prosecution

4     and see if you still object to the production of those

5     documents.  Okay.  And 16 to 21, we're going to assume, are the

6     ones that are clearly at issue here.

7          What I anticipate is having you -- giving you the

8     opportunity to talk, let me know whether we still have an issue

9     of scope, but once I issue my decision, I expect to have you

10    come back in, and we can deal with it item by item if that's

11    still an issue or not.  I don't know, but that's why I'm giving

12    you a heads up so that you can see if you can agree on the

13    scope assuming that my order allows them discovery.  Okay.

14         So that's important, and I hear you, and I will

15    include 27 to 29 both -- both as separate categories and as

16    part of the ones at issue today.

17         MR. FICK:  And then as to the grand jury instructions,

18    you know, I think a lot of the, sort of, boilerplate case law

19    the government cites about grand jury secrecy, I mean, is well

20    placed, but it's about, sort of, witnesses and testimony in

21    evidence not about the legal instructions.

22         And I think Judge Burroughs' decision on that is quite

23    persuasive, and there are some others that we cite also about

24    defense access to jury instructions.

25         And there are a couple reasons why it's particularly

1    important here.  One of them is in -- especially in a situation

2    where at the probable cause hearing the government agent with

3    decades of experience has difficulty defining terms at issue in

4    the criminal statutes charge, you know, you may be -- the old

5    saying that you can get a grand jury to indict a ham sandwich

6    may be true, but I think we really need to know what

7    instructions were given to the grand jury here about what

8    constitutes the crimes.

9         And that's -- so that's true both because of the

10   ambiguities and the lack of clarity even in experienced

11   government agents' discussion of these crimes and where we have

12   this really peculiar record of -- you know, I think the

13   transcript of Mr. Trim's testimony that's in the motion, I've

14   never seen anything like it, right.

15        It's not just that a witness is going to, like,

16   testify off the cuff and, like, go off on a tangent.  He is

17   trying to provide context to his answer to government questions

18   and he's trying to answer questions from grand jurors and he's

19   getting cut off.  That's very unusual.

20        And that's another, sort of, piece of, you know, in

21   this unusual proceeding why we think insight into what

22   instructions were given to the grand jurors and whether those

23   were legally appropriate are relevant, interesting, and there

24   shouldn't be any barrier, we don't think, or any special

25   showing needed for that production which I think was consistent

1    to Judge Burroughs' ruling which I thought was persuasive.

2         MR. HOLCOMB:  Your Honor, it's not consistent with

3    Judge Burroughs' ruling because what the defense's motion

4    leaves out is what she ultimately did in that case.

5         She -- the defense excerpts her view on why it's less

6    important to show a particularized need for legal instructions,

7    but in that decision, she says, but against the weight of First

8    Circuit precedent and the facts here, I will not find -- I will

9    not disregard the requirement of a particularized need.

10        And so even the -- the best case for them comes out

11   the other way, and the Court here should not disregard the

12   requirement in this circuit and in this district for a

13   particularized need for disclosure of legal instructions to the

14   grand jury.

15        And is there a particularized need here?  There isn't

16   one that's been articulated.  There's no alleged defect in the

17   indictment suggesting that the grand jury may have been

18   instructed on a particular legal term the incorrect way.

19        I really do have to take issue, again, with Mr. Fick's

20   continued mischaracterization of the special agent's testimony.

21   I think the motion mischaracterizes what the transcript shows.

22        This Court sustained objections at the probable cause

23   hearing when Mr. Fick tried to ask the witness for legal

24   definitions or legal conclusions.  That happened multiple times

25   with multiple different terms.

1           And, in any event, it's all beside the point because

2   the special agent was not the one who instructed the grand jury

3   on the legal elements of the offenses and so on.

4           And so any bones that the defense has to pick still

5   with Special Agent Goldsworthy's testimony really is irrelevant

6   to the legal charge, and Mr. Trim's testimony in the grand jury

7   is also irrelevant to the legal charge.

8           We, obviously, disagree on the defense's

9   characterization of what happened and what he was supposedly

10  not allowed to put out there.

11          I think the transcript actually shows that he was

12  trying to give -- give remarks not tied to any question, and

13  it's unclear how the defense says that whatever it was that he

14  was going to say is somehow relevant at all to the legal

15  charge, let alone exculpatory, as the defense claims, but, in

16  any event, there's no real connection between Mr. Trim's grand

17  jury testimony and the legal instructions here.

18          THE COURT:  So the only question that I have is that

19  they -- the testimony at the probable cause hearing was

20  confusing.  And at the end, the government asked for more time

21  to brief some of the elements, one of the elements, of the

22  smuggling charge.

23          And while that -- before that briefing took place, the

24  indictment took place, so we didn't continue with that issue,

25  so there were elements that were in dispute or undefined at the

1    conclusion of the probable cause hearing.

2            MR. HOLCOMB:  Your Honor, I agree that there -- excuse

3    me -- were areas of confusion from the probable cause hearing.

4    I can tell you what one of them -- what caused one of the areas

5    of the confusion, which is that --

6            THE COURT:  Me?

7            MR. HOLCOMB:  No.  No, Your Honor.  It was actually an

8    error -- a clerical error in the complaint affidavit because

9    the -- while it's clear from the complaint affidavit that it

10   charged smuggling under one section of the statute, the

11   language at the end -- or, I guess, the citation at the end

12   cited a different section of the smuggling statute which

13   actually involved or made reference to defined terms and legal

14   concepts that are just irrelevant to --

15           THE COURT:  It was -- yes.

16           MR. HOLCOMB:  -- what the smuggling offense actually

17   was.

18           THE COURT:  It became clear that that was different.

19           MR. HOLCOMB:  So that was one of the issues that the

20   government asked to be able to clear up, but then, based on the

21   posture of the case, went forward and obtained an indictment.

22           But that issue is cleared up in the indictment.  The

23   indictment clearly addresses which section of the smuggling

24   statute is charged, and so I would suggest that was one area of

25   confusion.

1          And the other, Your Honor, is the significance that

2     was placed on the term "biological materials."  There was a lot

3     of questioning that suggested that biological materials was

4     some statutory or regulatory term that had statutory or

5     regulatory importance to the criminal charge.  And the

6     government made clear then and makes clear again now that

7     there -- there's no legal term biological materials that's

8     relevant to the criminal charges here.

9          Where it comes in is just the factual question of it's

10    alleged that the CBP agricultural specialist asked Ms. Petrova,

11    are you carrying biological materials, and she initially denied

12    it.

13         THE COURT:  Well, isn't that relevant to the false

14    statement charges?  But, if I remember correctly, it's an issue

15    as to whether or not they had to be declared, and if the

16    statutory definition applies, then they might not have to have

17    been declared.

18         MR. HOLCOMB:  That's not quite correct, Your Honor,

19    because the declaration requirement applies to all articles is

20    the legal term, and so --

21         THE COURT:  Then we're back to the magnets.  Are we

22    back to the magnets?

23         MR. HOLCOMB:  We're back to the magnets.

24         And so -- so, you know, the requirement to declare

25    what it was she was carrying didn't depend on whether they were

1    or weren't biological materials.

2         Your Honor's correct that it is narrowly -- the words

3    biological materials are narrowly relevant to the false

4    statement charge in this indictment because that's the charge

5    that alleges that Ms. Petrova falsely denied carrying

6    biological materials when asked.

7         But I would just suggest that I think that got too

8    much attention at the probable cause hearing, more attention

9    than its relevance to the criminal charges, and that's another

10   reason why there was some confusion there.

11        THE COURT:  Let me just ask you this -- and I'll let

12   you talk, Mr. Fick, in a moment -- but is there any -- other

13   than the general concerns about privacy and confidentiality of

14   the grand jury, is there anything in particular with respect to

15   charges to the jury that require any extra concern about

16   confidentiality?

17        MR. HOLCOMB:  It's the ordinary concern that requires

18   a particularized need here.

19        THE COURT:  Okay.

20        MR. HOLCOMB:  And so I think the answer is really what

21   is permitted under the prevailing precedent, and even the

22   *Facteau* -- or *Facteau* case of Judge Burroughs that the defense

23   cites did not disregard the requirement for a particularized

24   need, and there is no -- there's no argument made here

25   that's -- that's connected enough to any alleged misinstruction

1    of the grand jury that amounts to a particularized need here.

2           THE COURT:  Doesn't she say in that case -- maybe I

3    have the wrong case -- but doesn't she say it's no longer an

4    issue because we're now at the end of the criminal proceedings

5    and I would have ruled otherwise if I had dealt with it before

6    the trial?

7           MR. HOLCOMB:  I don't know if --

8           THE COURT:  Do I have the wrong case?

9           MR. HOLCOMB:  I think, you know, there were a couple

10   of reasons why she says she is not granting or not compelling

11   disclosure of those materials, but one of those was that her

12   view, as she spelled out in that case, is not consistent with

13   prevailing First Circuit precedent, and in our brief and the

14   opposition --

15          THE COURT:  You do cite her subsequent case.

16          MR. HOLCOMB:  I do cite her subsequent case, and, not

17   only that, it's on page 17, Your Honor, but I cite two or three

18   other cases within this district noting *Facteau* but continuing

19   to find that a particularized need is required even for just

20   the legal instructions to the grand jury.

21          THE COURT:  Mr. Fick.

22          MR. FICK:  So I think the Court has an ample basis to

23   find particularized need, and I'd rest on the papers for that,

24   and just emphasize that, you know, again, the government is

25   trying to slice and dice and isolate arguments about words to

1    make them seem less important than they are.

2         I mean, the definition of biological materials,

3    whether it has a legal definition at the border, is plainly

4    relevant to the false statements charges.

5         The question of -- you know, there are multiple

6    issues, I think, underlying the smuggling charge, but it's

7    really not just about the, sort of, subsections.  A big

8    question there is, like, what is merchandise, and how is that

9    defined -- how is that defined to the grand jury in terms of,

10   you know, what they were told about that charge.

11        And so -- look, I think there's -- there's ample

12   reason here to -- for the Court to order in its discretion

13   release of the grand jury instructions especially where, I

14   mean, the government's even given us Mr. Trim's testimony, I

15   think, because even they would concede there's stuff in there

16   that's exculpatory and so I commend them for that, but, you

17   know, the, kind of, ordinary secrecy concerns here are really

18   absent especially as to the instructions.

19        MR. HOLCOMB:  Your Honor, I think just the indictment

20   itself makes clear that there's no real dispute over any of

21   the -- Mr. Fick just mentioned the definition of merchandise.

22   It's on page 4 in Count 3 of the indictment.

23        It charges her with fraudulently and knowingly

24   importing and bringing into the United States merchandise

25   defined at Title 19, U.S. Code 1401(c) as goods, wares, and

1    chattel of every description.  So there -- there's no -- if

2    that's the -- what the question is, the indictment answers it.

3         MR. FICK:  I mean, I don't think -- I don't know if

4    the -- if the grand jury was just told goods were goods and

5    chattels in every description, that's interesting.

6         I mean, I think that in itself doesn't really answer

7    the question.  I mean, it's a definition using words that also

8    have legal meaning and definition and may, sort of, belie the

9    underlying, sort of, commercial connotation of merchandise as a

10   matter of plain language, and just knowing what the grand jury

11   was charged here is important.

12        THE COURT:  I will take this under advisement as well.

13        MR. FICK:  Thank you, Your Honor.

14        THE COURT:  As for the sufficiency of the responses to

15   the other request, Mr. Holcomb, do you want to address that?

16   Do you want the opportunity to talk to each other about it?

17        MR. HOLCOMB:  I would just note, Your Honor, that the

18   government's aware of its responsibility to look beyond just

19   what's, like, literally in its own files, and so the

20   government's responses reflect its awareness and compliance

21   with -- with that obligation.

22        MR. FICK:  And I think as to those requests, Your

23   Honor, I don't have a problem with that representation.  I

24   think those issues largely have been resolved.  If something

25   further comes up, we'll talk about it among ourselves and only,

1    if necessary, bring it to the Court.

2              THE COURT:  Okay.

3              MR. HOLCOMB:  Your Honor, I believe one of the other

4    agenda items for today was going to be scheduling --

5              THE COURT:  Right.

6              MR. HOLCOMB:  -- dispositive motions.  I don't know if

7    Your Honor wants to defer that until after a written decision

8    on this motion.

9              THE COURT:  So why don't I hold this -- why don't I

10   schedule something for -- I think our excludable time runs out

11   today.  I think this is the last date that we had --

12             MR. FICK:  We certainly don't object to an exclusion

13   of time.  I would just note I am starting a trial on March 2nd

14   for which I am now frantically preparing that's going to be,

15   sort of, all-consuming for a while, so I'm not in a position to

16   do dispositive motions for the immediate future anyway.

17             THE COURT:  Okay.  Why don't -- I'm going to set a

18   status conference for -- where are we -- for mid-March, and

19   hopefully by then you will have my decision.

20             MR. FICK:  I just -- if we could wait until the third

21   week of March.  Judge Talwani is sitting 9 to 4:30 every day

22   for the first two weeks, so if we're still going -- I think the

23   third week hopefully we're done.

24             MR. HOLCOMB:  And, Your Honor, sorry to complicate

25   things, the third week I'm away, and so I suppose that means

1    the fourth week.

2              MR. FICK:  That's fine.

3              THE COURT:  So we're on the week of the 23rd, then.

4              MR. HOLCOMB:  Yes.

5              THE COURT:  Okay.  So what if we do -- what do I have

6    March 26th, Thursday?  The 27th, Friday, the 27th, at 10:30,

7    does that work?

8              MR. HOLCOMB:  Yes.

9              MR. FICK:  Yes, Your Honor.

10             THE COURT:  And I'm just going to set it up as a final

11   status, and we'll see what we cover.  We may deal with further

12   discovery issues if they are outstanding at that point, the

13   scope of specific discovery requests, and we'll deal at that

14   point with the scheduling of dispositive motions, all right, or

15   if it's appropriate, we'll send it to the district judge, and

16   you can schedule it there.  Okay.  Does that work?

17             MR. FICK:  Thank you, Your Honor.

18             THE COURT:  I'm going to exclude the time through

19   then.

20             MR. FICK:  We assent to the exclusion.

21             THE COURT:  Anything further?

22             MR. HOLCOMB:  No.  Thank you, Your Honor.

23             MR. FICK:  Thank you, Your Honor.

24             THE COURT:  Thank you, all.  This was actually very

25   helpful.

1          THE CLERK:  Court is in recess.

2          (Recording stopped at 11:30:00 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4            I, Jennifer Vaillancourt, Registered Professional

5     Reporter and Certified Shorthand Reporter, in and for the

6     United States District Court for the District of Massachusetts,

7     do hereby certify that the foregoing transcript is a true and

8     correct transcript of the audio-recorded proceedings held in

9     the above-entitled matter, to the best of my skill and ability.

10                    Dated this February 14, 2026.

11

12

13                    /s/ Jennifer Vaillancourt

14                    Jennifer Vaillancourt, RPR, CSR

15                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25