UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| KSENIIA PETROVA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:25-cv-00240 |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY; MARKWAYNE MULLIN,[1] | ) | |
| Secretary of the U.S. Department of Homeland | ) | |
| Security, in his official capacity; THERESA | ) | |
| MESSIER, Superintendent, Chittenden | ) | |
| Regional Correctional Facility, in her official | ) | |
| capacity; PETE R. FLORES, Acting | ) | |
| Commissioner, U.S. Customs and Border | ) | |
| Protection; JULIO CARAVIA, Director, | ) | |
| Boston Logan Airport Port of Entry, U.S. | ) | |
| Customs and Border Protection; PAMELA J. | ) | |
| BONDI, U.S. Attorney General; PAUL | ) | |
| CAMPBELL, Warden, Ouachita Correctional | ) | |
| Center, Monroe, LA; KEITH DEVILLE, | ) | |
| Warden, Richwood Correctional Center, | ) | |
| Monroe, LA, | ) | |
| | ) | |
| Respondents. | ) | |

**OPINION AND ORDER GRANTING PETITIONER'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**
(Doc. 117)

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Petitioner Kseniia Petrova moves for partial summary judgment "on a narrow, purely legal issue: whether [U.S. Customs and Border Protection ("CBP")] had lawful authority to cancel Ms. Petrova's visa under 22 C.F.R. § 41.122(e)(3)." (Doc. 117 at 1.) The Federal Respondents

---

[1] On March 24, 2026, Markwayne Mullin became the Secretary of Homeland Security. The Clerk's Office is respectfully directed to substitute him as the Respondent. *See* Fed. R. Civ. P. 25(d).

oppose the motion, arguing that, under the deferential standard accorded agency determinations under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA"), the court should find that Ms. Petrova's J-1 visa was lawfully canceled after she allegedly accepted an offer to withdraw her application for admission to the United States.[2]

## I.    Procedural Background.

On February 23, 2025, Ms. Petrova filed a petition for writ of habeas corpus and complaint (the "Original Petition") for declaratory and injunctive relief with respect to her detention by U.S. Immigration and Customs Enforcement ("ICE"). Ms. Petrova claimed that upon her attempt to enter the United States on February 16, 2025, CBP canceled her valid J-1 visa without legal grounds to do so and illegally detained her. Named as respondents were the U.S. Department of Homeland Security ("DHS"); DHS Secretary Kristi Noem, in her official capacity; and Theresa Messier, superintendent of the Chittenden Regional Correctional Facility, in her official capacity (the "Original Respondents"). In her initial petition, Ms. Petrova requested, in addition to habeas relief, that the court:

> (3) Declare [Original Respondents'] cancellation of Ms. [Petrova's] valid nonimmigrant visa unlawful and Order [Original Respondents] to set it aside;
>
> . . .
>
> (5) Order [Original Respondents] to immediately produce the expedited removal order, record of sworn statement, and associated paperwork to counsel;
>
> (6) In the alternative, order [Original Respondents] to immediately schedule and promptly conduct a credible fear interview;
>
> (7) Award [Ms. Petrova] attorney's fees and costs under the Equal Access to Justice Act, and on any other basis justified under law; and

---

[2] The Federal Respondents note that they "maintain[] that this [c]ourt lacks subject matter jurisdiction to review [Ms.] Petrova's visa-cancellation claim for the reasons previously cited in [their] motion to dismiss the amended complaint[,] ([Docs.] 91, 93)[,]" but "recognize this [c]ourt's contrary ruling." (Doc. 122 at 14 n.2) (citing *Petrova v. U.S. Dep't of Homeland Sec.*, 807 F. Supp. 3d 313, 334-44 (D. Vt. 2025); 8 U.S.C. §§ 1201(i); 1252(a)(5), (b)(9), (e)). The court notes Federal Respondents have preserved their challenge to this court's subject matter jurisdiction.

(8) Grant any further relief this [c]ourt deems just and proper.

(Doc. 1 at 17-18.)

On May 30, 2025, with leave of the court, (Docs. 59, 70), Ms. Petrova filed the First Amended Petition, (Doc. 72), which names as respondents DHS; DHS Secretary Kristi Noem; Pete R. Flores, Acting Commissioner of CBP; Julio Caravia, Director of the Boston Logan Airport Port of Entry; U.S. Attorney General Pamela J. Bondi (collectively, the "Federal Respondents"); Theresa Messier, superintendent of the Chittenden Regional Correctional Facility; Paul Campbell, warden of the Ouachita Correctional Center in Monroe, Louisiana; and Keith Deville, warden of the Richwood Correctional Center in Monroe, Louisiana. In her First Amended Petition, Ms. Petrova amended her claims and requested that the court:

(1) Assume jurisdiction over this matter;

(2) Declare CBP's finding of inadmissibility against Ms. Petrova unlawful and set it aside;

(3) Declare CBP's revocation of Ms. Petrova's valid nonimmigrant visa unlawful, set it aside, and order Respondents to reinstate it;

(4) Declare CBP's cancellation of Ms. Petrova's valid admission stamp unlawful, set it aside, and order CBP to issue a new admission stamp dated February 16, 2025;

(5) Declare CBP's cancellation of Ms. Petrova's Form I-94 Record of Admission unlawful, set it aside, and order CBP to create a new I-94 record of admission under 8 C.F.R. § 101.2 and in accordance with CBP protocol (*see CBP Inspector's Field Manual* § 15.12(b));

(6) Declare that after the inadmissibility finding has been set aside, and the revocation of Ms. Petrova's visa has been set aside, and the cancellation of Ms. Petrova's admission stamp has been set aside, and the cancellation of Ms. Petrova's Form I-94 Record of Admission has been set aside, Ms. Petrova is, by law, lawfully admitted to the United States in J-1 visa status;

(7) Order CBP to conduct a search for any and all records responsive to [Ms. Petrova's] [Freedom of Information Act ("FOIA")] request and demonstrate that it employed search methods reasonably likely to lead to the discovery of records responsive to [Ms. Petrova's] FOIA request;

(8) Order [Respondents] to produce, by a date certain, any and all non-exempt records responsive to [Ms. Petrova's] FOIA request and a *Vaughn* index of any responsive records withheld under claim of exemption;

(9) Issue an Order to Show Cause ordering Respondents to show cause why Ms. Petrova's habeas petition should not be granted;

(10) Order Ms. Petrova's immediate release from custody;

(11) Issue an Order enjoining Respondents from re-detaining Petitioner upon release from criminal custody;

(12) In the alternative, issue an order enjoining Respondents from transferring Petitioner outside of the six New England states of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, [and] Maine;

(13) Award [Ms. Petrova] attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

(14) Award [Ms. Petrova] attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and on any other basis justified under law; and

(15) Grant any further relief this [c]ourt deems just and proper.

(Doc. 72 at 24-25.)

The Federal Respondents moved to dismiss the First Amended Petition on June 27, 2025. (Doc. 91.) The court granted in part and denied in part their motion, ruling, among other things, that Ms. Petrova's FOIA claims must be dismissed for lack of subject matter jurisdiction and that the court also lacked subject matter jurisdiction to declare Ms. Petrova admissible. (Doc. 95.) Ms. Petrova's surviving claims consist of her APA and Due Process claims challenging the lawfulness of the CBP officer's revocation of her visa and the cancellation of her admission stamp. Ms. Petrova does not seek a declaration that she is admissible. The court has previously observed that Ms. Petrova has not asked the court to intervene in any criminal proceedings against her or declare that prosecution retaliatory in nature. *See* Doc. 95 at 43.

On February 20, 2026, the Boston Immigration Court denied Ms. Petrova's request to be admitted on J-1 status, finding Ms. Petrova was not admissible because her visa had been canceled by the CBP officer. The immigration court acknowledged Ms. Petrova's argument that the CBP officer's revocation of her J-1 visa was unlawful, but observed that:

4

neither the [c]ourt nor the parties have been able to identify any authority for the proposition that an [i]mmigration [j]udge can find that a CBP [o]fficer's revocation of a nonimmigrant visa was unlawful. Indeed, the District Court of Vermont, in which [Ms. Petrova] is a party in a parallel proceeding, reasoned that an [i]mmigration [j]udge lacks the authority to make a finding on the legality of [a] CBP [o]fficer's actions. *See Petrova v. U.S. Dep't of Homeland Sec.*, No. 2:25-CV-00240, 2025 WL 2772764[, at *13] (D. Vt. Sept. 26, 2025) ([] reasoning that a determination on the legality of the CBP [o]fficer's revocation or cancellation of the visa would "not be decided in an immigration proceeding"). Therefore, the [c]ourt makes its removability decision under the premise that [Ms. Petrova's] visa was properly cancel[]ed. *See Matter of P-N-*, 8 I&N Dec. 456, 457 (BIA 1959)).

(Doc. 117-1 at 3-4.)

On March 6, 2026, Ms. Petrova moved for partial summary judgment in this court. (Doc. 117.) She also moved for expedited briefing on the motion to allow her to seek reconsideration of the immigration court's decision before her J-1 visa's expiration date of April 26, 2026. (Doc. 118.) The court granted this request on March 10, 2026, finding that Ms. Petrova "(a) 'will be irreparably prejudiced unless [her] motion is heard on an expedited basis;' and (b) 'is not at fault in creating the situation that [she] asserts necessitates resolution of [her] motion on an expedited schedule.'" (Doc. 121) (alterations in original) (quoting *Cardoza v. Bloomin' Brands, Inc.*, 141 F. Supp. 3d 1137, 1142, 1144 (D. Nev. 2015)). Pursuant to the expedited briefing schedule, the Federal Respondents opposed the motion for partial summary judgment on March 23, 2026. (Doc. 122.) Ms. Petrova replied on March 25, 2026, (Doc. 124), at which time the court took the pending motion under advisement.

Although the Federal Respondents' response to Ms. Petrova's motion for partial summary judgment included a renewed motion to dismiss Ms. Petrova's challenge to her criminal prosecution, they recognize that Local Rules 7(a)(3)(A) and (5)(A) apply to that motion and that Ms. Petrova is entitled to thirty days to respond.[3]

---

[3] The Federal Respondents raise this argument under Fed. R. Civ. P. 12(b)(1). Because the Federal Respondents acknowledge Ms. Petrova's entitlement to thirty days to respond and refiled the motion as a separate document, the court does not address the motion to dismiss at this time.

Petitioner is represented by Gregory Romanovsky, Esq. Respondent Messier is represented by Debbie H. Stevens, Esq. The Federal Respondents are represented by Jeffrey M. Hartman, Esq., and Assistant United States Attorney Matthew J. Greer.

## II.    Factual Background.

### A.    The Undisputed Facts.

Ms. Petrova, a citizen of Russia, was initially admitted to the United States with a J-1 status on May 11, 2023. On February 16, 2025, after a trip abroad, Ms. Petrova departed from France, where she had lawful status to remain, and arrived at a port of entry in the United States. Ms. Petrova presented her J-1 visa to a CBP officer at Boston Logan Airport in Boston, Massachusetts. Ms. Petrova's passport included a valid visa to return to and enter France. *See* Doc. 100 at 22. She brought with her certain inert frog embryo samples from the Curie Institute (the "frog embryo samples"). The primary inspection officer generated an I-94 Record of Admission. During primary inspection, Ms. Petrova was asked if she was traveling with biological materials and "gave a negative declaration." *Id.* at 17. A search of her checked bag during secondary inspection "resulted in the discovery of a Styrofoam container with petri dishes" and "loose vials . . . packed in Ziplock bags[]" containing the frog embryo samples. *Id.* The CBP seized the frog embryo samples from Ms. Petrova.

Following a secondary inspection, a CBP officer canceled Ms. Petrova's visa and stamped "CANCEL[]ED-BOS" and wrote "22 CFR 41.122(e)(3)" and "212(a)(7)(A)(i)(I)" on it. *Id.* at 23. It is not clear when within the chain of events the cancellation took place, but it preceded the discussion of the withdrawal of Ms. Petrova's application for admission as the visa cancellation is mentioned therein.

---

It, however, notes that it has previously found Ms. Petrova does not challenge her criminal prosecution in this court other than to argue that the manner in which her request for admission to the United States was processed, which included her arrest and subsequent criminal prosecution, was a violation of Due Process.

During a CBP officer's inspection of Ms. Petrova's request for admission, the following colloquy took place in English[4] while Ms. Petrova was under oath:

**CBP Officer:** You are inadmissible pursuant to INA 212(a)(7)(A)(i)(I) as an immigrant without a valid and unexpired immigrant document. Your true intentions cannot be determined. Do you understand?

**Ms. Petrova:** Yes[.]

**CBP Officer:** You are being afforded the opportunity to willingly withdraw your application for admission [] to the United States in lieu of being expeditiously removed[,] which carries a bar of five years. Would you like to willingly withdraw your application for admission at this time?

**Ms. Petrova:** Yes[.]

**CBP Officer:** Your visa will be canceled. You must obtain a visa prior to future travel to the United States. Do you understand?

**Ms. Petrova:** Yes[.]

**CBP Officer:** Is there anything you would like to add?

**Ms. Petrova:** No.

**CBP Officer:** Would you like the U[.]S[.] [g]overnment to contact the Russian [g]overnment to let them know you are here?

**Ms. Petrova:** No[.]

**CBP Officer:** Do you have fear or are [you] afraid to return to your home country?

**Ms. Petrova:** Yes, I am scared to go back to Russia. I am afraid the Russian Federation will kill me for protesting against them[.]

*Id.* at 12-13. This exchange was memorialized in a sworn statement signed by Ms. Petrova in a Form I-867A: "I have read (or have had read to me) this statement, consisting of [seven] pages (including this page). I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true[,] and correct record of my interrogation[.]" (Doc. 100 at 14.)

Absent from the Form I-867A, but acknowledged by the Federal Respondents in their opposition, is Ms. Petrova's request that she "return to Paris, France, from whence

---

[4] The CBP officer asked Ms. Petrova, "Are you comfortable conducting this statement in the English language?" to which Ms. Petrova answered, "Yes[.]" (Doc. 100 at 8.)

her journey originated." (Doc. 122 at 18) (citing Doc. 72 at 15, ¶ 65.) Also absent from the Form I-867A, but reflected in a transcript of the recording of Ms. Petrova's encounter with CBP, is the CBP officer, after asking Ms. Petrova if she would like to withdraw her application, advising her: "The decision has been made. Regardless, you're not coming into the United States." (Doc. 111-3 at 9.)

A Form I-213 DHS Record of Deportable/Inadmissible Alien describes Ms. Petrova's February 16, 2025 encounter with CBP as follows:

> After being put under oath and completing a sworn statement, [Ms. Petrova] was afforded the opportunity to withdraw her application for admission in lieu of expedited removal, at which time she made a Credible Fear claim. [Ms. Petrova] was then processed for an Expedited Removal-Credible Fear and charged under [Immigration and Nationality Act] Section 212(a)(7)(A)(i)(I) as an intending immigrant without proper documents. [National Targeting Center] was notified of the findings. CBP [task force officer] was contacted and also apprised of findings.

(Doc. 100 at 18.)

On the Form I-275 from Ms. Petrova's encounter with CBP, entitled Withdrawal of Application for Admission/Consular Notification and dated February 16, 2025, the "Visa/BCC Canceled" box is checked and the "Application for Admission Withdrawn" box is unchecked. (Doc. 115 at 4.) The section of the form entitled "TO BE COMPLETED BY ALIEN WHEN APPLICATION FOR ADMISSION IS WITHDRAWN[]" is neither completed, dated, nor signed. *Id.* at 5.

Ms. Petrova was not permitted to leave the United States to return to France but was instead arrested, detained, and placed in removal hearings before being criminally prosecuted by the federal government in the District of Massachusetts with one count of concealment of a material fact, one count of false statement, and one count of smuggling goods into the United States.[5] Ms. Petrova has remained within the United States since February 16, 2025, and is subject to conditions of release issued by the District of Massachusetts.

---

[5] The "prosecution of [an individual] is a matter of public record, of which [a court] take[s] judicial notice." *Shmueli v. City of New York*, 424 F.3d 231, 233 (2d Cir. 2005).

Ms. Petrova is currently subject to immigration removal proceedings. In those proceedings, the federal government is seeking her removal to Russia. *See* Doc. 64 at 19:5–7 (The court: "But in the immigration hearing, you are asking for her removal to Russia, correct?" Federal Respondents: "Yes, Your Honor."). The allegations set forth in her immigration proceedings state:

1. You are not a citizen or national of the United States[.]

2. You are a native of Russia and a citizen of Russia[.]

3. On February 16, 2025, you arrived at Boston Logan International Airport seeking admission on a J-1 non-immigrant visa.

4. *At the time of admission, an immigration officer found you to be inadmissible to the United States due to having undeclared biological material, to wit, frog embryos, in your possession without the proper permits and supporting materials for such material.*

5. You withdrew your application for admission on February 16, 2025.

6. Your J-1 visa was cancel[]ed on February 16, 2025, under 22 C.F.R. 41.122(e)(3).

7. You were not then admitted or paroled after inspection by an Immigration Officer.

8. You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Immigration and Nationality Act: and/or you are an immigrant not in possession of a valid unexpired passport, or other suitable travel document, or document of identity and nationality.

(Doc. 41-6 at 1) (emphasis supplied).

## B.    The Disputed Facts.

Ms. Petrova asserts that the "primary inspection officer placed an admission stamp in her passport[.]" (Doc. 117 at 6.) The Federal Respondents dispute that the officer "physically stamped" Ms. Petrova's passport. (Doc. 122-1 at 2, ¶ 3.) They admitted in their Answer to Ms. Petrova's First Amended Petition, however, that "a CBP officer . . ., during the primary inspection, placed an admission stamp in her passport[.]" (Doc. 104 at 10, ¶ 53.) Whether the officer "physically stamped" or "placed an admission stamp" on Ms. Petrova's passport is immaterial to whether the CBP officer lawfully canceled her

9

visa. *See* 22 C.F.R. § 41.122(d) ("The failure or inability to physically cancel the visa does not affect the validity of the revocation.").

At a February 19, 2026 hearing in this case, the Federal Respondents conceded that "this case really has no disputed facts that are relevant to the visa cancellation at this juncture[.]" (Doc. 114 at 9:23-24).

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). Pure questions of law, such as the one at issue here, may be resolved by summary judgment. *See, e.g.*, *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1039 (2d Cir. 1995) ("Where the issues are purely legal and there is no disputed issue of fact, summary judgment is appropriate."); *N.Y. State Guernsey Breeders' Co-op v. Wickard*, 141 F.2d 805, 810 (2d Cir. 1944) ("Since on this record only questions of law were involved, summary judgment was proper.").

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted).

## B.    The APA.

Under the APA, the reviewing court may "hold unlawful and set aside agency action" if it is:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

(D) without observance of procedure required by law[.]

5 U.S.C. § 706(2)(A)-(D).

"An agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022) (internal quotation marks and citation

11

omitted). "Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) (citing *Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). The agency is further required to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

The scope of a reviewing court's inquiry is not unfettered but, rather, "narrow and deferential[]" and "limited to examining the administrative record to determine whether the agency decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment[.]" *Kakar*, 29 F.4th at 132 (internal quotation marks and citations omitted). Under the APA, "the court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "The whole record consists of 'all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position.'" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 2022 WL 2805464, at *3 (S.D.N.Y. July 18, 2022) (quoting *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989)); *see also Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012) ("Courts have consistently held that the term 'the whole record' refers to the full record that was before the agency, meaning the agency decision-maker, at the time of the decision.").

The Second Circuit permits the "admission of extra-record evidence" where: (1) "there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers[]"; (2) "the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice[]"; or (3) "the district court needs to supplement the record with background information in order to determine whether the agency considered all of the relevant factors." *Safe Haven Home Care, Inc. v. U.S. Dep't of Health & Hum.*

12

*Servs.*, 130 F.4th 305, 324 (2d Cir. 2025) (alteration adopted) (internal quotation marks and citations omitted).

The court "defer[s] to an agency's determinations so long as the agency gives adequate reasons for its decisions, in the form of a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Nat. Res. Def. Council, Inc. v. U.S. EPA*, 961 F.3d 160, 170 (2d Cir. 2020) (alteration adopted) (internal quotation marks and citation omitted). The court reviews legal questions *de novo*. *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020) ("Section 706 of the APA authorizes courts to review *de novo* 'all relevant questions of law' and 'interpret[ations] [of] constitutional and statutory provisions' made by an agency.") (alterations in original) (quoting 5 U.S.C. § 706).

"[R]eviewing courts remain bound by traditional administrative law principles, including the rule that judges generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) (emphasis in original) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)). A court "may not itself supply a reasoned basis for the agency's action that the agency itself has not given." *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) (internal quotation marks and citation omitted). "This reflects the 'settled proposition' that 'in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record.'" *Kakar*, 29 F.4th at 132 (alteration adopted) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019)).

"[I]n justifying its decision[,] the agency need not 'provide written findings about every piece of evidence that it considers.'" *Id.* (alteration adopted) (quoting *Dibble v. Fenimore*, 545 F.3d 208, 219 (2d Cir. 2008)). A court may therefore "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Dibble*, 545 F.3d at 219 (internal quotation marks and citation omitted). If it finds a violation of the APA, a court may order declaratory or injunctive relief. 5 U.S.C. §§ 702, 706; 28 U.S.C. §§ 2201-02; 28 U.S.C. § 1651.

13

## C.     The Tariff Act Governs Customs Violations.

The Tariff Act of 1930, known as the Smoot-Hawley Tariff Act, governs the penalties that may be imposed if a person fails to declare an article on a customs form or upon questioning at the time of the person's entry into the United States. In relevant part, it provides:

(1) Any article which--

> (A) is not included in the declaration and entry as made or transmitted; and

> (B) is not mentioned before examination of the baggage begins--

>> (i) in writing by such person, if written declaration and entry was required, or

>> (ii) orally, if written declaration and entry was not required;

> shall be subject to forfeiture and such person shall be liable for a penalty determined under paragraph (2) with respect to such article.

(2) The amount of the penalty imposed under paragraph (1) with respect to any article is equal to--

> (A) if the article is a controlled substance, either $500 or an amount equal to 1,000 percent of the value of the article, whichever amount is greater; and

> (B) if the article is not a controlled substance, the value of the article.

19 U.S.C. § 1497.

Federal regulations authorize a CBP officer to seize "[a]ny article in the baggage of a passenger arriving from a foreign country which is not declared . . . [and] the personal penalty prescribed by [§ 1497] shall be demanded from the passenger." 19 C.F.R. § 148.18(a). If the article is not seized, "a claim for the personal penalty shall be made against the person who imported the article without declaration." *Id.* Nowhere in the Tariff Act is authorization to revoke a person's visa or other travel document for a customs violation.

## D.     The Authority to Revoke a Visa.

Pursuant to federal law, the authority to revoke or cancel a properly issued visa is generally the exclusive prerogative of the consular officer or the Secretary of State:

14

"After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation." 8 U.S.C. § 1201(i). There is, however, also carefully circumscribed authority for a CBP officer to revoke a visa.

> [F]or a CBP officer to deny entry to a person seeking admission at the border, they need a valid legal basis. *See* 8 U.S.C. § 1201(h) (". . . found to be inadmissible *under this chapter or any other provision of law*") (emphasis added); 8 C.F.R. § 235.1(f)(1) (". . . that the alien is not subject to removal *under the immigration laws, Executive Orders, or Presidential Proclamations . . . .*") (emphasis added).

> The statute distinguishes between the absolute discretion of consular officers and the [limited] legal authority of CBP officers.

*Atanackovic v. Duke*, 399 F. Supp. 3d 79, 88 (W.D.N.Y. 2019) (emphasis supplied). A CBP officer has authority to "revoke a valid visa by physically canceling it[,]" 22 C.F.R. § 41.122(e), but that authority is limited to nine specified grounds:

> An immigration officer is authorized to revoke a valid visa by physically canceling it in accordance with the procedure described in paragraph (d) of this section if:

>> (1) The alien obtains an immigrant visa or an adjustment of status to that of permanent resident;

>> (2) The alien is ordered excluded from the United States under INA 236, as in effect prior to April 1, 1997, or removed from the United States pursuant to INA 235;

>> (3) The alien is notified pursuant to INA 235 by an immigration officer at a port of entry that the alien appears to be inadmissible to the United States, and the alien *requests and is granted permission to withdraw the application for admission*;

>> (4) A final order of deportation or removal or a final order granting voluntary departure with an alternate order of deportation or removal is entered against the alien;

>> (5) *The alien has been permitted by DHS to depart voluntarily from the United States*;

>> (6) DHS has revoked a waiver of inadmissibility granted pursuant to INA 212(d)(3)(A) in relation to the visa that was issued to the alien;

15

(7) The visa is presented in connection with an application for admission to the United States by a person other than the alien to whom the visa was issued;

(8) The visa has been physically removed from the passport in which it was issued; or

(9) The visa has been issued in a combined Mexican or Canadian B–1/B–2 visa and border crossing identification card, and the immigration officer makes the determination specified in § 41.32(c) with respect to the alien's Mexican citizenship and/or residence or the determination specified in § 41.33(b) with respect to the alien's status as a permanent resident of Canada.

22 C.F.R. § 41.122(e) (emphasis supplied). The nine grounds do not include a customs violation or even suspected smuggling of biological samples. The Federal Respondents have not argued otherwise.

If one of the nine grounds applies, the "nonimmigrant visa that is revoked shall be canceled by writing or stamping the word 'REVOKED' plainly across the face of the visa, if the visa is available to the consular officer." *Id.* § 41.122(d). In this case, the word "CANCEL[]ED" was used, which is interchangeable with "REVOKED." *See, e.g., Aziz v. Trump*, 231 F. Supp. 3d 23, 27 (E.D. Va. 2017) (describing how CBP officers revoked plaintiffs' visas by stamping "Cancel[]ed" on them); *Fife v. Barr*, 469 F. Supp. 3d 279, 287 (D.N.J. 2020) (same).

### E.    Whether the Cancellation of Ms. Petrova's Visa Violated the APA.

The Federal Respondents contend that the CBP officer properly found Ms. Petrova inadmissible because she was "an immigrant without a valid and unexpired immigrant document" as her "true intention cannot be determined." (Doc. 100 at 8.) They correctly observe that this court cannot review the admissibility determination. *See Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (ruling that an APA complaint or any determination of admissibility must be dismissed if it presents a challenge to a denial of permission to enter the United States pursuant to 8 U.S.C. § 1252(a)(5)'s jurisdictional bar). At the same time, however, they cite no facts or statutory or regulatory authority that would allow a CBP officer to cancel a visa for a customs violation. They do not claim Ms. Petrova offered contradictory or fraudulent reasons for seeking to enter the United

16

States, nor do they claim her reasons for seeking admission to the United States conflicted with the purposes of her J-1 visa. Instead, the cancellation of Ms. Petrova's visa was because of her alleged lack of candor about the frog embryo samples. The court has requested, and the Federal Respondents have failed to cite, any authority for a CBP officer to cancel a visa on this basis.

Relying on the unlawful visa cancellation based on the alleged customs violation, the Federal Respondents argue in a circular fashion that, because the CBP officer canceled Ms. Petrova's visa pursuant to 22 C.F.R. § 41.122(e)(3), Ms. Petrova became "an immigrant without a valid and unexpired immigrant document[]" at a United States port of entry. (Doc. 100 at 12.) Ms. Petrova then requested an opportunity to withdraw her application for admission. Rather than grant that request, the Federal Respondents arrested her and placed her in removal proceedings to deport her to the country where she fears persecution. The Form I-275 from Ms. Petrova's encounter with CBP was neither completed, dated, nor signed by Ms. Petrova.[6] It thus does not support a finding that Ms. Petrova withdrew her application and was granted permission to return to France. *See, e.g., United States v. Caldera-Lazo*, 535 F. Supp. 3d 1037, 1046 (E.D. Wash. 2021) ("[S]ection entitled 'TO BE COMPLETED BY ALIEN WHEN APPLICATION FOR ADMISSION WITHDRAWN' is blank, suggesting that the immigration officers decided that [the alien] was not a good candidate for withdrawal of application for admission.").

The Federal Respondents next argue that 22 C.F.R. § 41.122(e)(3) only requires that "permission to withdraw the application for admission" be "request[ed]" by Ms. Petrova and "granted" by the CBP officer and it does not require that an actual departure

---

[6] Contrary to the Federal Respondents' characterization, these omissions are not "harmless" "ministerial oversight[s.]" (Doc. 122 at 18.) To the extent they urge the court to undertake a harmless error analysis and only set aside agency action that constitutes prejudicial error, *see* Doc. 122 at 18 (quoting 5 U.S.C. § 706(2) that "due account shall be taken of the rule of prejudicial error") (internal quotation marks omitted); *see also Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 684 (2020) (explaining that "the rule of prejudicial error is treated as an administrative law harmless error rule") (internal quotation marks and citation omitted), in this case Ms. Petrova suffered prejudice because she was arrested and detained and thus any error was not harmless.

17

from the United States take place. (Doc. 122 at 21) (internal quotation marks and citation omitted) (alteration in original); *but see* 8 U.S.C. § 1225(a)(4) ("An alien applying for admission may . . . be permitted to withdraw the application for admission and [must] *depart immediately* from the United States.") (emphasis supplied). They note that "'[p]ermission' merely includes 'the act of permitted; the official act of allowing someone to do something' or 'a license or liberty to do something; authorization.'" *Id.* at 20 (quoting *Permission*, BLACK'S LAW DICTIONARY (12th ed. 2024) (alterations adopted)). They claim Ms. Petrova "received that permission," *id.* at 21, when the CBP officer told her, "You are being afforded the opportunity to willingly withdraw your application for admission [] to the United States in lieu of being expeditiously removed[,] which carries a bar of five years. Would you like to willingly withdraw your application for admission at this time?" and Ms. Petrova responded, "Yes[.]" (Doc. 100 at 12-13.)

The Federal Respondents conflate *offering* Ms. Petrova the opportunity to withdraw her application for admission with *granting* her permission to do so. Asking Ms. Petrova if she "[w]ould [] like to willingly withdraw [her] application for admission[,]" (Doc. 100 at 13), is not the same as granting her request when she answered in the affirmative. Had this taken place, Ms. Petrova would have returned to France where she had lawful status. As the CBP officer recounted, Ms. Petrova was "afforded *the opportunity* to withdraw her application for admission in lieu of expedited removal[]"; *id.* at 18 (emphasis supplied); the CBP officer does not claim permission to do so was actually granted.

Although the Federal Respondents assert that Ms. Petrova interrupted and "detoured" the withdrawal process with her credible fear allegation, this, too, does not explain the outcome. (Doc. 122 at 19.) The Federal Respondents' claim that Ms. Petrova could not return to France because they "could not guarantee that France would admit [Ms.] Petrova," *id.* at 20, is found nowhere in the record. The CBP officer did not express any concern that Ms. Petrova would be unable to return to France, nor is there a factual or legal basis for such a concern. Ms. Petrova had traveled from France with the frog embryos, and she would be returning without them. The Federal Respondents do not

18

deny she had lawful status to enter France. They cite no regulation or agency policy that commands Ms. Petrova's return to Russia, where she feared persecution. Agency policy, set forth in a CBP internal document entitled "Inspector's Field Manual," instructed that:

> [a]n alien who is permitted to withdraw must depart immediately from the United States, or as soon as return transportation can be arranged. If the alien arrived at an airport or seaport, arrange for departure on the next available transportation either back to the country where the alien boarded the flight or vessel, or to another country if the alien is entitled to enter that country.

INS Inspector's Field Manual § 17(d), available at Westlaw, FIM-INSFMAN 17.2, 2007 WL 7710869.[7] The court thus agrees with Ms. Petrova that the CBP officer's question regarding whether she wanted "the U[.]S[.] [g]overnment to contact the Russian [g]overnment to let them know [of her whereabouts,]" (Doc. 100 at 13), should not have "detoured" her departure, (Doc. 122 at 19), and "had nothing to do with her ability or willingness to return to France." (Doc. 124 at 4.)

The Federal Respondents' further contention that "CBP was unable to place [Ms.] Petrova on a departure flight" because it may have ultimately resulted in her return to Russia is pure speculation. France is a signatory of the United Nations Convention Against Torture. *See Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, UNITED NATIONS TREATY COLLECTION, https://treaties.un.org/pages/viewdetails.aspx?src=ind&mtdsg_no=iv-9&chapter=4&clang=_en (last visited Mar. 30, 2026). There is no evidence that France would have deported Ms. Petrova to Russia, nor is there any evidence that the CBP officer was concerned about that potential. This is the kind of *post hoc* rationalization that does not "reflect[] . . . the agency's contemporaneous explanation[.]" *Kakar*, 29 F.4th at 132 (internal quotation marks and citation omitted).

---

[7] Although the Inspector's Field Manual is no longer the agency's current guidance, courts continue to rely on it when interpreting CBP's policies and procedures. *See, e.g., United States v. Chavarria-Lopez*, 2026 WL 710617, at *6 (D. Mass. Mar. 13, 2026) (evaluating whether it was reasonably likely withdrawal of application for admission would have been granted by consulting the six non-exhaustive factors the Inspector's Field Manual instructs CBP officers to consider); *United States v. Rita-Luna*, 2025 WL 2374201, at *4 (D. Ariz. Aug. 15, 2025) (same).

The undisputed facts reveal that Ms. Petrova's visa was impermissibly canceled because of the frog embryo samples and for no other reason. Indeed, the cancellation took place before she asked to return to France and before she expressed a fear of persecution in her home country. Stated differently, the Federal Respondents cannot justify an unlawful visa cancellation for a customs violation by relying on what transpired after the visa cancellation took place. Even were the court to accept their approach, it would not explain their refusal to allow Ms. Petrova to return to France and their efforts to deport her to Russia.

Ms. Petrova attempted to withdraw her application for admission but was not granted permission to do so. Cancellation of her J-1 visa was therefore not justified by 22 C.F.R. § 41.122(e)(3). There is no other ground that would authorize the visa cancellation by a CBP officer. Revocation of Ms. Petrova's visa was therefore "arbitrary, capricious, . . . or otherwise not in accordance with law[;] . . . in excess of [CBP's] statutory jurisdiction, authority, or limitations[]"; and "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A), (C), & (D). This unlawful action violated the APA, and the CBP's cancellation of Ms. Petrova's J-1 visa must be set aside.

## CONCLUSION

For the foregoing reasons, Ms. Petrova's motion for partial summary judgment is GRANTED.

The court hereby DECLARES that the cancellation of Ms. Petrova's visa:

(1) was "arbitrary [and] capricious"; *id.* § 706(2)(A);

(2) was "not in accordance with law"; *id.*,

(3) was "in excess of [CBP's] statutory jurisdiction, authority, or limitations"; *id.* § 706(2)(C); and

(4) was "without observance of procedure required by law[.]" *Id.* § 706(2)(D).

The court further DECLARES that:

(1) Ms. Petrova's J-1 visa was not lawfully canceled or revoked as of February 16, 2025; and

(2) the improper revocation of Ms. Petrova's J-1 visa is hereby set aside.

20

21

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___7th___ day of April, 2026.

Christina Reiss, Chief Judge
United States District Court